# EXHIBIT 5



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

**CAUSE NO: FSD 155 OF 2022 (DDJ)**

**CAUSE NO: FSD 156 OF 2022 (DDJ)**

IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)

AND IN THE MATTER OF 51JOB, INC.

---

### DIRECTIONS ORDER

---

**UPON** the Summons for Directions of the Petitioner (the **"Company"**) dated 15 June 2022 filed in Cause Number FSD 155 of 2022 (DDJ)

**UPON** the Summons for Directions dated 15 June 2022 filed in Cause Number FSD 156 of 2022 (DDJ)

**IT IS HEREBY ORDERED THAT:**

**A.    Consolidation**

1.    Cause Numbers FSD 155 of 2022 (DDJ) and FSD 156 of 2022 (DDJ) (and any appeals therefrom) be consolidated pursuant to GCR O.4 r.4 and from the date of this order the two matters proceed as one action (the **"Proceedings"**).

2.    The Proceedings go forward bearing the number, title and content of Cause No. FSD 155 of 2022, with the Company as the Petitioner and any dissenters listed in **Appendix 1** (each a **"Dissenter"**, and collectively the **"Dissenters"**) as the Respondents.



3.   For the purposes of appearing, acting or advising in the Proceedings, counsel admitted in either cause are deemed to be admitted in the Proceedings.

**B      Appointment of Experts**

4.   The Company and any of the Dissenters who are represented by a Cayman Islands law firm or who otherwise actively participate in the Proceedings ("**Represented Dissenters**") shall have leave to instruct and call as a witness at trial one expert witness each (the Represented Dissenters jointly and severally to instruct one expert between them) in the field of valuation (the "**Experts**") in order to opine upon the fair value of the Dissenters' shares in the Company as a going concern as at 26 April 2022 (Cayman Islands time) (the "**Valuation Date**").

5.   The Experts shall be appointed by no later than 42 days from the date of this Order, and on that date the Company and the Represented Dissenters shall each advise the other in writing of the identities and contact details including email addresses of the respective Experts so appointed.

6.   The Company and the Represented Dissenters shall have leave to instruct and call, at a hearing following the Court's determination of fair value (the "**Interest Hearing**"), one expert witness each (the Represented Dissenters jointly and severally to instruct one expert between them) to opine on the fair rate of interest for the purposes of section 238(11) of the Companies Act (2022 Revision) (together, the "**Interest Experts**"). For the avoidance of doubt, the same individual may be instructed and called as both an Expert and an Interest Expert. The directions in respect of the Interest Hearing shall apply as follows:

   6.1   If the Company and the Represented Dissenters, or either of them, consider an Interest Hearing necessary, the Interest Experts shall be appointed within 21 days of the date of the Order made upon the Court's determination of fair value of the Dissenters' shares in the Company, and on that date the Company and the Represented Dissenters shall each advise the other in writing of the identities and contact details including email addresses of the respective Interest Experts so appointed.

   6.2   Absent agreement between the Company and the Represented Dissenters at that time, and notwithstanding the provisions of any other direction herein, the Company and the Represented Dissenters shall have liberty to apply for further directions regarding the



exchange of reports and supplemental reports from, and production of a joint memorandum by, the Interest Experts, and in relation to any other matters connected with determining the fair rate of interest.

**C      Confidentiality and Non-Disclosure**

7.     No Expert or Expert's Appointee (being each person whom an Expert appoints to assist them in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Expert Memorandum (as defined in this Order) and any other preparations in relation to the Proceedings) (each an "**Appointee**" and collectively the "**Appointees**"), nor any Dissenter (including their agents, advisers, sub-advisers, representatives, affiliates and service providers and consultants (but excluding Cayman Islands attorneys) (collectively, their "**Representatives**")), shall be given access to the Data Room (as defined below) or permitted to attend a Management Meeting (as defined below) until the Expert, Expert's Appointee or relevant Dissenter and the Company enter into, and exchange, a Confidentiality and Non-Disclosure Agreement in the same or substantially similar form attached to this Order as **Appendix 2**, and no Expert or Expert's Appointee, nor the Company (including their Representatives) shall be given access to documents discovered by a Dissenter until and unless the Expert, Expert's Appointee, or the Company and the relevant Dissenter enter into, and exchange, a Confidentiality and Non-Disclosure Agreement in the same or substantially similar form attached to this Order as **Appendix 2.**

**D      Electronic Data Room and Company Disclosure Procedure**

8.     Within 14 days from 22 November 2022 (the "**Discovery Commencement Date**"), the Company shall instruct a data room service provider to open an electronic data room (the "**Data Room**") and, subject to paragraph 7 above, provide access to the Experts, the Appointees, the Dissenters, and their respective Representatives and legal advisors.

9.     At the same time as the Data Room is opened, the Company shall upload to the Data Room all documents that were made available by the Company to members of the Buyer Group (as defined in **Appendix 3**) via any electronic data room(s) set up for or utilized for the purposes of the merger transaction, and shall also upload the index for such documents (the "**Transaction Data Room Documents**").



10. The Company shall, within the time periods set in paragraph 12, upload to the Data Room all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents set out in Appendix 3 of this Order which were prepared or created in the 5 year period ending on the Valuation Date and which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

11. The Company shall, within the time period set in paragraph 12.4, upload to the Data Room all additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email, WeChat or otherwise) and other materials which are in its possession, custody or power prepared or created in the 5 year period ending on the Valuation Date which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date.

12. The Company shall produce its disclosure on a rolling basis:

    12.1 within 42 days from the Discovery Commencement Date, documents responding to Categories G, M, W, and EE of Appendix 3;

    12.2 within 84 days from the Discovery Commencement Date, documents responding to Category A, C, D, H, and L of Appendix 3;

    12.3 within 126 days from the Discovery Commencement Date, documents responding to Categories N, O, and P of Appendix 3; and

    12.4 within 196 days from the Discovery Commencement Date, all other additional documents in the Company's possession, custody or power relevant to fair value in accordance with paragraph 11 above.

13. The Company and the Represented Dissenters shall comply with the disclosure protocol at **Appendix 5** hereto when uploading documents to the Data Room.

14. Where documents in the Company's possession, custody or power are required to be redacted in order to comply with the laws of the People's Republic of China the protocol set out at



**Appendix 6** shall apply. The Represented Dissenters (or any of them) have liberty to apply for further relief to challenge any redactions applied pursuant to the protocol set out in **Appendix 6** and seek production of non-redacted documents on the basis that the Company is not permitted to redact discoverable information in reliance on the laws of the People's Republic of China and/or that the redactions are not required in order to comply with the laws of the People's Republic of China.

15. Subject to the final sentence of paragraph 35 of this Order, Represented Dissenters who have been given access to the Data Room shall be given full access rights to the documents therein, save that no Represented Dissenters will have the ability to modify documents in-situ within the Data Room; however, all such documents shall be in a form which the Represented Dissenters can download to their own systems either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

16. The costs of and associated with the establishment and maintenance of the Data Room, including the Data Room provider's costs of (i) uploading, processing and hosting the documents added to the Data Room, (ii) producing the Data Room Index (as defined below) and any updated versions thereof, (iii) technical support, including the costs of facilitating any bulk export or download of documents, and (iv) Experts, Appointees, Dissenters and Representatives seeking access to the Data Room, shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the Proceedings.

17. The Company shall, on an ongoing basis whilst the Proceedings are extant, bear the costs of a maximum of 15 access codes per group of Represented Dissenters represented by a single Cayman Islands law firm, and as many access codes as the Experts may require, to facilitate access to the Data Room (such costs ultimately to be costs in the Proceedings). Should any Represented Dissenter require additional access to the Data Room, such Represented Dissenter shall bear the specific costs of such access, and the Company will arrange for such costs to be charged by the Data Room provider to the Represented Dissenter directly. Where a group of Represented Dissenters represented by a single Cayman Islands law firm elect to establish their own Data Room pursuant to paragraph 35, their entitlement under this paragraph shall be reduced to 2 access codes. If the Represented Dissenters as a group



decide to establish their own Data Room, the Company shall only be required to bear the costs of a maximum of 5 access codes for the Represented Dissenters.

18. No Data Room usage report, or any other analysis of any party's usage of the Data Room, shall be run by any party on the usage of another party, its Representatives, legal advisers or its appointed Expert and their Appointees, without that party's express written consent or order of the Court.

**E      Lists of Documents; Translations**

19. The Company will ensure that the documents it uploads to the Data Room pursuant to paragraphs 9 to 12 above and paragraph 22 below will be appropriately indexed in an electronically searchable form (the "**Data Room Index**"). The Data Room Index shall be compiled in a manner which complies with the requirements for lists in Order 24, r.5(1) of the Grand Court Rules (the "**GCR**"). This index shall be updated contemporaneously with any documents being added to the Data Room by the Company. Any changes in the content of the Data Room shall be clearly identified to the  Represented Dissenters at the same time they are made.

20. In relation to the documents which are to be disclosed pursuant to this Order, the Company shall, on or before the dates for compliance with paragraphs 9 to 12 above, and from time to time thereafter as may be necessary, file and serve on the Represented Dissenters a list of documents complying with GCR O.24, r.5 (a "**List of Documents**"). So long as the Data Room Index has been provided in a manner which complies with the requirements for lists in GCR Order 24, rule 5(1), the Data Room Index may be treated as the Company's index of documents in accordance with GCR O.24, r.5(1) and any documents that may fall within GCR O.24, rr.5(2) and 5(3) shall be listed separately in accordance with Form No. 16 of Appendix 1 to the GCR. However, if the Company provides a List of Documents on or before the dates for compliance with paragraphs 9 to 12 above, then that List of Documents shall constitute the Company's list for the purposes of GCR O.24, r.5 in place of the Data Room Index.  Nothing in this Order or in Appendix 2 hereto shall derogate from each party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.



21.  In the event that any party wishes to rely on a document which is not in the English language and a certified English translation is not available, that party shall procure and provide a certified English translation of the document, or any relevant parts of the document to be relied on, at its own cost. An electronic copy of the certified English translation shall be uploaded to the Data Room as soon as practicable.  The costs of any such translations shall be costs in the Proceedings.

**F    Experts' Information Requests of the Company**

22.  Unless the Court otherwise orders, the Company shall upload to the Data Room any additional information, documents (of whatsoever description, whether electronic, hard copy or in any other format), materials and communications (whether by email, or otherwise) which are or have been in its possession, custody or power requested by any Expert for the purpose of preparing their own opinion (Information Requests).  For the avoidance of doubt, if an Expert so requests, this may include documents, communications, materials or information produced after the Valuation Date.  Such requests may be made from the date on which the upload of documents to the Data Room pursuant to paragraph 12.1 is completed until 28 days before the date fixed for the exchange of Expert Reports (as provided for at paragraph 41.3 below). Any Information Requests from an Expert and any responses from the Company thereto shall be in writing and shall be copied simultaneously by email to the other Expert to the email addresses notified in accordance with paragraph 5 above.

23.  The Company shall provide written answers to each batch of Information Requests and shall upload the written answers and any other responsive documents to the Data Room as soon as practicable, and in any event (unless otherwise agreed) within 21 days of receipt of that Information Request.  For the avoidance of doubt, should the Information Request be received by the Company after 5.30 p.m. (Cayman Islands time), this timeframe shall begin to run from 8.30 a.m. (Cayman Islands time) the following Cayman Islands business day.

24.  The Experts' Information Requests shall be made periodically and the Experts shall use their best endeavours to submit only concise and clear questions.



## G  Management Meetings

25. Within 28 days of a request by either of the Experts, unless otherwise agreed or directed by the Court, the Company shall procure that appropriate members of its management team be available to meet with both Experts simultaneously, in person or by way of video link as may be agreed between the Company and the Represented Dissenters, such meeting to be scheduled to take place at a mutually convenient place and time, for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective Expert Reports (a "**Management Meeting**").

26. The number of Management Meetings requested by the Experts shall not be restricted, save that no Management Meetings may be requested by either of the Experts within the 56 days prior to the date on which the Expert Reports are due to be exchanged, and no Management Meeting shall take place within the 28 days following any prior Management Meeting, unless otherwise agreed between the Company and the Represented Dissenters or directed by order of the Court.

27. The Company and the Represented Dissenters shall agree on the time and date, attendees, format (video conference or in person), and (if applicable) location for a Management Meeting.

28. If agreement cannot be reached as to the time or date, attendees, format and/or location of a Management Meeting, the Company or the Represented Dissenters may apply to the Court for directions on not less than 10 working days' notice to the Company or the Represented Dissenters (as appropriate), such matter to be resolved by the Court on the papers unless the Court otherwise orders.

29. Management Meetings shall be conducted in English. If necessary to facilitate efficient and effective participation by any member of the Company's management team, the Company shall arrange for an independent interpreter to be present at Management Meetings. The costs of any interpreter shall be borne equally by the Company and the Represented Dissenters. The Represented Dissenters may, in the alternative, agree to instruct their own interpreter(s) for a Management Meeting, in which case the Represented Dissenters shall bear the costs of their own interpreter(s). The costs of all interpreters shall nonetheless be costs in the Proceedings.



30. Only members of the Company's management team, the parties' Cayman Islands legal advisers, the Experts (together with the Experts' team members), any interpreters (if applicable) and any transcription service providers may attend Management Meetings, save that any Management Meetings held by video-link or held in person but for which it is possible to facilitate such video links may also be attended by representatives of the Represented Dissenters in an observatory capacity on such video link. Each party shall be responsible for the travel, visa, accommodation and other logistical arrangements of its Expert and legal advisors in relation to Management Meetings and the costs thereof shall be costs in the Proceedings.

31. Each Expert shall provide a list of questions and/or topics ("**List of Questions and Topics**") to the Company not less than 14 days prior to the agreed date for a Management Meeting. The List of Questions and Topics shall be copied by email to the other Expert at such time as it is sent to the Company. Any Expert may ask reasonable follow-up questions at such Management Meeting to the extent that they consider it necessary. If an Expert reasonably wishes to raise a new question or topic not included in the List of Questions and Topics, reasonable accommodation shall be made by the Company and agreement to provide a response shall not be unreasonably withheld.

32. The Company shall arrange for Management Meetings to be recorded and a transcript prepared ("**Management Meeting Transcript**"). Both the recording and the transcript shall be circulated by the Company and uploaded to the Data Room by the Company as soon as reasonably practicable thereafter and in any case within 14 days of the relevant Management Meeting. The cost of such recording and transcript shall be borne equally by the Company and the Represented Dissenters, and such costs shall be costs in the Proceedings.

33. Within 21 days of uploading the transcript of a particular Management Meeting, the Company shall be permitted to consider whether there are any errors in the transcript and, if so, explain any such errors to the Represented Dissenters and produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents which demonstrate any such error. Within 7 days of receiving notice of any purported errors and supporting documents, the Represented Dissenters shall confirm their agreement or otherwise to the purported errors that have been identified, and within 7 days thereafter the Company shall circulate to the



Represented Dissenters and upload to the Data Room a copy of the transcript which identifies (a) any amendments agreed between the Company and the Represented Dissenters, and (b) any statements which the Company maintains are erroneous but which the Company and the Represented Dissenters have not agreed should be amended (the "**Reviewed Transcript**") and the supporting documentation relied upon by the Company in support of its position.

34.     To the extent an Expert intends to refer in their Report, Supplemental Report or Joint Expert Memorandum to information in a Management Meeting Transcript they shall identify the passages from the Management Meeting Transcript that they intend to refer to no later than 14 days before the exchange of the relevant report in order to provide the Company with an opportunity to clarify, correct or comment upon the relevant passage, in writing, to the Experts and (if applicable) produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents which demonstrate any error or misstatement. The Expert is not required to explain how or why he/she intends to rely on the Management Meeting Transcript extract(s). The Company shall provide any clarification, correction or comment within 7 days.

**H      Dissenter Disclosure**

35.     Subject to the Company entering into, and exchanging, a non-disclosure agreement in the same or substantially similar form as that contained in Appendix 2, with the Represented Dissenter as a disclosing party and the Company as the recipient, each Represented Dissenter shall, in accordance with paragraph 36 below, upload to the Data Room (or, at the Represented Dissenter's election, by way of an alternative data room) within the period specified in paragraph 12.4 of this Order, documents in its possession, custody or power falling within the categories of documents identified at Appendix 4 of this Order which were prepared or created in the 2 year period ending on the Valuation Date and which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date. Each Represented Dissenter's disclosure in the Data Room (or any alternative data room) shall be available to the Company and the Experts but not to any other Dissenter.

36.     Each Represented Dissenter shall, on or before the date for compliance with paragraph 35 above, file and serve upon the Company a list of documents describing the documents to be provided under paragraph 35 above which are in the Represented Dissenter's possession, custody or power. The list of documents shall be treated as a list of documents in accordance



with GCR O.24, r.5(1) and any documents that may fall within GCR O.24, rr.5(2) to 5(4) shall be listed separately in accordance with Form No. 16 of Appendix 1 to the GCR. Nothing in this Order or in Appendix 5 hereto shall derogate from each party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.

37. The costs of hosting such documents in the Data Room (but not in an alternative data room, which costs shall be borne initially by any Represented Dissenter(s) who choose(s) to use one on an ongoing basis, but shall ultimately be costs in the Proceedings) shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the Proceedings.

38. Paragraphs 13 to 15 above shall apply in the same manner, and with the necessary modifications to give effect to those paragraphs, to the Represented Dissenters' upload of documents to the Data Room (or any alternative data room).

I    **Factual Affidavits**

39. The Company shall file and serve any factual evidence by no later than a date 56 days from the date of uploading its documents to the Data Room pursuant to paragraph 12.4. The Company shall have liberty to apply to extend that date on the grounds that any pending or foreshadowed FDO Application (as defined in paragraph 49 below), or any required document disclosure or deposition resulting from such FDO Application and the uploading of such documents and deposition transcripts to the Data Room, will not be completed in sufficient time ahead of the deadline for service of the Company's factual evidence and the Represented Dissenters reserve all rights to resist any such application. The Represented Dissenters shall file any evidence in response by no later than 28 days of service of the Company's factual evidence upon them. The Company shall file any evidence in reply by no later than 14 days of service of the Represented Dissenters' evidence upon it.

40. Any factual evidence to be relied upon at the hearing of the Petition shall be given by affidavit or affirmation and leave is hereby granted to the Company and the Represented Dissenters to cross-examine any deponent of any factual affidavit or affirmation and the deponent(s) of any such affidavit(s) or affirmation(s) shall attend for cross-examination on the condition that notice requiring their attendance is given 14 days before the CMC (as defined below) or, if the CMC



is dispensed with or the date of the CMC is fixed less than 14 days prior to the hearing of the CMC then the deadline shall be eight weeks prior to trial.

**J      Expert Reports and Joint Expert Memorandum**

41.    Signed reports of each of the Experts (the **"Expert Reports"**) shall be:

    41.1    Confined to the issue of the fair value of the Dissenters' shares as a going concern in the Company as at the Valuation Date;

    41.2    Prepared in accordance with the Rules for Expert Witnesses in the FSD Guide; and

    41.3    Exchanged simultaneously 29 weeks after the date on which documents are uploaded to the Data Room pursuant to paragraph 11 above.

42.    The Experts shall meet at a mutually convenient time, whether in person, by telephone, conference call or video link or howsoever they shall decide and so often as they jointly consider necessary (the **"Experts' Meeting"**), but no later than 28 days after the exchange of the Expert Reports, to discuss the differences between their respective Reports with a view to narrowing the issues between them and producing the Joint Expert Memorandum required below.

43.    A joint memorandum of the Experts (the **"Joint Expert Memorandum"**) recording:

    43.1    the fact that they have met;

    43.2    when and where they met, and that they discussed the Expert issues;

    43.3    the issues on which they agree;

    43.4    the issues on which they disagree; and

    43.5    a brief summary of the reason(s) for any such disagreement,

shall be completed and issued to the Company and the Represented Dissenters by the Experts by no later than 28 days following the Experts' Meeting.



44.	Any supplemental Expert Reports ("**Supplemental Expert Reports**") shall be exchanged simultaneously by no later than 48 days following the issuance of the Joint Expert Memorandum.

45.	The Company and the Represented Dissenters shall each be at liberty to call as expert witnesses at trial their own appointed Expert whose report(s) have been exchanged pursuant to the provisions of this Order.

46.	The Company shall be at liberty to cross-examine the Represented Dissenters' appointed Expert on their report(s) at trial, and the Represented Dissenters shall be at liberty to cross-examine the Company's appointed Expert on their report(s) at trial.

**K**	**Third Party disclosure**

47.	Any party that seeks foreign ancillary relief in aid of these Proceedings, whether by way of third party discovery applications, applications in the United States of America under 28 U.S.C. § 1782, or otherwise,shall, within one business day after serving any such application, notify this Court, and the Company and the Represented Dissenters, of the applications so that the Court can ensure that any foreign ancillary relief can be accommodated in the timetable of these Proceedings.

48.	Each party will disclose to the Company and the Represented Dissenters any and all documents received from any third party or non-party (whether by way of an order of any foreign court or voluntary assistance by the third party) within 7 days of receipt, subject to the Company and the Represented Dissenters taking reasonable steps required in compliance with any protective orders made in any foreign discovery proceedings. Disclosure shall be made in accordance with paragraphs 19 and 20 or 35 and 36 (as applicable).

49.	Any party that seeks a foreign discovery order in connection with these Proceedings, whether by way of third party discovery applications, applications in the United States of America under 28 U.S.C. § 1782, or otherwise ("**FDO Application**"), shall make all reasonable efforts to do so expeditiously, and in any event, shall bring such FDO Application by no later than 42 days after the date on which documents are uploaded to the Data Room in accordance with paragraph 12.4 above.



50.     Neither the Represented Dissenters nor their attorneys, whether local or foreign, shall show, quote from, or summarise any of the documents discovered by the Company in the Proceedings to which the Non-Disclosure Agreement in Appendix 2 to this Order applies and which contain "Confidential Information" as defined in that agreement, to any respondent to an FDO Application ("**FDO Respondent**") or any proposed FDO Respondent (whether as part of an application against an intended FDO Respondent or during a deposition of a FDO Respondent), or otherwise use any such document in an FDO Application, without the consent of the Company or, failing that, leave of this Court, unless:

50.1     the FDO Respondent or proposed FDO Respondent is a custodian/recipient of the document in question; or

50.2     the document in question memorialises or otherwise records a meeting, or portion of a meeting, for which the FDO Respondent or proposed FDO Respondent was in attendance, in which case the Represented Dissenters may freely show, quote from or summarise that document to the relevant FDO Respondent, or otherwise rely upon the document as the basis for a FDO Application against them.

51.     The Company shall not unreasonably withhold its consent to any request by the Represented Dissenters to use additional relevant documents discovered by the Company in the Proceedings for the purposes of any FDO Application.

**L      Case Management, Case Management Conference and Trial Dates**

52.     Unless the Company and the Represented Dissenters otherwise agree, a Case Management Conference ("**CMC**") shall be held on the earliest date convenient to the Court and the Company's and the Represented Dissenters' Cayman Islands legal advisors and counsel after the deadline for exchange of any Supplemental Expert Reports, or in the event that no Supplemental Expert Reports are exchanged, on the earliest date convenient to the Court and the Company's and the Represented Dissenters Cayman Islands legal advisors and counsel once it is confirmed that no Supplemental Expert Reports will be exchanged. The Company and the Represented Dissenters may agree that the CMC be dispensed with provided that the Court does not indicate that a CMC is necessary.



53. The Company and the Represented Dissenters shall, on an ongoing basis while the Proceedings are extant, each pay 50% of the cost of the recording and transcription of any hearings in the Proceedings, but these costs shall ultimately be costs in the Proceedings. The Company and the Represented Dissenters shall agree on the supplier and fee quote prior to each hearing.

54. For convenience only, the deadlines set out in various paragraphs in this Order are tabulated in a schedule attached to this Order as **Appendix 7**. To the extent there is any inconsistency between the terms of this Order and Appendix 7, this Order shall prevail.

55. Save as varied by this order or further order, the practice and procedures set out in the FSD Guide are to be followed.

56. Liberty for any party to apply for further directions in respect of the matters addressed in this Order and any other matters prior to the CMC.

57. Within 28 days of the closing date for factual evidence in accordance with paragraph 39 above, the Company and the Represented Dissenters shall seek to agree a time estimate for trial and thereafter promptly write to the Court to fix the trial dates, with the trial to commence at least 8 weeks after the exchange of Supplemental Expert Reports and subject to the Company's and the Represented Dissenters' counsels' availability.

58. Within five days of the filing of this Order, the Company shall inform the Represented Dissenters of the total number of shares that shall be the subject of the trial of the Petition, and shall inform the Represented Dissenters of any change within one week of such change.

**M    Holiday Blackout Periods**

59. The following periods are dedicated holiday periods to enable the Company and the Represented Dissenters and the legal and Expert teams to take leave should they desire to do so. Time shall not run during these periods for any purpose in relation to this Proceeding, including any task provided for under this directions order and in respect of any correspondence exchanged in relation to this Proceeding:

    59.1    24 December to 2 January;

59.2    Chinese New Year, being seven calendar days from the first Bank Holiday in Beijing for Chinese New Year; and

59.3    National Day Golden Week, being seven calendar days from the first Bank Holiday in Beijing for the Golden Week.

**DATED** this    19    day of   January    2023

**FILED** this    19    day of   January    2023

*David Doyle*

_____

**THE HONOURABLE JUSTICE DAVID DOYLE**

**JUDGE OF THE GRAND COURT**

**APPROVED AS TO FORM AND CONTENT**

*Maples and Calder (Cayman) LLP*

**Maples and Calder (Cayman) LLP**
Attorneys for the Company

*Collas Crill*

**Collas Crill**
Attorneys for the Dissenter numbered 24 to 44 in Appendix 1

*Campbells LLP*

**Campbells**
Attorneys for the Dissenters numbered 48 and 49 in Appendix 1

*Carey Olsen*

**Carey Olsen**
Attorneys for the Dissenters numbered 1 to 23 in Appendix 1

*Walkers*

**Walkers**
Attorneys for the Dissenters numbered 45 to 47 in Appendix 1

# Appendix 1

## List of Dissenters

| S/n | Dissenter / Member | Address |
|-----|--------------------|---------|
| 1. | 507 Summit LLC | Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA (Mailing: 853 Broadway, Suite 1109, New York, NY 10003, USA) |
| 2. | Bluefin Capital Management LLC | 41 Madison Avenue - 36th Floor, New York, NY 10010, USA |
| 3. | Cambridge University Endowment Fund by Indus Capital Partners, LLC | c/o The Chancellor, Masters and Scholars of the University of Cambridge as Trustee of the Cambridge, The Old Schools, Cambridge CB2 1TS, Cambridge, United Kingdom |
| 4. | Camelot Event-Driven Fund, a series of Frank Fund Trust | CT Corporation Systems, 4400 Easton Commons Way Suite 125 Columbus, OH 43219, USA |
| 5. | Catalur Master Fund, LP | c/o U.S. Bank Global Fund Services (Cayman) Limited, Governors Square, PO Box 10555, 23 Lime Tree Bay Avenue West Bay, Grand Cayman, KY1-1005, Cayman Islands |
| 6. | Crown Managed Accounts SPC | Grand Pavilion Commercial Centre, 1st Floor, 802 West Bay Road, PO Box 31855, George Town, Grand Cayman, KY1-1207, Cayman Islands |
| 7. | Fulcrum Distressed Opportunities Fund III, LP | Forbes Hare Trust Company Limited, Suite 716, 10 Market Street, Cassia Court, Camana Bay, Grand Cayman KY1-9006, Cayman Islands |
| 8. | Hildene Opportunities Master Fund II, Ltd | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands c/o Hildene Capital Management, LLC, 333 Ludlow Street, South Tower, 5th Floor, Stamford, CT 06902, USA |
| 9. | Indus Select Master Fund, Ltd. | Mourant Governance Services (Cayman) Ltd, 94 Solaris Avenue, Camana Bay PO Box 1348, Grand Cayman, KY1-1108, Cayman Islands |

| S/n | Dissenter / Member | Address |
|-----|-------------------|---------|
| 10. | Investment Opportunities 3 Segregated Portfolio | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 11. | Invictus Special Situations Master I, L.P. | Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands |
| 12. | KHA Capital Partnership I LP | 16192 Coastal Highway, Lewes, Milton, DE 19968, USA |
| 13. | LMA SPC for and on behalf of MAP 98 Segregated Portfolio | 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 14. | Man Funds XII, SPC-1783 SP II | c/o Maples Corporate Services Limited, PO Box 309, Ugland House, George Town, Grand Cayman, KY1-1104, Cayman Islands |
| 15. | Oceana Master Fund Ltd | c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 16. | ODS Capital LLC | 78 Lighthouse Drive, Jupiter, FL 33469, USA |
| 17. | PWCM Master Fund Ltd. | c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 18. | Pentwater Equity Opportunities Master Fund Ltd. | c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 19. | Pentwater Merger Arbitrage Master Fund Ltd | c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 20. | Pentwater Unconstrained Master Fund Ltd. | c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 21. | Stonehill Institutional Partners, L.P. | c/o Stonehill Capital Management LLC, 320 Park Ave, 26th Floor, New York, NY 10022, USA |
| 22. | Stonehill Master Fund Ltd. | c/o Stonehill Capital Management LLC, 320 Park Ave, 26th Floor, New York, NY 10022, USA |
| 23. | Two Seas Global (Master) Fund LP | Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |

| S/n | Dissenter / Member | Address |
|-----|---------------------|---------|
| 24. | 405 ACM Global Opportunities Fund | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 25. | 405 ACM Ltd. | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 26. | Alpine Partners (BVI), L.P. | Jayla Place, Wickhams Cay 1, PO Box 3190, Road Town, Tortola, VG1110, British Virgin Islands |
| 27. | Athos Asia Event Driven Master Fund | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 28. | BMSF Sub LP | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 29. | Boothbay Absolute Return Strategies, LP | Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, USA |
| 30. | Boothbay Diversified Alpha Master Fund LP | Appleby Global Services (Cayman) Limited, 71 Fort Street, PO Box 500, Grand Cayman, KY1-1106, Cayman Islands |
| 31. | Church Murray Fund, LLC | 251 Little Falls Drive, Wilmington, DE 19808, USA |
| 32. | Corbin ERISA Opportunity Fund, Ltd | 590 Madison Avenue, 31 Floor, New York, NY 10022, USA |
| 33. | FMAP ACL Limited | Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 34. | FourWorld Event Opportunities, LP | 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman, KY1-1108, Cayman Islands |
| 35. | FourWorld Global Opportunities Fund, Ltd. | Mourant Governance Services (Cayman) Ltd, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman, KY1-1108, Cayman Islands |
| 36. | FourWorld Special Opportunities Fund, LLC | 251 Little Falls Drive, Wilmington, DE 19808, USA |
| 37. | FourWorld Global Strategic Opportunities Fund I, LLC | 251 Little Falls Drive, Wilmington, DE 19808, USA |

| S/n | Dissenter / Member | Address |
|-----|--------------------|---------|
| 38. | FW Deep Value Opportunities Fund I, LLC | 251 Little Falls Drive, Wilmington, DE 19808, USA |
| 39. | Integrated Core Strategies (US) LLC | c/o Millennium Management LLC, 399 Park Avenue, New York, NY 10022, USA |
| 40. | KL Special Opportunities Master Fund Ltd | PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| 41. | Palliser Capital Master Fund Ltd | c/o Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9008, Cayman Islands |
| 42. | Pinehurst Partners, L.P. | 590 Madison Avenue 31st Floor, New York, NY 10022, USA |
| 43. | Quadre Investments, L.P. | 2100 N. Ocean Blvd, Suite 2003, Fort Lauderdale, FL 33305, USA |
| 44. | QVT Family Office Fund LP | c/o Intertrust Corporate Services (Cayman) Ltd., One Nexus Way, Camana Bay, Grand Cayman, KY1-9005, Cayman Islands |
| 45. | Blackwell Partners LLC - Series A | 280 South Mangum Street, Suite 210, Durham, NC 27701-3675, USA |
| 46. | Maso Capital Investments Ltd | Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY 1-9008, Cayman Islands |
| 47. | Star V Partners LLC | 2100 West End Avenue, Suite 1000, Nashville, TN 37203, USA |
| 48. | Oasis Core Investments Fund Ltd | c/o Maples Corporate Services Ltd., PO Box 309, Ugland House, George Town, Grand Cayman, KY1-1104, Cayman Islands |
| 49. | Oasis Focus Fund LP | c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808, USA |
| 50. | Anthony H. Steinmetz | 7231 Wirth Road, Millstadt, IL 62260, USA |
| 51. | Christopher M. Smith | 8817 Juniper Ct., Tinley Park, IL 60487, USA |
| 52. | Verition Multi-Strategy Master Fund Ltd | 1 American Lane, Greenwich, CT 06831, USA |

## Appendix 2

## Confidentiality and Non-Disclosure Agreement

*[NB: Where the Company is the Recipient, references to the "Company" shall be amended accordingly]*

This Confidentiality and Non-Disclosure Agreement (the **"Agreement"**), effective [Date] (the **"Effective Date"**), is entered into

**BETWEEN**

**51job, Inc.**, a company incorporated under the laws of the Cayman Islands and having its registered office address at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, George Town, Grand Cayman KY1-1104, Cayman Islands (the **"Company"**)

**AND**

[NAME], a company incorporated under the laws of [jurisdiction] and having its registered office address at [address] (the **"Recipient"**),

(each herein referred to individually as a **"Party"**, and collectively as the **"Parties"**). **WHEREAS**

(A)     On 27 April 2022, at an Extraordinary General Meeting, the members of the Company passed a resolution approving a proposed merger between the Company and Garnet Faith Limited (**"Merger Sub"**), pursuant to an Agreement and Plan of Merger dated 21 June 2021 as amended by Amendment No.1 dated 1 March 2022 among the Company and Merger Sub (the **"Merger"**). As a result of the Merger, the Company ceased to be a publicly traded company.

(B)     The dissenting shareholders of the Company identified in **Appendix 1** of the Directions Order (as defined herein) (each a **"Dissenter"**, and collectively the **"Dissenters"**) have dissented from the Merger pursuant to Section 238(5) of the Cayman Islands Companies Act (2022 Revision).

(C)      On 15 July 2022, the Company petitioned the Grand Court of the Cayman Islands to determine the fair value of the Dissenters' shares and was assigned the Cause No. FSD 155 of 2022 (DDJ) (the **"Proceedings"**).

(D)      Pursuant to an order for directions in the Proceedings dated [date] (the **"Directions Order"**), the Company is to establish an electronic data room (the **"Data Room"**) to which discovered documents are to be uploaded for the purposes of the Proceedings.

(E)      Pursuant to the Directions Order, meeting(s) may be convened at which members of the Company's management team will provide information and answer queries relevant to the preparation of the Parties' Experts' respective Expert Reports (the **"Management Meeting"**).

(F)      The Company is engaged in proprietary and confidential business activities, and could be prejudiced if Confidential Information (as defined herein) pertaining to the Company or its business is disclosed publicly or to third parties, or used by the Recipient, its Representatives and/or Appointees (as defined herein) for purposes not reasonably related to the purposes of the Proceedings.

**NOW, THEREFORE,** in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Company and the Recipient hereby agree as follows:

**1      DEFINITIONS AND INTERPRETATION**

1.1      In this Agreement the following words and expressions shall have the following meanings:

(a)      **"Affiliates"** means a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation.

(b)      **"Appointee"** means each person whom an Expert appoints to assist them in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Expert Memorandum (such other terms as defined in the Directions Order) and any other preparations in relation to the Proceedings.

(c) **"Representatives"** means, with respect to a Recipient, its Affiliates, agents, advisers, sub-advisers, representatives, legal advisors, service providers and consultants.

1.2 References to recitals and clauses are references to the recitals to and clauses of this Agreement.

1.3 Headings to clauses and the use of bold type are for convenience only and shall not affect the interpretation or construction of this Agreement.

1.4 Words in the singular include the plural and vice versa.

## 2 CONFIDENTIAL INFORMATION

2.1 **"Confidential Information"** means:

(a) Any information disclosed by the Company to the Recipient, its Representatives and/or Appointees either directly or indirectly, in writing or orally, related to: trade secrets; business, commercial, or financial information; financial statements; financial or business plans and strategies; financial models and advices; projections or analyses for future or prior periods; tax data; business and marketing plans and strategies; assets and liabilities; proposed strategic transactions or acquisitions, strategic alternatives, or business combinations; or other personally or commercially sensitive or proprietary information of the Company and its subsidiaries; and

(b) Any notes, analyses, compilations, studies, interpretations, documents or records containing, referring to, relating to, based upon or derived from, such Confidential Information, in whole or in part, created by the Recipient, its Representatives and/or Appointees.

2.2 Confidential Information shall not, however, include any information that:

(a) Was publicly known or made generally available to the public without a duty of confidentiality prior to the time of disclosure to the Recipient by the Company;

(b)     Has become publicly known or made generally available to the public without a duty of confidentiality after disclosure to the Recipient by the Company through no action or inaction of the Recipient in breach of this Agreement; or

(c)     Is in the rightful possession of the Recipient without confidentiality obligations at the time of disclosure by the Company to the Recipient as shown by the Recipient's then contemporaneous written files and records kept in the ordinary course of business.

2.3     If the Recipient or its Representative becomes compelled by applicable law, rule or regulation or request of governmental or regulatory authority to disclose any Confidential Information, the Recipient will, insofar as it is permitted to do so by applicable law, rule or regulation and other than in the case of routine regulatory investigations, provide the Company with a written notice at least seven (7) days in advance of such disclosure, where practicable, and will provide such reasonable assistance to the Company, as the Company may require at the Company's sole expense, in seeking a protective order or other appropriate remedy.

2.4     If the Company waives the Recipient's compliance with this Agreement or fails to obtain a protective order or other appropriate remedy, the Recipient will furnish only that portion of the Confidential Information that it is required to disclose by applicable law, rule or regulation provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such disclosure compelled by applicable law, rule or regulation.

## 3     MAINTENANCE OF CONFIDENTIALITY

3.1     Except as may otherwise be agreed in writing by the Company or ordered by the courts of the Cayman Islands by way of relief from the implied undertaking or otherwise, all Confidential Information and its contents received by the Recipient, its Representatives and/or Appointees shall be:

(a)     Maintained as set forth in this Agreement;

(b)     Disclosed only to such persons and in such manner as permitted by this Agreement; and

(c)     Used solely for the purposes of or related to the Proceedings.

3.2     Prior to its Representatives and/or Appointees being granted access to the Data Room, attending a Management Meeting, and/or receiving the Confidential Information, the Recipient shall:

(a)     Ensure that its Representatives and Appointees expressly agree in writing to comply with the confidentiality terms imposed by this Agreement or are otherwise bound by confidentiality obligations no less restrictive than those contained herein; and

(b)     Confirm in writing to the Company that the agreements in clause 3.2(a) above have been obtained or obligations of confidentiality (as contemplated by clause 3.2(a) above) are otherwise in place.

3.3     The Recipient, its Representatives and its Appointees shall keep the Confidential Information confidential and shall not, unless for a purpose of or related to these Proceedings:

(a)     Disclose any Confidential Information or permit any Confidential Information to be disclosed, either directly or indirectly, to any third party (other than other Representatives or Appointees or Recipients who have signed a confidentiality agreement in this form and their Representatives or Appointees) without the Company's prior written consent; or

(b)     Use the Confidential Information for any purpose other than as set out at Clause 3.1 above or exploit the Confidential information in any way:

(i)     In communications with any competitor or competitors of the Company or its subsidiaries or affiliates; and/or

(ii)    As a basis for trading in the securities of the Company or its subsidiaries or affiliates.

3.4     The Recipient shall take necessary measures to protect the confidentiality, and to avoid disclosure and unauthorised use, of Confidential Information. Without limiting the foregoing,

the Recipient shall take at least those same measures it employs to protect its own confidential information.

3.5 The Recipient shall reproduce the Company's proprietary rights notices on any copies of documents, in the same manner in which such notices were set forth in or on the original.

## 4 BREACH OF CONFIDENTIALITY

4.1 The Recipient shall notify the Company of:

(a) Any unauthorised use or disclosure, or suspected unauthorised use or disclosure, of Confidential Information by the Recipient, its Representatives and/or Appointees as soon as reasonably practicable upon becoming aware of such use or disclosure; and

(b) Any actions by the Recipient, its Representatives and/or Appointees which are in breach of their respective obligations under this Agreement as soon as reasonably practicable upon becoming aware of such use or disclosure.

4.2 In the event of a breach of 4.1(a) and/or 4.1(b) of this Agreement, the Recipient shall reasonably cooperate with any and all efforts of the Company to help the Company regain possession of Confidential Information and/or prevent its further unauthorised use or dissemination.

4.3 The Recipient agrees to be responsible for any breach of this Agreement by any of its Representatives and/or Appointees that have received or obtained Confidential Information.

4.4 Nothing in this Agreement shall prejudice in any way the rights of the Company to file an application with the Cayman Islands court for a protective order relating to any Confidential Information. For the avoidance of doubt, any failure by the Company to obtain such an order or other protection after having a reasonable opportunity to do so shall not preclude the Recipient from making use of the Confidential Information in the Proceedings.

## 5    DESTRUCTION OF MATERIALS

5.1    Upon the earlier of (i) the final determination of the Proceedings (including all appeals therefrom), or (ii) a legally binding agreement having been executed between the Company and the Recipient as to the amount payable to it as a result of the Merger, and payment having been duly received by the Recipient (the **"Final Determination"**) the Recipient shall, upon request by the Company following the Final Determination, take all reasonable and proportionate steps within 14 days of the Company's request to:

(a)    subject to clause 5.2, promptly destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient;

(b)    procure that all of its Representatives and/or Appointees destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient's Representatives and/or Appointees; and

(c)    certify in writing to the Company that the Recipient has complied with the requirements of this Clause 5.

5.2    Notwithstanding the foregoing, one copy of the Confidential Information may be retained by the Recipient or its attorneys to comply with applicable law or regulation, provided that copies so retained shall continue to be treated as confidential in accordance with the provisions of this Agreement.

5.3    Notwithstanding the destruction or erasure of Confidential Information pursuant to this Clause 5, the Recipient and its Representatives and Appointees shall continue to be bound by their confidentiality obligations and other obligations under this Agreement.

## 6    INDEMNITY

The Recipient shall indemnify the Company against all liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other professional costs and expenses) suffered or reasonably incurred by the Company arising out of or in connection with any breach of this Agreement by the Recipient, its Representatives and/or Appointees.

## 7    INADEQUACY OF DAMAGES

The Recipient agrees that any violation of this Agreement may cause irreparable injury to the Company which cannot be adequately remedied in monetary terms or other damages, and accordingly the Company may be entitled to obtain injunctive relief, specific performance and/or any other equitable relief in addition to all other legal remedies concerning any threatened or actual breach of any of the provisions of this Agreement.

## 8    TERM

8.1    The obligations of the Recipient under this Agreement shall survive until 24 months following compliance with Clause 5 above. Notwithstanding the foregoing, the Recipient's duty to hold in confidence any Confidential Information that was disclosed by the Company during the term of this Agreement shall remain in effect for five years from the date the Confidential Information was disclosed by the Company.

8.2    The termination of this Agreement shall not affect any accrued rights or remedies to which the Company is entitled.

## 9    NO WARRANTY

The Company makes no warranties, express, implied or otherwise, with respect to non-infringement or other violation of any intellectual property rights of a third party or of the Recipient.

## 10 NO LICENSE

This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Recipient any rights, license or authority in or to the Confidential Information except as expressly set forth in this Agreement. Title to the Confidential Information will vest solely with the Company.

## 11 MISCELLANEOUS

11.1 This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that the Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, without written consent of the Company. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. The Recipient hereby represents and warrants that the person executing this Agreement on its behalf has express authority to do so, and, in so doing, to bind the Party thereto.

11.2 This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior written and oral agreements between the Parties regarding such subject matter.

11.3 If any provision herein shall be determined to be void or unenforceable in whole or in part for any reason whatsoever such invalidity or unenforceability shall not affect the remaining provisions or any part thereof contained within this Agreement and such void or unenforceable provisions shall be deemed to be severable from any other provision or part thereof herein contained.

11.4 No provision of this Agreement may be waived except by a written instrument executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provisions of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a written instrument signed by the Parties to this Agreement.

11.5    The Parties may execute this Agreement in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by email or facsimile transmission, and email or facsimile copies of executed signature pages shall be binding as originals.

## 12    GOVERNING LAW AND JURISDICTION

12.1    This Agreement and any dispute, claim, suit, action or proceeding of whatever nature (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of the Cayman Islands.

12.2    Each Party irrevocably agrees to submit to the exclusive jurisdiction of the courts of the Cayman Islands over any claim or matter arising under or in connection with this Agreement or the legal relationship established by this Agreement; provided that nothing in this Clause 12 shall prevent a Party from seeking interlocutory or interim injunctive relief in other jurisdictions.

12.3    Each Party irrevocably agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

**IN WITNESS WHEREOF,** the Parties acknowledge that they have read and understood this Agreement and have executed this Agreement as of the Effective Date.

Signed for and on behalf of )

**51job, Inc.** )

by its duly authorised agent )

)    Name:

)    Designation:

)    Date:

In the presence of: )

)

)

)

)

Name:

Date:

Signed for and on behalf of )

**[NAME OF RECIPIENT]** )

)

)    Name:

)    Designation:

)    Date:

In the presence of: )

)

)

Name: )

### Appendix 3

### Categories of documents to be disclosed pursuant to paragraph 10 of the Order

In this Appendix 3, headings are for convenience only and shall not affect the interpretation or construction of this Appendix, and the following definitions apply:

"Document" includes, without limitation, original, draft and all non-identical copies of all hard copy and electronically or digitally stored information, including all forms of correspondence, agreements, instant messages (including text messages, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), memoranda, calendars and other planners, records of telephone conversations, notebooks and all other forms of work papers, presentations, spreadsheets, graphs, charts, and any and all other forms of analyses.

"Communication" means any written, or electronic transmission of information (in the form of facts, ideas, inquiries, or otherwise), including all meetings, discussions, dialogues, conversations, telephone calls, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, correspondence, facsimiles, emails, text messages, chat messages (including Bloomberg messages, Instant Bloomberg chats, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), or other forms of written interchange, however transmitted, including reports, notes, memoranda, lists, agenda, proposals, opinions, messages, video tapes, and other documents or records of communication.

Unless otherwise stated, the definitions in the Company's proxy statement dated 29 March 2022 (the "**Proxy**") are adopted herein below.

### The Company, the Special Committee and their advisors

A.      Any Communications with and Documents produced by, provided to or received from Duff & Phelps or its representatives or affiliates (the "**Financial Advisor**") in relation to the Proposed Transaction or the Merger, which includes all matters set out in the Proxy (including but not

limited to the Financial Advisor's fairness opinions dated 21 June 2021 ("**Prior Opinion**") and 1 March 2022 (the "**Revised Opinion**"), together the "**Opinions**"), including Communications and Documents passing between the Financial Advisor and:

i. The independent directors or Special Committee of the Company;

ii. The Company's other directors, management, employees, counsel or advisors, including Rocketeer Management;

iii. Any members of the Participants and/or any of their respective advisors and/or representatives (collectively the **"Buyer Group"**); and

iv. Any other potential purchasers or interested parties.

B. Any Communications and Documents in respect of the Company's decision to form the Special Committee, including the Company's choice of the members of the Special Committee, and any Communications and Documents in relation to the appointment of Mr Li-Lan Cheng and Mr Eric He as members of the Special Committee (including Communications and Documents made and produced prior to their appointment) and any internal or external analysis conducted in respect of their suitability and independence.

C. Any Communications and Documents relating to the Special Committee's decision to engage Duff & Phelps as the Financial Advisor in connection with the Proposed Transaction and the Merger, including any Communications and Documents relating to any other financial advisor considered but not appointed.

D. Any Communications with and Documents produced by, provided to, received from or by or passing between any of (i) the Company and any of its representatives, agents, employees or advisors, (ii) the Company's Special Committee or its members, (iii) the Financial Advisor, (iv) any member of the Buyer Group, (v) any other potential purchaser or interested party, (vi) Rocketeer Management, (vii) any other advisors or consultants to the Company or the Special Committee and/or (viii) any shareholders of the Company, in relation to the Proposed Transaction and the Merger, including for the avoidance of doubt any minutes or agendas of meetings and any supporting documentation, notes, records and any other reports prepared for such meetings.

E.       Any Communications and Documents (including all prior versions and drafts) in relation to the negotiation of the Merger Agreement or the Merger or projections being prepared for the Buyer Group or actual or prospective financiers..

F.       Any Communications with and Documents produced by, provided to or received from any other potential purchasers who considered making or did make proposals in respect of the Merger.

G.      Any Communications and Documents (including all prior versions and drafts) in relation to the negotiation of the proposed Transaction Agreement and the Merger Agreement and related Documents.

H.      Any Communications and Documents produced by, provided to, received from or communicated between employees, directors, management or consultants of the Company in the production and calculation of any projections sent to the Financial Advisor and/or Special Committee and any other sets of projections in existence (including, for the avoidance of doubt, in respect of the Opinions as well as any other proposal) including materials being drafts of or discussing any projections sent to the Financial Advisor and/or Special Committee, including earlier or alternative drafts or versions of such projections whether sent to the Financial Advisor and/or Special Committee or not.

I.       Any Communications and Documents concerning regulatory developments in the People's Republic of China and their purported or potential impact on the Proposed Transaction, including all Communications and Documents produced by, provided to, received from or communicated with the Chinese regulators and any advice received by the Company and / or Special Committee relating to these issues.

J.       Any Communications and Documents relating to the purported or perceived macroeconomic developments and market conditions resulting in the renegotiation of the merger price.

**Buyer group and potential purchasers**

K.      Any Communications with and Documents produced by, provided to or received from any member of the Buyer Group in relation to the Proposed Transaction and/or Merger (including,

but not limited to, for the purposes of undertaking due diligence on the Company, all management forecasts or other budgets, models or reports provided to the same, all prior versions and drafts of the Proposed Transaction and Merger documents and all Communications and Documents relevant to the negotiation of the same) and/or the purchase of shares in the Company.

L.      Any Communications with and Documents produced by, provided to or received from the Buyer Group or any other actual, potential or prospective financiers of (i) the Company, (ii) the Buyer Group or (iii) any other potential purchaser (including, without limitation, Shanghai Pudong Development Bank Co., Ltd and China Merchant Bank Co., Ltd) for the purposes of securing finance for or in relation to the Proposed Transaction or the Merger or any potential or actual proposal (by way of debt finance or equity capital contributions), undertaking due diligence on the Company and/or for negotiating the terms of the Proposed Transaction, Merger or related proposals (including those concerning price, structure or conditions).

**Corporate and financial documents**

M.      Minutes and agendas of Board meetings and any supporting documentation and any other reports prepared for Board Meetings of the Company.

N.      Monthly management accounts for the Company.

O.      Consolidated and unconsolidated quarterly accounts for the Company.

P.      Monthly and/or quarterly financials for the Company including, where available, budgets, profit and loss statements, balance sheets, cash flow statements and any accompanying notes, commentary, reports or business plans.

Q.      Any Communications and Documents relating to or supporting the values of long-term investments, loans and other receivables and liabilities of the Company.

R.      INTENTIONALLY LEFT BLANK

S.      Any Communications or Documents relating to any aspect of the Company's business plans that the Company believed it could not achieve as a publicly traded company.

T.     Any Communications or Documents relating to any off-balance sheet or non-operating assets and liabilities of the Company, including pension liabilities and foreign exchange liabilities of the Company.

U.     Advice or analysis relating to corporation tax, withholding tax or other tax prepared by or for the Company's management.

## Projections and valuations

V.     Financial projections, forecasts, valuations, budgets, reports and models and supporting documentation for the Company including:

(i)     Internal long-term forecasts, budgets, projections, reports and models including source data and any supporting documentation;

(ii)    External forecasts, budgets, projections, reports and models relating to the Company's long-term plans including any supporting documentation;

(iii)   Any Communications, board minutes or other Documents relating to the Company's projections (for the avoidance of doubt including but not limited to those Documents and Communications previously produced by, provided to, or communicated between employees of the Company in the production and calculation of the projections sent to the Financial Adviser and any other sets of projections in existence); and

(iv)    Valuations or models of the Company (or any part of it, and whether for financial reporting, tax or investment appraisal purposes or otherwise) prepared by or for the Company, including any accompanying or supporting documentation and Documents provided to or obtained from any financial adviser in relation to any such valuation.

W.     Any analyst, third party market and industry reports on or relevant to the Company and/or the markets in which the Company operates, including any Communications with and Documents produced by, provided to or received from any such analyst, third party and/or industry member.

## Operations and strategy

X.      Any internal Documents relating to market share of the Company broken down by business segment.

Y.      Any Documents and Communications relating to any other potential acquisition of the Company or any part of it considered by the Company's management or Board.

Z.      Any agreements between the Company and its major suppliers being those suppliers providing 5% or more of the cost of goods sold by the Company.

AA.     Any Communications and Documents relating to any significant changes to the business of the Company or industry-related events that either had, or were perceived as having the potential to have, a significant effect on the long term projections of the Company.

BB.     Any Communications and Documents regarding the impact of COVID-19 and any foreign exchange issues including the potential depreciation of the Renminbi on the Company.

CC.     Any Communications and Documents relating to the Company's post-Merger plans, including all valuation and analysis, relevant to any potential relisting or IPO of the Company, whether in the People's Republic of China or elsewhere, and whether or not the potential relisting or IPO was or may ultimately not be pursued.

**Shares and shareholders**

DD.     Any Documents or Communications relating to any potential stock buybacks and the price(s) at which the Company would be willing to repurchase its own stock.

EE.     The number, terms and class of shares issued by the Company and any changes thereto.

FF.     The terms and conditions of any outstanding share options of the Company.

GG.     Any Communications and Documents produced by, provided to, received from or passing between the Company and/or any of its shareholders in relation to the Proposed Transcaction or the Merger, including in relation to the shareholders' interests and incentives, including, without limitation, any Communications in relation to the exercise of shareholders' voting rights or voting agreements, or objections, including all written objections to the Proposed

Transaction or the Merger received by the Company and any documents responding to, discussing, analysing or commenting on the objections received from the shareholders.

HH. Any significant transactions in the Company's shares .

II. Any Communications with and Documents produced by, provided to, received from or communicated between directors, management, consultants, advisors or senior officers of the Company in relation to the market price, potential future market price, or value of the shares of the Company including but not limited to, Documents and Communications relating to the change in the market price of the shares of the Company between the execution of the Original Merger Agreement and Amendment No. 1 to the Original Merger Agreement as well as whether the Company's market price was believed to have reflected the Company's intrinsic value.

JJ. Any Communications or Documents relating to any material non-public information (**"MNPI"**) in relation to the Company and value of the shares of the Company.

**The Proposed Transaction and Merger**

KK. Any Communications and Documents in relation to the engagement of, and provision of advisory services in relation to the Proposed Transaction or the Merger including by Rocketeer Management and its agents and affiliates (**"RM"**) including (i) any contracts entered into with RM and (ii) all Communications and Documents in relation to RM's exploration of "potential strategic transactions, including possible minority or control transactions, mergers and acquisitions, debt financings or equity financings" as referred to in the Proxy; (iii) all Communications and Documents in relation to the Original Proposal (as defined in the Proxy); and (iv) all Communications and Documents in relation to the Merger.

**Appendix 4**

**Categories of documents to be disclosed pursuant to paragraph 35 of the Order**

Documents which exist and are within the Dissenters' possession, custody or power and which were created or received between 26 April 2020 and 26 April 2022 which are relevant to the question of the fair value of the Dissenters' shares in the Company as at the Valuation Date and which fall within the categories set out below:

1.  All documents reflecting or relating to any valuations or similar analyses of the Company that the Dissenters prepared, reviewed, or considered, including but not limited to:

    1.1  All written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company's shares;

    1.2  Any internal valuations of the Company or the Company's shares; and

    1.3  Any valuations of the Company or Company stock reviewed or considered by the Dissenters in connection with the above.

2.  A list of any communications that the Dissenters had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger in relation to the value of the Company or its shares.

3.  Confirmation of the date the Dissenters purchased any or all of their shares in the Company, including the method of purchase.

4.  A schedule setting out the history of the Dissenters' trades in the shares of the Company in the form set out at Schedule 1 to this Appendix 4.

5.  All documents, information and material issued or shared between the Dissenters' investment manager and/or investment advisor and the Dissenters' investment committee for their consideration of the Company's go-private transaction including file notes of meetings, meeting agendas and all forms of written communications.

## Schedule 1 to Appendix 4

## Sample Schedule of Trades

| Fund | Transaction Type | Trade Date | Settle Date | Notional Quantity | Trade Price |
|------|------------------|------------|-------------|-------------------|-------------|
|      | Buy              |            |             |                   |             |
|      | Sell             |            |             |                   |             |
|      | Buy to Cover     |            |             |                   |             |
|      | Sell Short       |            |             |                   |             |
|      | Buy (Transfer)   |            |             |                   |             |
|      | Sell (Transfer)  |            |             |                   |             |

## Appendix 5

## Disclosure Protocol pursuant to paragraph 13 of this Order

### A.    Definitions

1.    **Metadata** means data about data. In the case of an electronic Document, metadata is typically embedded information about the Document that is not readily accessible once the native electronic Document has been converted into an electronic image or paper Document, for example, the date on which the Document was last printed or amended. Metadata may be created automatically by a computer system or may be created manually by a user.

2.    **MD5 Hash Value** means the Message Digest algorithm 5 which is used to provide a 128-bit hash or "digital signature" for electronic Documents and is generated upon the basis of the binary data of a file; where two (2) or more items have the same MD5 Hash Value they are deemed to be duplicates.

3.    **Native File Format** means an electronic Document stored in the original form in which it was created by a computer software program.

4.    **Near-Native File Format** means a Document which has been minimally converted from its original format in order to facilitate review or exchange between parties, but which retains all relevant functionality of the original file.  For instance, an email stored on a server may be downloaded as a .MSG file, or a Google Document may be saved in Microsoft Word (.DOCX) format.

5.    **Parent Document** means a Document with one or more attachment.  For example, an email is a parent Document and any Documents attached to the email are its attachments. If an email has attachments which have in turn have their own attachments, the overall parent email will be considered the Parent Document to all those attachments, irrespective of which email they are directly attached to.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Petitioner whose address for service is PO Box 309, Ugland House, George Town, Grand Cayman, KY1-1104, Cayman Islands (Ref: CJM/LRS/MKS/AID/303788.12/73078646)    42

## B. Preservation of Documents

6. The parties will take steps to preserve all potentially discoverable Documents, including the metadata of such Documents, and to ensure no metadata is altered during the preservation, collection, review of Documents or the disclosure process generally.

## C. De-duplication

7. Stand-alone electronic Documents or entire Document families with the same MD5 Hash Value will be identified and any duplicates removed, except:

   7.1 where duplicates are added to a party's List of Documents (as defined in this Order) because they are family members of other Documents which are also disclosed. Duplicates which are part of a family are not to be removed, unless the whole of the family are in fact duplicates.

   7.2 scanned hard copy Documents.

8. A deNIST filter will be applied to the Documents during processing to identify and remove files that are generally created by operating systems or applications and contain no user-generated information or data. The deNIST culling process identifies files found on the National Institute of Standards and Technology (NIST) list of Documents that hold no value for litigation purposes.

## D. Format

9. Electronic Documents are to be provided in their Native File Format or Near Native File Format with all functionality, such as formulae and computations intact and enabled, and without watermarking, subject to:

   9.1 Documents, other than excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in Tagged Image File Format (**TIFF**) with the relevant .opt file and Document ID coding;

9.2 Excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in a Native Format or near Native Format by using a software solution that retains the full functionality of the excel spreadsheet while applying redactions, such as Milyli, Evolver, or Redact Assistant.

10. All PDF and image (e.g. TIFF or JPG) Documents, and Documents that are electronic images of hard copy documents containing text, will be provided with corresponding Document level OCR text files where possible or shall otherwise be uploaded to the Data Room in a searchable format using optical character recognition

11. Each party will ensure Documents are decrypted, or that passwords are supplied. To the extent encryption for Documents cannot be successfully processed despite reasonable efforts, a slip sheet stating that the Documents cannot be decrypted shall be inserted in its place, including the metadata required, to the extent it can be reasonably extracted from the file in its encrypted form.

12. Unless otherwise agreed or ordered by the Court, parties should not place any restrictions on Documents that prevent opposing parties from accessing them.

13. Family-inclusive Documents will be uploaded to the Data Room with metadata load files containing the family attachment range to allow linking of Documents from the same family. Subject to any claim to privilege, all family Documents are to be disclosed where only one member of a family Document is identified as relevant.

14. The following applies in relation to attachments to emails:

14.1 Any Document that is attached to or embedded within another Document is to be classed as an attachment (unless an excluded Document);

14.2 Attachments must be listed as separate Documents; and

14.3 In general, attachments will appear immediately after the Parent Document in the parties' Lists of Documents.

15.     Subject to the final sentence of paragraph 35 of this Order, the Represented Dissenters who have been given access to the Data Room shall have full access rights to the Documents therein, save that no Represented Dissenter will have the ability to modify Documents in-situ within the Data Room; however, Documents shall be in a form in which the Represented Dissenters can download any versions of the Documents (e.g. TIFF or native) either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

## E.     Document Coding

16.     Parties are required to code Documents in the Data Room by providing the following metadata detail for each Document, where such detail is reasonably available:

16.1    Document ID: The document ID must be a unique reference and begin with "*51JOB*" for the Petitioner and "*D01-*", "*D02-*", etcetera for the Represented Dissenters based on the order in which they appear in Appendix 1.  The document ID should be 8 digits in length following the party indicator, utilising zeros if necessary, e.g. 51JOB-00001234

16.2    Parent document ID: If there is no Parent Document, leave this field blank.

16.3    Last Modified Date: This should be the date and time last modified, or the manually coded date in the format DD/MM/YYYY, HH:MM:SS.

16.4    Date Created: This should be the original date and time a file was created and may be the same as the Last Modified Date.

16.5    Sent date: The date and time that the Document was sent in the case of an email and may be the same as the Date Created.

16.6    Title/Subject/Description: The description or title of the document.  For emails, this will be the email subject, for other electronic Documents it should be the file name.  Where documents are scanned from hard copy, this column should identify a title or description based on the face of the document..

16.7    Document title: The extracted title of the Document.

16.8    Document type: this will be the file extension of the document, preceded by a full stop (e.g., .pdf, .xls, .msg, etc).

16.9    Sender/Author: The name of the author of a Document or sender of an email.

16.10   CC: The name of the recipient(s) of the Document in a CC. Use a semi-colon (;) symbol as the multi-value separator.

16.11   BCC: The name of the recipient(s) of the Document in a BCC. Use a semi-colon (;) symbol as the multi-value separator.

16.12   Recipient: The name of the recipient(s) of the Document. Use a semi-colon (;) symbol as the multi-value separator.

16.13   Custodian: The name of the custodian from whom the Document was drawn.

16.14   Duplicate Custodian: The name of the custodian who had duplicate copies of the Document

16.15   MD5 Hash Value: as defined.

16.16   Contains Redactions: This will be a binary "Yes/No" code applying where the whole or part of a Document has been redacted.

16.17   Reason for Redaction: This will identify the reason(s) for the redaction using the following labels, as applicable (the labels at subparagraphs (a) to (e) relate to the PRC redaction regime set out in Appendix 6):

    (a)    Important Data;

    (b)    Personal Information;

    (c)    State Secrets;

    (d)    Unmarked State Secrets;

(e)     State Sensitive Information;

(f)     Litigation privilege;

(g)     Legal advice privilege; and

(h)     Without prejudice privilege.

17.     When a Document is uploaded to the Data Room it shall contain the above information and such information should be visible to users of the Data Room.

18.     Upon request by an Expert, redacted documents shall be provided in their native format manually amended by way of deletion of redacted information.

## F.     Excluded Documents

19.     System Files, temporary internet files, cookies and irrelevant embedded images (ie. company logos) are to be excluded from searches and discovery (to the extent possible).

## G.     Withholding Disclosure - Privilege

20.     Nothing in this Protocol will prevent a party from withholding Documents from production on the basis of any applicable Cayman Islands law.

21.     If a claim of Cayman Islands law privilege is asserted over a portion of a Document only, that portion will be redacted and the Document produced.

22.     The redacted sections of a Document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted and stating the reason for the redaction in the List of Documents.

## H.     List of Documents

23.     In their List of Documents, the parties shall provide the following information to the extent that this information is reasonably available:

23.1    Document ID;

23.2    Parent document ID;

23.3    Last Modified Date;

23.4    Date Created;

23.5    Email sent date;

23.6    Conversion ID;

23.7    Title/subject/description;

23.8    Document type: (ie. .pdf, .xls, .msg etc);

23.9    Sender/Author;

23.10   Recipient;

23.11   Contains Redactions;

23.12   Reason for Redaction.

24.     Each party reserves the right to reasonably request further information from the disclosing party in relation to specific Document(s), other than those fields listed above.

25.     Each party's List of Documents will be ordered by family group, with attachments listed below Parent Documents.

26.     The parties' List of Documents will be provided in an excel spreadsheet format (.xlsx).

## I.     Variation

27.     This protocol may be varied by agreement of the parties in writing or by order of the Grand Court of the Cayman Islands.

**Appendix 6**

**Protocol regarding documents required to be redacted in order to comply with the laws of the People's Republic of China**

## A    REDACTION OF DOCUMENTS

1.    It is the Company's position that documents in the Company's possession, custody or power may need to be redacted prior to production in order to comply with the laws and regulations of the People's Republic of China (**"PRC"**) concerning the protection andcross-border transmission of Personal Information, State Secrets and State Sensitive Information (as defined below).

2.    The Represented Dissenters make no admissions in respect of the Company's position that it is permitted or required to redact documents pursuant to this protocol.   The Represented Dissenters are entering into this protocol to avoid delays in these proceedings and reserve all rights.

3.    It is also the Company's position, recorded in the First Affirmation of Xiaomeng Wang dated 12 October 2022, that it is unlikely that it will need to redact documents on the basis that they contain Important Data (as defined in paragraph 5.1 below).  If, contrary to that position, the Company decides that it is necessary to redact information pursuant to this protocol on the ground that it contains Important Data:

   3.1    The Company will notify the Represented Dissenters within 7 days of making that decision that it intends to redact Important Data pursuant to the terms of this protcol.

   3.2    Upon receipt of any notification given by the Company in accordance with paragraph 3.1, the Company and the Represented Dissenters shall seek to agree a further protocol relating to the inspection of any Redacted Documents containing Important Data in its unredacted form in the PRC and for the timing of any application for the release of Important Data in accordance with paragraph 29 (the "**Important Data Protocol**").

3.3    If the Company and the Represented Dissenters are unable to agree to the terms of the Important Data Protocol within 14 days, either party may apply for further directions from the Court.

4.    The Company shall engage a third party law firm in the PRC (the **"PRC Counsel"**) to carry out the redaction of documents in the Company's possession, custody or power in accordance with this protocol.

5.    Subject to this protocol, the Company may redact information on any one (or more) of the following grounds (**"Redacted Document"**), provided that it contains information of the type specified below (each a **"PRC Redaction Category"**):

5.1    **"Important Data"** means data which, once tampered with, destroyed, leaked, or illegally acquired or used, may endanger national security, economic operations, social stability, public health and safety, etc. The definition of important data is prescribed by the relevant PRC laws, regulations, and applicable national standards currently in force[1] or which may come into effect in the course of these proceedings.

5.2    **"Personal Information"** means information recorded in electronic or other forms, which can be used, independently or in combination with other information, to identify an individual's personal identity, including but not limited to the individual's name, date of birth, identity certificate number, passport number, driver license number, personal bank account number and bank statements, biometric data, residence address, telephone number, email address, health information, and whereabouts and which is not permitted to be transferred out of the PRC pursuant to the relevant PRC laws and regulations currently in force[2] or which may come into effect in the course of these proceedings (the Company shall notify the

---

[1]    See Measures on Security Assessment for the Cross-border Transfer of Data.

[2]    Cybersecurity Law of the People's Republic of China (as amended) (**"Cybersecurity Law"**); Personal Information Protection Law of the People's Republic of China; Criminal Law of the People's Republic of China (as amended) (**"Criminal Law"**); Interpretation of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues Concerning the Application of Law In the Handling of Criminal Cases of Infringement of Citizens' Personal Information (as amended); Measures on Security Assessment for the Cross-border Transfer of Data.

Represented Dissenters as and when such PRC laws and regulations come into effect).

5.3 **"State Secrets"** means information expressly marked as a state secret by a PRC authority with a red stamp (or other similar markings) containing the words "绝密 " (TopSecret), "机密" (Secret), "秘密" (Confidential) or other similar terms to that effect.

5.4 **"Unmarked State Secrets"** means a document that does not have an express mark by a PRC authority but which may also constitute a state secret if there is, in the PRC Counsel's judgment, sufficient evidence which indicates that the information in the document in question has already been designated by the PRC authorities as a state secret.

5.5 **"State Sensitive Information"** means information that has not been expressly marked as a state secret by a PRC authority, but which, in the opinion of the PRC Counsel meets the criteria for a state secret (i.e., matters that have a vital bearing on the State security and national interests of the PRC) The definition of state secrets is prescribed by the relevant PRC laws, regulations, and applicable national standards currently in force[3] or which may come into effect in the course of these proceedings, and the Company shall notify the Represented Dissenters as and when such PRC laws and regulations come into effect.

6. The redacted sections of a document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted. All redactions must be applied in a way that makes it clear, on the face of the redaction, which PRC Redaction Category is said to apply. Redactions should only be made to the limited extent that such redaction makes it impossible to identify Important Data, Personal Information, State Secrets, Unmarked State Secrets or State Sensitive Information in that Redacted Document.

---

[3] See Law of the People's Republic of China on Guarding State Secrets (as amended); Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets (as amended); Criminal Law; Cybersecurity Law; Interpretation of the Supreme People's Court on Several Issues Concerning the Specific Application of Law in the Trial of Cases of Stealing, Spying into, Buying or Unlawfully Supplying State Secrets or Intelligence for Entities outside the Territory of China (as amended); Definition Groups Relating to National Security and Interests (as amended).

7.  The following codes must be used to identify the redactions made (in accordance with Appendix 5):

    7.1  Important Data;

    7.2  Personal Information;

    7.3  State Secrets;

    7.4  Unmarked State Secrets; and

    7.5  State Sensitive Information.

**B    REVIEW OF REDACTED DOCUMENTS**

8.  Where documents have been redacted (fully or partially) to remove information of the type set out at paragraphs 5.1 to 5.5 of this Appendix, the PRC Counsel (with guidance from the Company's Cayman Islands legal advisors[4]) will review the redacted information within the PRC to determine whether the redacted information is relevant.

9.  For the avoidance of doubt, only the PRC Counsel may review information that has been redacted on the basis that it constitutes State Secrets, Unmarked State Secrets or State Sensitive Information.

**C    PRODUCTION OF REDACTED DOCUMENTS**

10. Where a fully or partially Redacted Document is relevant (whether because the redacted or unredacted portion or both is/are relevant, as the case may be), the Redacted Document will be uploaded to the Data Room in its redacted form.

---

[4] The same guidance that would be given to any third party document reviewers routinely used in large disputes: that is, the background of the dispute, the relevance test and the categories of documents in Appendix 3 in addition to the Company's general discovery obligation. In the case of State Secrets or State Sensitive Information, the PRC Counsel will not reveal the content of the redacted information to the Company's Cayman Islands legal advisors.

11. The following information will be provided in the Data Room in relation to any Redacted Document in accordance with Appendix 5:

11.1 Whether the redactions are for Personal Information, Important Data, State Secrets, UnmarkedState Secrets and/or State Sensitive Information; and

11.2 The document's metadata.

12. Upon uploading the Redacted Documents to the Data Room, the Company will upload to the Data Room a report ("**PRC Redaction Report**") setting out the following information for each Redacted Document:

12.1 the Document ID (as defined in Appendix 5);

12.2 the PRC Redaction Category that is said to apply;

12.3 the legal basis for the redaction (i.e. the relevant provisions of the law or regulation);

12.4 whether the redacted information is relevant.; and

12.5 in respect of redactions made for Unmarked State Secrets which are also relevant, a concise description of the nature of the redacted information.

13. Upon uploading the Redacted Documents to the Data Room, PRC Counsel will file sworn evidence in the Grand Court of the Cayman Islands confirming that they have made reasonable efforts to ensure that all of the redactions the PRC Counsel has applied to the Redacted Documents have been made in accordance with this PRC Redaction Protocol and that each redaction has been properly applied in compliance with the relevant PRC laws and regulations in force at the relevant time by exercising its professional judgement.

## D INSPECTION OF REDACTED DOCUMENTS IN UNREDACTED FORM

14. The Represented Dissenters and/or the Experts or their nominee can request inspection of a Redacted Document in its unredacted form in the PRC in accordance with the following paragraphs of this section.

D.1 Inspection of unredacted documents containing Personal Information

15. If the Represented Dissenters and/or the Experts or their nominee wish to inspect an unredacted copy of a Redacted Document containing Personal Information, they must notify the Company's Cayman Islands legal advisors in writing.

16. Within two business days of receipt of the said notice, the Company shall make the document requested available for inspection by the requesting party or its nominee in unredacted form. Where a requesting party proposes to inspect the document via its nominee it shall specify the name of the nominee and its relationship to the nominee at the time it makes its request.

17. The requesting party may only review the unredacted document at the Company's business address in Shanghai or another location as may be mutually agreed (the **"Designated Location"**), at a mutually convenient time and date, accompanied by a representative of the Company. The Designated Location will likely be the location where the server hosting the document in question is situated, and will be sufficiently large to accommodate all reviewers.

18. The parties inspecting the unredacted document at the Designated Location shall not:

    18.1 Photograph, record, videotape, make notes of, or in any way reproduce any part of the redacted Personal Information during their inspection or bring any part of the redacted Personal Information out of the Designated Location; or

    18.2 Disclose the redacted Personal Information or any part thereof to any third party whether during or after the inspection. However, the reviewers may discuss the content in general terms with their colleagues, the Represented Dissenters or their representatives so long as they do not disclose any redacted Personal Information.

19. Should the Represented Dissenters wish to dispute the proposed redactions, the Represented Dissenters may apply to the Grand Court for directions within 21 days of their inspection under paragraph 17 of this Appendix.

D.2 Inspection of unredacted documents containing State Secrets, Unmarked State Secrets, or State Sensitive Information

20. The Company will, upon a request from the Represented Dissenters or the Experts, allow unredacted versions of Redacted Documents containing State Secrets, Unmarked State Secrets or State Sensitive Information to be inspected within the PRC by an independent PRC legal counsel jointly appointed by the Company and the Represented Dissenters (the **"Independent Counsel"**).

21. The Independent Counsel will be jointly instructed by the parties by way of a joint letter of instruction agreed between the parties (the **"Joint Instructions"**). The Joint Instructions will incorporate the terms set out in this section (section D(2) of this Appendix), and will require the Independent Counsel to confirm that:

   21.1 The Independent Counsel may only inspect unredacted information (as many times as is required) in a Designated Location, accompanied by a representative of the Company;

   21.2 The Independent Counsel shall not photograph, record, videotape, make notes of, or in any way reproduce any part of the unredacted information during the inspection(s) or bring any part of the unredacted information out of the Designated Location; and

   21.3 The Independent Counsel shall not disclose the unredacted information to any third party whether during or after the inspection(s). **"Third party"** in this regard refers to anyone other than those persons who had conducted the inspection at the Designated Location.

22. If the Represented Dissenters or the Experts require a document containing State Secrets, Unmarked State Secrets or State Sensitive Information to be inspected by an Independent Counsel, they must notify the Company's Cayman Islands legal advisors of their request and the proposed Independent Counsel.[5]

23. Within two business days of receipt of the said notice, the Company must make the document requested available at the Designated Location in unredacted form for

---

[5] For the avoidance of any doubt: (1) such request may be made at any time; (2) the Company and the Represented Dissenters will each be responsible for 50% of the fees of the Independent Counsel.

inspection by the Independent Counsel. Within five business days of the inspection of the unredacted document, the Independent Counsel will:

23.1 Advise the parties' Cayman Islands legal advisors in writing whether the Independent Counsel agrees or disagrees with the PRC Counsel's proposed redactions (that is, whether the Independent Counsel agrees that the proposed redactions relate to Stale Secrets, Unmarked State Secrets or State Sensitive Information); and

23.2 Provide its reasons in writing to (i) the PRC Counsel, and (ii) the parties' Cayman Islands legal advisors provided no redacted information is divulged in doing so.

24. Within three business days of receipt of the Independent Counsel's reasons in paragraph 23.2 of this Appendix, the PRC Counsel will confirm in writing to the parties' Cayman Islands legal advisors whether it still considers the redactions to be necessary.

25. If the PRC Counsel no longer considers that the redactions are necessary, the Company shall upload the relevant document to the Data Room in unredacted form within two business days of its receipt of the PRC Counsel's written confirmation in paragraph 24 of this Appendix.

26. The parties may ask written questions of the Independent Counsel in relation to a document that is the subject of the notice delivered under paragraph 22, and the parties' Cayman Islands legal advisors must be copied into all such correspondence with the Independent Counsel. Any response by the Independent Counsel must:

26.1 Be in writing, copied to the parties' Cayman Islands legal advisors;

26.2 Not contain any of the redacted information; and

26.3 Certify that nothing within the response contravenes PRC law or regulation.

27. If any disputes pertaining to the redactions remain unresolved after the steps listed above have been completed, the Represented Dissenters may apply to the Grand Court of the Cayman Islands for directions within 21 days of receipt of the PRC Counsel's written confirmation in paragraph 24 above.

28. For the avoidance of doubt, as part of any application under paragraph 27 of this Appendix, the parties agree that the Company and the Represented Dissenters may rely upon the communications provided by the Independent Counsel in paragraphs 23 and 26 of this Appendix.

E **SEEKING APPROVAL FOR CROSS-BORDER TRANSFER OF IMPORTANT DATA**

29. Subject to paragraph 3 and in accordance with the Important Data Protocol, the Company shall seek the necessary approval from the relevant PRC authorities to discover and produce all such Important Data in the Proceedings in unredacted form. The Company will use its best endeavours to obtain necessary approvals from the relevant PRC authorities to produce Important Data in the Proceedings, and will do so expeditiously and as efficiently as possible. The Company shall keep the Represented Dissenters informed at reasonable and regular intervals of its progress in obtaining relevant approvals.

30. The Company shall, upon reasonable request by the Represented Dissenters, and where permitted by relevant PRC laws and regulations, produce to the Represented Dissenters copies of relevant application documents submitted by or on behalf of the Company to relevant PRC authorities to obtain necessary approval to produce Important Data in the Proceedings, as well as any correspondence passing between the Company or its agents and any third party, including the relvant PRC authorities, relating to the approval process.

31. The Company acknowledges that, if the PRC authorities do not approve the discovery and production of Important Data in the Proceedings in unredacted form, the Represented Dissenters may apply for further relief from the Court including an order that the Company is not permitted to withhold Important Data on the basis of compliance with foreign legal obligations.

## Appendix 7

## Schedule of Dates

[To be addressed in separate correspondence]