# EXHIBIT 9



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 184 OF 2020 (RPJ)**

**IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)**
**AND IN THE MATTER OF FGL HOLDINGS**

| | |
|---|---|
| **Appearances:** | **Mr Richard Boulton QC and Mr Mac Imrie QC of Maples Group for FGL Holdings** |
| | **Mr Simon Salzedo QC of Mourant on behalf of the Dissenters** |
| **Before:** | **The Hon. Justice Raj Parker** |
| **Heard:** | **23 May – 8 June 2022 and 22 – 24 June 2022** |
| **Decision Delivered:** | **1 September 2022** |
| **Reason for Decision Delivered:** | **1 September 2022** |

<div align="center">

**HEADNOTE**

</div>

*Section 238 of the Companies Act (2020 Revision)-merger between two US businesses-regulation of US Life assurance businesses- valuation methods-market price-efficient markets hypothesis-discounted cash flow-suitability of free cash flow to equity model-material non public information-transaction price-transaction process-fair value-Delaware jurisprudence-effect of COVID pandemic -minority discount.*



**REASONS FOR DECISION**

## INTRODUCTION

1.  The Court is asked to determine the fair value of the shares that the Dissenters held in the Company (FGL) following its acquisition by the buyer (FNF) as at the Valuation Date of 29 May 2020.[1]

2.  The Company's expert, Professor Kenneth Lehn, opines that the fair value of each dissenting share was US$8.60 as at the Valuation Date, based on market data about the share price, cross-checked to comparable companies' data, as well as other factors he describes as 'observable'.

3.  Professor Lehn explains that the market price as of 29 May 2020, adjusted to remove the value being ascribed to the shares in anticipation of the merger (the "Adjusted Unaffected Market Price"), US$8.60, is the most reliable indicator of fair value because it is "*based on the actual relationship between the changes in the price of an FGL ordinary share and the changes in the value of market and industry indices*".[2]

4.  He further explains that the Transaction Price of US$11.06 reflects "*an upper bound on the fair value of an FGL ordinary share*" because the shareholder vote at the EGM implies that it "*exceeded FGL's shareholders' assessment of the fair value of an FGL ordinary share*"[3] and because transaction prices "*reflect a sharing of the expected gains from the transaction, including anticipated synergies, that are not included in the determination of fair value*[4].

5.  Professor Lehn determined that the fair value of the Dissenter's shares is most accurately estimated using a market-based approach, which results in a fair value of less than the Transaction Price, which he says incorporates a premium, as the buyer (FNF) expected gains

---

[1] The fair rate of interest, to be applied to the amount of the judgment has, by agreement between the parties, been deferred until the fair value is determined
[2] Expert Report of Professor Kenneth M. Lehn ("Lehn Report"), dated 29 October 2021, § 36
[3] Ibid. at § 23
[4] Ibid. at §118



would be achieved by the introduction of FGL's complementary annuity and life insurance business into FNF's existing insurance business. He also points out that the Transaction Price reflects the fact that the cash portion of the merger consideration was fixed before COVID impacted FGL and, in particular, its securities portfolio, which FGL was required to mark-to-market. He therefore comes out a fair value less than the Transaction Price.

6.      By contrast, the Dissenters' expert, Mr Scott Davidson, opines that the fair value of each share was US$20.78 per share, based largely on a dividend discount model ("DDM") (akin to a discounted cash flow ("DCF") valuation methodology), which the Dissenters also refer to as a Discounted Earnings Analysis ("DEA"). The other component of Mr Davidson's valuation is the Transaction Price of US$11.06 per share, which he has blended at a ratio of 15:85 with the DCF type methodology he used[5].

7.      The positions of the parties on the fair value of the Dissenters shares, supported by the expert evidence each has adduced, are therefore poles apart.

8.      Mr Davidson reached a value 88% higher than the Transaction Price .It is also nearly double the highest price at which FGL shares had traded, which implies that the Company was grossly undervalued by the market at the time.

**Evolution of the Company**

9.      The Company has provided a description of its evolution from which this is a summary.

10.      Prior to the merger, the Company's shares were listed on the New York Stock Exchange ("NYSE"). Previously known as "FG", from its original corporate name of Fidelity & Guaranty Life Insurance Company, the Company has been in business since about 1960. Its corporate headquarters are in Des Moines, Iowa.

---

[5] {Day9/156:3-10}

220901 In the matter of FGL Holdings – Ruling - FSD 184 of 2020 (RPJ)



*2017 transaction*

11.     The Company was acquired by a Cayman Islands special purpose acquisition company ("SPAC") CF Corporation ("CF Corp") in 2017. CF Corp's founding investors included Mr Chinh Chu ("Mr Chu")[6] and Mr William Foley ("Mr Foley"). After the Company was acquired in 2017, and throughout the merger process, the Company was known as "FGL".

12.     Funding for the acquisition was provided by funds affiliated with the Blackstone Group, Inc., a large investment firm ("Blackstone"), and its credit platform, GSO Capital Partners LP, ("GSO") and FNF (Fidelity National Financial,Inc).

13.     On 25 May 2016 there was an initial public offering (the "IPO") for CF Corp.'s ordinary shares and warrants.

14.     On 30 November 2017 CF Corp.'s acquisition of FGL closed and the Company's ordinary shares and warrants began trading on the NYSE. FGL signed ,at the same time ,an investment management agreement ("IMA") with Blackstone ISG-I Advisors L.L.C. ("Blackstone Advisors"), an indirect, wholly-owned subsidiary of Blackstone. Blackstone Advisors was appointed to manage the investment of FG's assets. Blackstone Advisors has separate fiduciary duties to Blackstone and GSO.

*Shareholding*

15.     FGL's ordinary shares and preferred shares were from then held by the following individuals and entities:

a)      FNF and its subsidiaries owned approximately 7.6% of the outstanding FGL ordinary shares and all of the Series B preferred shares;

---

[6] Mr Chu was a former Senior Managing Director of Blackstone Inc



b) Funds associated with Blackstone owned approximately 17.6% of the outstanding FGL ordinary shares;

c) GSO owned approximately 2.8% of the outstanding FGL ordinary shares and all of the Series A preferred shares;

d) Mr Foley, chairman of the FNF board and the co-chairman of the FGL board, owned approximately 6.7% of the outstanding FGL ordinary shares (both directly and through BilCar, LLC, an entity he controls); and

e) Mr Chu, the co-chairman of the FGL board, owned approximately 6.7% of the outstanding FGL ordinary shares (both directly and through CC Capital Management LLC ("CC Capital"), an entity that he controls).

16. Although these investors continued to own their shares at the time of the merger, none, individually or collectively, owned a sufficient number of ordinary shares to ensure the merger was approved at an EGM.Together they controlled 41.4% of votes.

17. The balance of FGL's shares were principally owned by sophisticated institutional investors (who had no affiliation with FNF, FGL, or Blackstone) and which amounted to approximately 56.3% of FGL's issued and outstanding shares at the time of the EGM.

*The Dissenters*

18. The Dissenters invested in the Company shortly after its securities were listed pursuant to the 2017 transaction. Their investment strategy is apparently to apply 'independent fundamental analysis' to a concentrated portfolio of securities, using a long-term horizon.They use a value-oriented, event-driven strategy that focuses on identifying under-valued securities arising in special situations.

19. At the time of the merger, the Dissenters in aggregate owned 12 million ordinary shares representing approximately 5.4% of the outstanding ordinary shares,making them one of the largest unaffiliated shareholders.



*The Merger*

20.     The merger consideration (Transaction Price) comprised both cash and shares of the acquirer, FNF, and was subject to the application of a pro-ration formula between the cash component and the stock component, in the event that either the cash or stock portions were oversubscribed.

21.     The indicative merger price , based on the then market value of FNF shares at the time the terms of the merger were struck in February 2020, was US$12.50 per share, of which 40% would be paid in the form of shares of FNF, with the remaining 60% to be paid in cash.

22.     The Merger Agreement was negotiated and announced on 7 February 2020, prior to the onset of the COVID-19 pandemic in the USA and the government lockdown orders.

23.     Soon after the announcement the world began to experience the onset of the pandemic and by the time of the extraordinary general meeting ("EGM") to approve the merger transaction on 29 May 2020, the effects of COVID had already had a serious destabilising effect upon the US financial markets. The impact upon the financial position of the Company, like many others in the sector, was being anxiously considered from within and externally.

24.     Although the value of the stock component of the merger transaction had fallen by 35% between February 2020 and May 2020, the value of the cash component did not change. As a result, the total reduction in the Transaction Price was only 11.52%, from approximately US$12.50 to US$11.06. This was less than the decrease in the share prices of other comparable companies over the same time period.[7]

25.     In order for the merger to be effective at least 66.67% of the ordinary FGL shares owned by holders who attended the EGM and were unaffiliated with FNF had to vote to authorise the

---

[7] For example, between 7 February 2020 and 29 May 2020, the stock for Athene Holdings Ltd. ("Athene") dropped 37.1% and AEL dropped 25.1%. See Supplemental Report of Kenneth Lehn, § 58, Chart 1.


transaction. Notwithstanding the decline in FNF's share price by the time of the EGM, support for the merger was overwhelming.[8]

*The Company and its business*

26.     The Company has provided a description of its business from which this is a summary.

27.     FGL is a financial services business that sells annuities and life insurance products and maintains an investment portfolio in the US. It is a low-margin, capital-intensive business operating in a highly competitive market. It is subject to strict insurance regulations in the states in which it operates.

*Products*

28.     FGL provides fixed annuities and life insurance products to its US based customers.  Fixed annuities are insurance contracts that offer the person who owns the annuity a set amount of income paid at regular intervals until a specified period has ended or an event (such as the death of the person who owns the annuity) has occurred.

29.     FGL's products were sold through a network of around 200 independent marketing organisations ("IMOs") representing 37,000 independent insurance agents. The merger with FNF has allowed the Company to enter additional distribution channels.

30.     FGL offers three principal types of products:

a)      Fixed Income Annuities ("FIAs"), which are deferred annuities that link returns to specific market indices (e.g., the S&P 500). FIAs are FGL's most popular product.

b)      Multi-Year Guarantee Annuities ("MYGAs"), which are deferred annuities that offer a predetermined guaranteed interest rate for a specified number of years; and

---

[8] Over 99% of all unaffiliated shareholders who attended the EGM voted in favour of the merger. Of the 213,320,205 outstanding shares, only 1,621 voted against the merger.



c)  Indexed Universal Life policies ("IULs") are life insurance policies, in which
policyholders earn returns which are credited to the cash value of their accounts.

31.  It is of importance to note that FGL's business is highly regulated by state insurance regulators
who determine whether FGL has sufficient capital reserves and surpluses as compared to its
outstanding liabilities, which is sometimes referred to as the risk-based capital ratio (or "RBC
Ratio").

32.  These regulators oversee and approve FGL's payment of dividends to their shareholders and
limit the types of securities and credit instruments in which insurers like FGL can invest. FGL
made (and continues to make) regular public filings of detailed statutory financial statements
with its state regulators.

*Statutory accounting*

33.  FGL undertakes statutory accounting as it must pursuant to the relevant regulations. Statutory
accounting differs from GAAP accounting in that it is mainly focused on the financial strength
of the insurer. GAAP accounting is not so focussed and spreads recognition of income and
expenses over time.

34.  Statutory accounting treats many items on a cash basis and so provides that income must be
recorded only when realized and expenses must be recorded, in full, at the time the expense is
incurred. Accordingly, statutory accounting allows regulators to better estimate the present
effects of future liabilities, than GAAP accounting.

*Revenues, operations and regulation*

35.  FGL generates revenue from product sales. The proceeds from product sales are then invested
in a portfolio primarily managed by Blackstone Advisors.



36.     As the liabilities to policyholders are long-term, state insurance regulators prescribe the amounts that FGL must retain as surplus capital and regularly scrutinize its investment portfolio and investment management agreements with the goal of satisfying themselves that there is no solvency risk for the duration of the liabilities.

37.     A simplified explanation of how the Company operated at the time of the merger and its business environment is as follows:

    a)      IMOs marketed and sold products to policyholders. In the 12 months ending 31 December 2019 (the last full financial year before the Valuation Date), revenue from policy sales was US$3,839 million.

    b)      State regulators require that as new policies are sold, additional funds are reserved for capital surplus to protect against the risk that the Company cannot honour its future contractual payments to policyholders.

    c)      The net proceeds from sales of policies, after deductions for capital reserves and the payment of fees and commissions to the IMOs, were invested into the Company's investment portfolio, the vast majority of which was managed by Blackstone Advisors, pursuant to the IMA. As at 31 December 2019, FGL's average assets under management were worth US$27,358 million.

    d)      The Company generated profit when the income from the investment portfolio exceeded the amount required to meet liabilities to policyholders and other costs attendant to running the business, including management fees paid to Blackstone Advisors (referred to as the "net investment spread"); the "gross investment spread" is the difference solely between the income derived from the portfolio and payments to policyholders. [9]

---

[9] Mr Blunt explained this as follows *A. Sure, probably the simplest explanation -- so we take in Premiums from a policyholder. I'll take a common example: a client gives us $100,000, we give them guaranteed crediting rate. Today it would be 3 per cent, a year ago it might have been 2. It's for a fixed duration, so they are tied up for five years.  It has some tax benefits in the United States. We go through our investment team and our partnership with Blackstone. We invest. We invest at a rate higher than the guarantee. We are obviously taking some credit risk*



e)      As disclosed in the Proxy Statement and FGL's ordinary-course public filings with the SEC, FGL's business was subject to a number of risks including investment risks, such as defaults on credit instruments, competition, errors in mortality or morbidity assumptions, regulatory risks, and operational risks.

f)      FGL's fixed annuity and insurance products are sensitive to interest rates. Low interest rates may reduce the Company's ability to achieve the returns necessary to meet contractual obligations or cause changes in policyholder withdrawals that could have an adverse effect on the Company's financial condition, results of operation, and cash flows.

g)       On the other hand, a significant increase in interest rates in a very short period can lead to increased policy loans and policy withdrawals or surrenders, which can result in investment losses for FGL if it is forced to liquidate investments at a loss to obtain money to pay these obligations.

h)      FGL operates in an intensely competitive industry. Factors which drive competition are name recognition, service, investment performance, product features, price, perceived financial strength and claims-paying ability, and credit ratings. If the products that FGL provides are not competitive with other companies' products, this can impact its sales growth projections. Having a lower credit rating than competitors limits the distribution channels to which FGL has access, which also impacts its sales.

i)      The sale of annuities is subject to changing regulatory environments which can negatively affect the Company's business. Among the regulatory risks that FGL experienced was a change in US tax laws which prevented the Company from

---

*and liquidity risk, et cetera, and before that we are capturing a premium. So that would be the idea. Not too dissimilar from a bank, although banks tend to borrow short and lend long. The key difference would be a bank tends to borrow money short -- savings, deposits, chequing accounts -- and lends long -- mortgages. So they've got a bit of a mismatch. Our model is a little different. So we will borrow, in this case, five years/seven years, depending on the contract that the policyholder selected, and we will invest it accordingly.* {Day 2/172:4} – {Day 2/172:24}.


achieving a tax saving it had projected. The December 2017 Tax Cut and Jobs Act introduced a new "base erosion and anti-abuse tax" (commonly referred to as the "BEAT Tax"), significantly reducing the tax efficiencies that the Company had sought to achieve via its offshore reinsurance structure.

*Blackstone management of investment portfolio*

38.   Blackstone is one of the leading originators of private credit in the world.  Through the operation of the IMA, FGL had access to Blackstone Advisors' proprietary investment opportunities that provided it with high-quality, investment-grade assets that offered better returns than would have been available to FGL without its strategic relationship with Blackstone Advisors. Blackstone Advisors also provided FGL with access to bespoke investment opportunities, such as private credit, mortgage-backed securities, and alternative assets.

39.   The IMA provided FGL with access to Blackstone Advisors' 'best-in-class' investment opportunities and management expertise. With their assistance FGL was able to increase its investment yield while maintaining its credit profile. Further, FGL's relationship with Blackstone Advisors put FGL on equal (or better) footing than its competitors, many of whom had relationships with other institutional investment managers. The investment portfolio of FGL's principal competitor and most comparable company, Athene, was managed by one of the largest private equity investors, Apollo Global Management, Inc.

40.   In early 2020, prior to the merger, the IMA was amended (the "Amended IMA"). The Amended IMA had the overall effect of reducing the percentage of Blackstone Advisors' fees. The fee rates payable to Blackstone Advisors under the Amended IMA were: 0.30% on AUM up to US$25 billion; 0.24% on AUM above US$25 billion and up to US$75 billion; and 0.22% on AUM above US$75 billion. AUM between 2017 and 2020 has been estimated at US$25-30 bn so Blackstone's fees were probably in the region of US$75 - 90 million per annum.

41.   Both the IMA and the Amended IMA were required to be approved by the Company's Iowa insurance regulator.



42. The Amended IMA, like the IMA, renewed automatically and could not be terminated, except in limited circumstances. Both IMAs were publicly available and disclosed in the Company's SEC filings at the time they were signed.

43. The asset management services provided by Blackstone Advisors, as an outside asset manager, helped FGL remain competitive, both in offering attractive products to customers and in creating value for shareholders. Blackstone's management increased the investment spread on FGL's portfolio, which allowed FGL to simultaneously offer higher yielding products to customers and increased returns to shareholders.

*FGL's commercial objectives and efforts pre-merger*

44. In 2017, FGL announced it intended to grow its business through strategic mergers and acquisition of blocks of insurance policies. This goal was not achieved. Unable to grow through acquisition, FGL remained relatively small in comparison to its competitors, such as Athene, which had over three times more capital than FGL, was more diversified, in more institutional channels and broker-dealers, and had a higher credit rating than FGL.

45. In order to reduce expenses, FGL sought to expand its reinsurance business, F&G Reinsurance, with the goal of reducing FGL's effective tax rate from approximately 20% to 15% through reinsurance opportunities with third parties. This goal was not achieved because the aforementioned Tax Cuts and Jobs Act, which included the BEAT Tax, was enacted in the US.

46. Management sought to improve FGL's financial performance in other ways, seeking a goal to achieve a year-over-year return on equity of 15-20%. FGL also sought to secure the benefits of its relationship with Blackstone Advisors by repositioning FGL's portfolio to invest in higher-yielding structured products and other fixed income investments and securities of private issuers. FGL came out of certain low-yielding securities and went into higher-yielding securities such as higher-yielding corporate bonds, more structured products, and alternative securities that provided a higher return on its investments. For example, in March of 2018, FGL was predicting a net yield increase on its investment income of 50 to 70 basis points ("bps") once Blackstone Advisors completed FGL's portfolio repositioning.



47.  FGL sought to improve its credit ratings to achieve an A- rating from the four major credit rating agencies. Because banks and other channels typically will not sell insurance products from companies with a credit rating below A-, improving FGL's credit ratings would have allowed it to enter into additional distribution channels and increase sales of its insurance products. In November 2018, one of four ratings agencies that rated FGL, A.M. Best, upgraded the financial strength rating for FGL's US operating companies and F&G (Bermuda) Reinsurance to A- ("Excellent"). This upgrade allowed FGL to expand its distribution channels and had a positive impact on its access to funding and related cost of borrowing. The other ratings agencies upgraded FGL only after the merger was announced, based on the financial strength of FNF.

48.  Notwithstanding the foregoing measures, FGL's management did not achieve its goal of a year-over-year return on equity increase of approximately 15-20%. In December 2018, the Company brought on a new CEO, Christopher Blunt, who was tasked with improving the Company's performance.

*Financial metrics showed improvement*

49.  In 2018, FGL's sales across all product lines totalled US$3.6 billion, an increase of 39% compared with full year 2017.

50.  In 2019, total sales across all product lines for the year increased to US$4.3 billion, a 22% increase from 2018.

51.  In addition, FGL's investment income yield increased. In 2018, net book yield for new investments was 4.64% (which represented an increase of 43 bps) while the average National Association of Insurance Commissioners ("NAIC") rating of the Company's general account remained largely the same.

52.  FGL's 2018 adjusted operating income ("AOI") was US$257 million, or US$1.19 per share, which represented a 41% increase from 2017. FGL's 2018 return on equity ("ROE") was



16.6%, which represented an increase of 460 bps from 2017. In 2019, FGL's AOI was US$320 million, or US$1.48 per share, which represented an increase of 25% from 2018.FGL's 2019 ROE was 20.0%, which represented an increase of 340 bps from 2018.FGL's FIA net investment spread increased from 2.41% in 2018 to 2.85% in 2019. FGL's net investment spread on all products increased from 1.95% in 2018 to 2.23% in 2019. In both years, the Company's credit rating as measured by the NAIC remained the same. The higher yields on FGL's investments directly resulted from Blackstone's ability to reposition FGL's portfolio.

53. Notwithstanding these improvements, FGL still faced significant competition from larger and better-capitalized competitors. In addition, the low-interest rate environment at that time put pressure on FGL's investment portfolio. As certain fixed income investments in FGL's portfolio reached maturity, FGL had to reinvest the money earned from those investments in new fixed income securities with lower interest, and therefore, lower interest payments. This resulted in decreased yield for certain investments in FGL's portfolio.

*Share price*

54. Between the date of its IPO in 2017 and the merger, FGL's stock price fluctuated from a low of US$6.09 per share in 2018 to a high of US$10.70 per share in December 2019. This was after the Company had approved a stock buyback in December 2018 and the payment of ordinary dividends totalling US$9 million to holders of ordinary shares in 2019. In the first half of 2020, the Company paid US$4.5 million in ordinary dividends.

*The merger transaction itself*

55. On 5 November 2019, FNF made an unsolicited merger proposal to the Board of FGL to acquire the Company for US$11.00 per share in cash and FNF stock. This offer followed extended preliminary discussions principally between Mr Foley and Mr Chu.[10]

---

[10] See Proxy Statement pp77-78



56.     Neither FNF nor its chairman, Mr Foley, had the voting power required to pass a special resolution, even with the support of Blackstone.

57.     FNF believed that the acquisition of FGL would complement its existing business because as a provider of title insurance, FNF performs best when interest rates are low. Low interest rates result in an increase in the sale of mortgages and, accordingly, increases in real property transactions and the sale of title insurance. In contrast, as a provider of insurance products that offer better returns when interest rates are high, FGL performs best when interest rates are increasing.

58.     Accordingly, FNF and FGL are counter-cyclical businesses and, when combined, provide a hedge against each other's sensitivities to shifting interest rates. The rationale was that the combined businesses should be able to provide shareholder returns in both high and low interest rate environments. In fact and with hindsight, the merger with FNF allowed the Company to enter substantially broader and new distribution channels which have had a positive effect on the business since the date of the merger. The Company acquired a greater access to capital and a better credit rating. As a result the present financial state prospects of the Company are different to that which might have prevailed if there had not been a merger with FNF.

59.      Upon receipt of the proposal, FGL formed a Special Committee comprised of members of the Company's board (Mr Chu, Mr Quella, Mr Abell, Mr Baird and Mr Walsh)[11] .Mr Chu was elected as Chairman of the FGL Special Committee.

60.     Numerous advisors were appointed in respect of the potential merger with FNF.

61.     Houlihan Lokey Capital Inc ("Houlihan Lokey") were appointed as a financial advisor .The Company further appointed Credit Suisse Securities (USA) LLC ("Credit Suisse") as another financial advisor .The FGL Special Committee appointed CC Capital Partners LLC ("CC Capital Partners"), an entity controlled by Mr Chu as a transaction advisor .

---

[11] Four members of the board were excluded from the FGL Special Committee for conflicts of interest: Mr Foley and Mr Massey, who both sat on the board of FNF, Mr Blunt, due to being CEO of FGL, and Mr Chee, who was a Senior Managing Director at Blackstone.



62.     The Company appointed Skadden Arps Slate Meagher & Flom LLP ("Skadden") and Kirkland & Ellis LLP ("Kirkland") as legal advisors, and Walkers as Cayman Islands counsel.

63.     The merger negotiations took place from 5 November 2019 to 7 February 2020. The Merger Agreement was entered into and announced on 7 February 2020. The merger was approved by a special resolution of the shareholders at an EGM held on 29 May 2020 (which the experts agree is the Valuation Date), and became effective on 1 June 2020. On 1 June 2020, FGL Holdings merged with Cayman Islands companies affiliated with FNF. As a consequence, the Company became a wholly owned subsidiary of FNF and continues to operate as FGL Holdings.

64.     As mentioned above, the merger consideration was not for a fixed cash amount. Instead, as of 7 February 2020, the merger terms provided that shareholders of FGL could elect whether to receive either 0.2558 FNF shares per FGL share, or US$12.50 per FGL share in cash. If either election option was "over-subscribed" (i.e., too many shareholders selected one or the other), both options were subject to a pro-ration formula (applied to the total merger consideration). Based on the pro-ration formula, FGL shareholders who elected to receive cash consideration in effect received US$8.3465 in cash and 0.084996 FNF shares for every FGL share they owned.

65.     Due to the onset of the pandemic by April 2020 FNF's stock price had declined by approximately 37% from the date the Merger Agreement was signed. It is not disputed that all comparable company stocks and relevant market indices also declined over the same period as the world suffered from the early stages of the COVID pandemic. There was turbulence in a number of global markets.

66.     Based on the US$31.57 closing price of the FNF shares on the NYSE on 29 May 2020, the cash equivalent value of the Transaction Price on 29 May 2020 for those shareholders who elected cash consideration (i.e., the merger price or Transaction Price) was US$11.06 per share.



67.     In summary, therefore, the cash equivalent of the Transaction Price reduced from US$12.50 per share to US$11.06 per share between February and May 2020, because of the reduction in the market value of the FNF shares.The total value of the merger was approximately US$2.7 billion.

*The company's fact witnesses*

68.     FGL called three fact witnesses:   Mr Christopher Blunt, FGL's Chief Executive Officer ("CEO") who was in place from January 2019; Ms Lisa Foxworthy-Parker, the former Head of Financial Planning & Analysis at FGL and current member of FNF's Investor Relations team; and Mr James Quella, a member of the Special Committee (who has had no association with FGL since the Merger.)

*Mr Blunt*

69.     I found Mr Blunt to be a straightforward, smart and experienced executive. His evidence was balanced and consistent.

70.     He has over 27 years of industry experience and deeply understood the business, key financial metrics and the regulatory environment in which the Company operated.

71.     As a member of the Company's Board of Directors he was familiar with the start of the merger negotiations, the impact of COVID and the support that FNF as acquirer provided following the announcement of the merger.

*Transaction price*

72.     He himself owned over 800,000 shares and described the Transaction Price as at the date of the EGM,US$11.06,  as an ' *absurdly good price*" when answering questions at the Management Meeting. The context was that the price was achieved during the onset of the pandemic.

73.     Like many CEO's he has been consistently publicly upbeat about the company's business prospects since he joined the Company.



74. His views have been recorded in his public statements and on pre-announcement earning calls. He has made it clear that he held the view that the market did not fully share his belief in the growth prospects for the business and did not acknowledge the improvements he had achieved since he started at the Company, which included reducing operating costs and working with Blackstone to reposition the Company's investment portfolio and so to increase profitability[12].

75. Mr Blunt had conveyed on investor calls that the market did not fully understand the Company's business model and had undervalued FGL's shares.[13] That I accept is his personal view. The market has been shown to have been of a different view.

76. He said in cross-examination, he would "*just have to conclude that I've failed to persuade*" the market.[14] He nevertheless thought the Transaction Price was '*absurdly good.*".

77. As CEO of the Company he was in a good position to assess whether the Transaction Price was fair or not with his deep knowledge of the Company's business prospects and plans as at the relevant time.

78. He was intimately aware of the Company's business, growth trajectory, and relationship with Blackstone as an investment manager.

79. At the time the transaction was announced he conferred with his head of mergers and acquisitions Mr Jon Bayer. Mr Bayer was himself an experienced former UBS analyst. He also conferred with Mr Raj Krishnan, another senior employee, and said that they both believed that

---

[12] See {Day2/180:18} - {Day2/181:24} *(Q. So you had delivered, and you believed you could continue to deliver, consistent net spreads despite crazy gyrations in treasury rates? A. Correct. Q. And I think you are also saying that the market had failed to appreciate that FGL was different from other insurers in that particular respect? A. Yes, either failed to appreciate or simply disagreed. Q. Okay. Your view was failed to appreciate because your view was that they were undervaluing? A. Correct.); {Day3/56:9-14} ("Q. So against this understanding of how the market was being informed, what's your position on whether the market shared your beliefs about the company's operations? A. I would say they clearly didn't or you would have seen the share price trading higher. That was my view.").*
[13] {Day2/180:19-20} *("We continued to believe that our stock is fundamentally undervalued.");{Day2/181:21} ("Yes, [the market] either failed to appreciate or simply disagreed.").*
[14] {Day3/10:20-24}.



the transaction price exceeded fair value and that no topping bidder would emerge from the go shop process[15].

*Conflicts*

80.     Immediately prior to his tenure at FGL, Mr Blunt was CEO of Blackstone Insurance Solutions (BIS). He was clear that his previous association with Blackstone (BIS) would have had no effect on his undivided efforts to improve FGL. Similarly he made clear that it was solely as a director and officer of FGL that he operated and that he had no higher loyalties to Mr Foley or Mr Chu the two main players at FNF and FGL.[16]

*Covid*

81.     Mr Blunt explained how the  pandemic had adversely affected the entire  insurance sector  in the months leading up to the valuation date and highlighted the concerns at the time that a sharp decline in the value of the Company's investment portfolio might prompt regulators to require additional capital to be reserved.

82.     He also highlighted that issuers of its debt securities might default and policyholders might surrender their contracts which would mean the Company would have to realise losses which would have negatively affected its ability to grow and probably would have led to ratings downgrades.

83.     It was .according to Mr Blunt, extremely difficult to get in front of clients and process new business. Like for many businesses there was much doom and gloom around. The negative scenario planning and stalling of the business began to lift a bit by May 2020 when he said that the Company was seeing '*a little light at the end of the tunnel*' assisted by the US government and Federal Reserve US$ 2 trillion liquidity made available to the economy to stabilise markets.[17]

---

[15] {Day 3/58:9} - {Day3/60:25}. {Day3/59:1-18}.
[16] {Day2/164:20} - {Day2/165:20}; {Day3/42:21} - {Day3/43:18}.
[17] {Day2/193:9-18}; {Day3/99:9} - {Day3/100:20}. {Day2/193:20-22}; {Day2/194:2-10}.{Day2/194:5–10}.



*Effect of FNF bid*

84.　　When the merger was announced and FNF assured the market that it intended to close, FGL benefited from a credit rating upgrade conditional on the merger completing, and by the provision of a US $200 million line of credit from FNF.

85.　　This allowed FGL to continue writing business even though some of its closest competitors could not and had the effect of shielding FGL from some of the impacts of the pandemic.[18] In the Management Meeting Mr Blunt had shown the impact on one of the company's competitors, American Equity life insurance (AEL).[19]

*Dividends*

86.　　Mr Blunt also confirmed that the Company's capacity to distribute cash to shareholders is determined on the basis of statutory accounting and that its regulators had to approve any such dividends. He explained that the regulators' approach was conservative because they are concerned with solvency and the Company's ability to meet its obligations to policyholders principally, not with returning capital to shareholders.

87.　　He also explained that in assessing the capacity for distributions the Company would consider its RBC ratio, which is an important metric for ratings agencies. The Company had set a target RBC ratio of 400% as it was constantly attempting to secure ratings upgrades.[20]

88.　　He did not accept Mr Davidson's (Schedule 2) projections and pointed out the failure to account for the reinvestment necessary for continued growth because "*you can't take all of the cash out every single year from an insurance company and have high perpetual growth, it doesn't work that way*"[21].

---

[18] {Day3/53:12} - {Day3/54:12}.
[19] Management Meeting transcript, page 184, line 23 to page 186, line 5
[20] {Day3/2:18-19}; {Day3/12:12-19}; {Day3/62:19} - {Day3/63:2}. {Day7/33:1} – {Day7/33:23}.
[21] Day3/61:18} - {Day3/62:4}. This was echoed by Ms Foxworthy-Parker and Mr Quella. {Day3/75:1-9}; {Day4/19:13} - {Day4/20:13}.



*Ms Foxworthy- Parker*

89.    Ms Foxworthy-Parker joined the Company in 2014 and currently serves as Senior Vice President of Investor & External Relations (now for FNF).

90.    I found Ms Foxworthy- Parker to be well versed in the technical and regulatory aspects of the Company's financial operations. She was impressive in her knowledge of the complex statutory and regulatory accounting requirements which applied.

91.    She was meticulous and precise in the way she gave her evidence and did her best, in my view, to give a true and accurate account.

*Dividends*

92.    She had explained at the Management Meeting that the Company had a business plan for the long-term.  Positive performance of the balance sheet drove earnings which had to be reinvested in order to have sufficient statutory capital for growth.  Distributions of earnings or capital had to take account of ratings and regulatory thresholds[22]. Regulators requested projections from the Company both in the ordinary course and in response to extraordinary events such as the pandemic[23].

*Forecasts*

93.    As to the way in which the Company prepared five year forecasts, she explained that life and annuity companies such as FGL produce multi-year forecasts in the ordinary course of business .Multi-year plans were prepared in June of each year.

---

[22] {Day3/74:19} - {Day3/75:9}.
[23] {Day3/76:16} – {Day3/76:20}; {Day3/100:14-16}.



94. The forecasts are important for determining how capital and earnings will develop and, particularly, ensuring that ratings agency and regulatory thresholds are met.

95. It took more than six months to complete the forecasts which required technical input from across the Company as well as consultation with senior management[24]. It was customary for both regulators and rating agencies to require access to the Company's projections.

96. When the merger discussions commenced she was already in the process of preparing the Company's annual multi-year plan for the period 2019 to 2023.The Company had only completed its modelling process through 2023.[25]

97. As part of the merger process, the FGL Special Committee then requested that FGL management prepare finalised five-year projections for the years 2019-2023 .As a result she changed her focus to prepare the FGL forecasts which resulted in a forecast for the fourth quarter of 2019 and a refinement of the 2023 forecast to reflect input from management and the Special Committee. This resulted in the finalised FGL forecasts which could then be shared with financial advisors.

98. As a result the multi-year process she had commenced was not fully completed and FGL did not develop a projection for 2024[26].As explained by Ms Foxworthy-Parker, at the time of the finalisation of the FGL forecast, management only had access to actual results for Q1 2019 – Q3 2019.[27]Accordingly, in the FGL forecast Q1-Q3 2019 results were actual, while Q4 2019 and years 2020, 2021, 2022 and 2023 were forecasted.

99. Following the meeting of the Special Committee on 5 December 2019, in which the Special Committee requested that the FGL forecasts be produced, Credit Suisse queried whether a view of 2024 was available.  In relation to this Ms Foxworthy-Parker's  evidence was:

---

[24] {Day3/76:4-25}.
[25] Foxworthy-Parker Affidavit 2, §6
[26] Day3/80:3-7
[27] {Day 3/77:14} – {Day 3/78:7}.


*"'I recall them asking if there was a view of 2024 available, and we explained that our five-year period, as I've just walked through here, commenced with 2019 and would run through 2023 and that we would not have a management view or a bottom-up projection for 2024'."*

100.    She was challenged in cross examination as to whether the Credit Suisse work could be equated with the Company's forecasts. Ms Foxworthy-Parker "*validated*" their work on the basis that she considered the two forecasts they produced  to be "*reasonable*"[28].

101.    However, her evidence was that this could not be equated with an extra year of FGL's forecasts. They were only extrapolations, and her work was limited to confirming that the mathematics used to derive the extrapolation was correct[29]. She considered them reasonable only within their context of being an extrapolation[30].

102.    She explained that she had performed a quick top-down accuracy check, completed within four hours, as compared to the months of work that went into the preparation of the annual multi-year projections of FGL forecasts and performed '*truly a fact check*".[31]The Company forecasts by comparison were produced in a bottom-up manner which built on the Company's asset portfolio[32].

103.     Her view was that Credit Suisse was '*applying arbitrary growth to the year over year change*' to derive the extrapolation[33].

*James Quella*

104.    Mr James Quella ("Mr Quella") served as a director of the Company from 30 November 2017 to the completion of the Merger on 1 June 2020. He retired from Blackstone in 2013, where he had been a partner since 2004. He retained an appointment as a Senior Advisor at Blackstone

---

[28] {Day 3/90:17}.
[29] {Day3/81:3-14}.
[30] {Day 3/83:18} – {Day 3/18:22}.
[31] Day3/82:18} - {Day3/83:12}; {Day3/84:6-7}.
[32] Day 3/75:21} – {Day 3/76:10}.
[33] {Day3/84:6-7}



whilst he was a director of the Company. He has not been compensated in any way by Blackstone since 2016[34].

105.    Mr Quella is a seasoned insurance industry executive, had been an independent director of FGL since 30 November 2017 and was a member of the Special Committee. He had experience on other special committees and much experience of corporate mergers and acquisitions.

106.    He has served as a director on the boards of over 30 companies. He was the Chairman of the Board of Directors of Michaels' Stores and is a director of Dun & Bradstreet. His relevant prior experience included serving as Chairman of the special committee that was formed to sell Michaels' Stores to Apollo, following its unsolicited offer to acquire Michaels.

107.    He was knowledgeable about the Company, the insurance industry and the financial analyses of businesses from his years of having been engaged in buying and selling companies as a private equity partner.

108.    I found Mr Quella to be a forthright and generally reliable fact witness. He was the only witness who was called to describe the transaction process. He had a lack of independent recollection of some of the details involved in the transaction. He certainly remembered the salient 'deal points' (such as the contact by Kuvare and their interest in conducting due diligence) and provided a robust rebuttal of the Dissenters case that the process was seriously deficient. At times I found him to be less than forthcoming in relation to some of the points put to him in cross-examination by Mr Salzedo QC .Perhaps to give him the benefit of the doubt ,this was because he was unsure of the factual details . This did not detract from my overall impression that he was giving a straightforward account.

---

[34] {Day4/3:5-9}.



*Special Committee*

109.     He maintained that he and the other members of the Special Committee were well qualified to oversee a transaction of the size and complexity of the merger. He regarded the other members of the Special Committee highly, each of whom had decades of their own deal experience.

110.     He described how they had sought to attract a rival bidder to create competitive tension with FNF [35]. Because of Mr Chu's relationship and credibility with Blackstone they were an obvious potential bidder.Mr Chu continued to solicit Blackstone through the course of the negotiations with FNF but was ultimately unsuccessful in attracting a bid from them[36].

111.     Mr Quella said:

*'We kind of held out to FNF that, you know, Blackstone was still in the mix because we wanted them to feel, you know, some sense of insecurity that their bid might not be matched or offers would be better.'[37]*

*Mr Chu*

112.     Mr Quella did not have a detailed recollection of the numerous Special Committee meetings, informational sessions and telephone calls which took place .He had a high level recollection of the major decisions taken and e defended the decision to delegate negotiations to Mr Chu robustly. [38]

113.     He maintained that the Special Committee made the final decisions, not Mr Chu.  He said:

*"We would never, as a matter of process, allow Chu to negotiate a price of the company with no discussion with the special committee."[39]*

---

[35] {Day4/139:3-14}.
[36] {Day4/140:1} – {Day4/141:11};
[37] Day4/139:15} – {Day4/140:7}
[38] {Day4/34:22} – {Day4/35:13}.
[39] {Day4/86:11–13}



114.   He believed that Mr Chu was the best choice to lead the negotiations. This was because he had deep experience as a deal negotiator and transaction specialist, with an "*impeccable reputation*" and "*stunning" track record*[40].

115.   He also had a familiarity with FNF and Mr Foley, who Mr Quella considered to be a "*formidable*" negotiator[41].  Mr Chu was also capable of tough negotiation in order to achieve the best possible transaction price for FGL[42].

*MVB*

116.   Mr Quella  batted away the suggestion that Mr Chu  had a financial incentive to push through a deal at a low price so that he could derive a fee from BIS  through a sub- advisory agreement as 50% owner of MVB Management LLC ("MVB").This was  an entity owned by (affiliates of) Mr Chu and Mr Foley, and was engaged as a "*sub-advisor*" to Blackstone in connection with Blackstone's management of FGL's investment portfolio under which MVB received annually a share from Blackstone's fees. Mr Quella confirmed the fees were proportionate to the amount of FGL assets being managed by Blackstone, and were around US$12-13 million per year[43].

117.   Mr Quella was clear that Mr Chu's incentive was '*to get the highest possible value for the company*' '*over and above any other interests*' since he stood to ''*gain dramatically more money*' from an increase in the acquisition price than from MVB fees[44]. Mr Quella explained that because the IMA's moved "*with the assets*," BIS and therefore MVB were entitled to their fees regardless of who owned FGL.[45]

---

[40] {Day4/138:5-9}.
[41] {Day4/138:10-15}.
[42] {Day4/138:13-15}.
[43] {Day 4/68:8} – {Day 4/69:5}.
[44] {Day4/72:3-13}.{Day4/70:7-12}.{Day4/70:7–12}.
[45] {Day4/70:7–12}.



*CC Capital*

118. Mr Chu was also founder, Managing Partner and majority shareholder (approximately 99.7%) of CC Capital Management LLC, of which CC Capital Partners was an affiliate.CC were being paid a fee of US$3.75m of which US$3.5m was contingent on a deal closing.

119. The FGL Special Committee designated CC Capital Partners as its financial advisor to assist with its review of the FNF proposal in addition to advising on any other potential strategic alternatives available to FGL. According to Mr Quella, CC Capital conducted meaningful work against a standard fee arrangement[46].

120. I do not accept that this arrangement would have caused Mr Chu to push through a transaction to further his own interests and disregard his duties and obligations to the unaffiliated shareholders. There is no credible evidence that this happened or was likely.

121. The Special Committee as advised by their deal counsel, did not consider this to be an inappropriate arrangement . Mr Chu did not have control over decisions made by the Special Committee which would be the only body which would determine whether to recommend the merger to shareholders.

122. Mr Chu had a fiduciary responsibility to the unaffiliated shareholders as chairman of the Special Committee. He had a large personal shareholding in the Company of approximately 15 million shares. I do not accept that Mr Chu's personal financial incentives for the deal to complete were in substantial conflict with his role as chairman of the Special Committee and so caused him to conduct the negotiations inappropriately. There is no credible evidence to this effect.

---

[46] {Day4/70:7–12}. Day9/184:17} – {Day9/188:22}.



*Collar*

123. Mr Quella had a good recollection of the attempts to persuade FNF to agree to the collar sought by the Special Committee[47].The Special Committee desired a collar to protect the value of the stock portion of the Merger Consideration[48].FNF's  position was there was no legal basis to have a collar and also for the transaction to qualify as a tax-free reorganisation and that FGL needed to choose between the two.

124. His evidence was that the Special Committee and Mr Chu tried hard to achieve both a collar on FNF's share price, and also for voting agreements which obligated major shareholders to vote for any superior transaction recommended by the Special Committee.  These objectives were not achieved.

125. I find Mr Quella's account to be  credible and the fact that Mr Chu and the Special Committee were unable to secure either was simply a reality of the relative bargaining positions of the parties which went back and forth right up until days before the deal was signed[49].

126. The Dissenters have not shown that FGL chose not to include a collar because Mr Chu had a personal interest in a tax-free transaction. I accept that it was ultimately a matter of negotiation as to whether FNF would accept a collar or not[50]. In the result FNF chose not to do so even though FGL's lawyers had proposed a solution to have both a tax-free treatment and a collar.

*Offer from FNF*

127. Mr Quella maintained that the Special Committee was under no compulsion to agree to the sale and that ,pre-pandemic ,a price of US$11  per share was not acceptable because the Company had not been put up for sale.

---

[47] {Day4/61:6} - {Day4/63:19}.
[48] {Day4/119:14}.
[49] FGL Holdings Special Committee Meeting Minutes dated 4 February 2020
[50] 9 {Day4/130:5-8}.



128.   They had received an unsolicited offer from FNF :

> '*where you have to make a determination as to' do I want to sell the company at this price and is it a price that is fair to unaffiliated shareholders', and because you are not selling the company, there isn't sort of a momentum of . . . 'we got to get something done, we need to sell the company, it's like our intent to sell the company'. This was an inbound offer that we were reacting and responding to''[51].*

129.   The sequence was as follows.  On 18 November 2019, the FGL Special Committee rejected the offer of US$11.00 per ordinary share, and did not advance a counterproposal.[52] On 4 December 2019, the FNF Special Committee submitted a revised proposal, offering to acquire all outstanding shares for US$12.00 per ordinary share, to be paid 60% in cash and 40% in FNF common stock.

130.   On 5 December 2019, the Proxy Statement (Proxy) states that the FGL Special Committee signalled to FNF, via Credit Suisse, that a price of US$13.00 per ordinary share or higher would be 'compelling'.

131.   Mr Chu lowered FGL's signalled price of US$13.00 or higher to US$12.75 on 10 December 2019 following an offer of US$12.25 from FNF on 6 December 2019.

132.   On the same day, on 10 December 2019, FNF made an offer of US$12.50 per ordinary share to be paid 60% in cash and 40% in FNF common stock .The next day on 11 December 2019 the parties entered into NDA , standstill agreements and due diligence was commenced at that price.  Mr Quella's evidence is that on this date, he did not believe that a higher price would be obtained from FNF and that it did not appear that there would much more negotiation.[53]

133.   Mr Quella explained Mr Chu's authority to negotiate as follows :

---

[51] {Day4/89:14-25}.
[52] Proxy Statement, p.81
[53] {Day 4/58:24} – {Day 4/58:25}.



*"On December 10, 2019, after the telephonic informational session of the FGL special committee concluded, Mr Chu ... telephoned ... FNF to advise them that the FGL special committee believed that [their] proposal to acquire ..." The shares at 12.25: "... was insufficient and would not be accepted." And they replied that FNF would not go to 13. Mr Chu then suggested that the special committee: "... might consider entering into a transaction with FNF at a price of $12.75 ..."*
*What was his authority to do that?*

> *A.    He was the chairman of the special committee negotiating a transaction at the best available price and, of course, he did not have the authority to close a deal but he did have the real time on the ground negotiating power to extract as high a price as he could.'*

134.    I do not accept the Dissenters argument that it is a matter of concern that there is no record of the decision by the Special Committee to put 'a ceiling' on the Transaction Price of US$13.00 from the notes taken of the relevant informational session of the Special Committee.  These appear to be less than formal notes (which were unsigned) of discussions rather than formal approved minutes.

135.    I do not accept the Dissenters argument that the reality is likely to be that the price ceiling was fixed single-handedly by Mr Chu, since given its significance if it had been discussed by the Special Committee that would have been recorded by the lawyers who took the notes.

136.    Mr Quella explained that by the time the Special Committee authorised Mr Chu to solicit a US$13.00 per share offer from FNF, in early December 2019, it had already formed a good idea of what price it would be willing to accept, and what would likely be achievable in the context of the negotiation.[54]

137.    The Special Committee had:

---

[54] {Day4/87:8-12}.



> "*already reviewed a lot of information regarding value and, in the process of the negotiation, had a pretty good idea of what we thought we would be willing to accept as a best price that would be, in the context of this negotiation, achievable*"[55]

138.   Mr Quella was asked in cross examination whether there was a decision taken by the Special Committee that any offer of US$12.25 or above would be accepted if it was convinced that it was FNF's best offer. He responded that '*their best offer doesn't have to be accepted*'[56].

*Information taken into account by special committee*

139.   I do not accept the Dissenters case that the Special Committee made this assessment without the best estimate projections available at the time relating to sales, revenue and portfolio projections.

140.   I accept the Company's case that the analyses that the Special Committee reviewed during the course of the negotiations, including the finalised FGL forecasts (Cases A and B) and the Milliman report were consistent with the Special Committee's understanding of the Company's pre-pandemic value[57]. I do not accept the Dissenters suggestion that the Special Committee was negotiating without relevant information.

141.   This has in my view all the appearances of an arm's length negotiation. I do not accept the Dissenters case that the Special Committee process was insufficiently robust because it had delegated to a single individual, Mr Chu, authority to negotiate on its behalf. I accept that it did so on the understanding that the Special Committee would make the final decision. I accept the Company's case that Mr Chu's interests were sufficiently aligned with those of the unaffiliated shareholders and that he was the best person to effectively 'go into bat' against Mr Foley for FNF.

---

[55] {Day 4/87:8} – {Day 4/87:12}.
[56] {Day4/92:14-23}.
[57] {Day4/136:4-22}.



*DCF*

142.　It was also Mr Quella's view from his own transaction experience in the sector that a DCF analysis is unsuited to valuing financial services firms like FGL[58].In his opinion the valuation of FGL prepared in 2017 for use in connection with the CF Corp transaction by Bank of America Merrill Lynch (BAML) was not a DCF valuation. He said '*They called it a DCF but it wasn't*'[59].Mr Quella also said the dividends listed in the model would not be 'distributable' unless the company was not expected to be growing[60].

143.　Mr Quella was involved as a member of the Board of CF Corp. Although he did not have a good independent recollection of the details of that transaction, there is no reason to doubt that this is his honest opinion.

144.　His view was that the advisers to that transaction, Credit Suisse and Rothschild ,did not perform a DCF analysis ,and neither did the Special Committee's advisers ,Houlihan Lokey[61] and Credit Suisse[62].

*Transaction Price*

145.　His evidence as to the fairness of the transaction price was he said affirmed by the Milliman report which he described as being in the same '*ZIP Code*' that others such as Houlihan Lokey and Credit Suisse derived ,albeit using different methodologies.

146.　　He said:

---

[58] {Day4/24:5–19}.
[59] {Day 4/11:3}.
[60] {Day 4/15:18} – {Day 4/15:19}, {Day 4/16:18}.
[61] The experts agreed that Houlihan Lokey's purported DCF analysis was in fact based on the results of its comparable companies analysis, and is therefore better characterised as a market-based approach based on selected multiples derived from comparable companies.
[62] {Day4/15:2-19}; {Day4/83:19–25}; {Day4/16:7–12}.



*'the value of the common share by my recollection -- and I'm sure, if I was presented with some numbers in front of me -- was very consistent with all the other valuation methods that were used by the special committee to do its valuation, which was, you know -- sort of in the zip codes that we all now come to understand, to be 15 on the high end and sort of 10 on the low end. There is sort of that range, and this would have been consistent'[63]*

147.    The Milliman report was prepared pre-pandemic and was according to Mr Quella '*a statutory accounting cash flow analysis and statutory accounting would be close to cash flow in most cases.*'[64]

148.    He explained the adjustments he would make to the range of enterprise values from the Milliman report to give a value per share. He indicated that parent company liabilities and preferred share obligations would be deducted[65].

149.    His evidence was that the Special Committee determined that the Transaction Price was higher than fair value. The Transaction Price was in his view a '*very good deal for [FGL] shareholders*'[66] in light of the uncertain economic environment created by the pandemic at the time.  This is consistent with Mr Blunt's evidence.

150.    In his view the deal price was the best case outcome  for FGL  in light of the impact on the business environment  as  the pandemic hit.

*Effect of pandemic*

151.    He gave this rather ironic account in a scenario where FGL did not conclude the deal and the pandemic worsened:

---

[63] {Day 4/136:15} – {Day 4/136: 23}.
[64] {Day4/103:17-21}.
[65] {Day4/107:6-15}.
[66] {Day4/143:12}. Mr Quella also said  that he personally kept the FNF stock he received as consideration in the deal, and waited to sell until the share price recovered. {Day4/144:14-24}.



*"So the prospect of the downside risk, which at that contemporary moment was very hard to judge -- we knew that FGL's forecasts were noticeably lower, we knew that capital impairment, $2.5 billion of the investment losses, were real, and our ability to forecast how much worse it might get was challenging and, with the consideration still being largely cash and FNF stock being somewhat lower, but not so much lower that from a deal perspective it didn't appear to be for us a very good deal for shareholders -- and if we walked away from the deal -- and, by the way, I think there were also some considerations where we couldn't walk away from the deal even if we wanted to, but if we walked away from the deal and the pandemic got worse and FGL's stock went to [$]5, I suspect I might be in the Cayman Islands in a trial where I was being told that I should have taken the deal and what was I thinking, when there was a $11 share offer and you let the stock go to [$]4."*

152. In addition, he said that the Company's bond holdings in the sectors most susceptible to COVID had lost half of their value, and FGL's bonds were trading at 80 cents on the dollar, which reflected the "*stunning fact*" that "*certain bondholders considered the value of [FGL's] equity to be zero.*" As a consequence, FGL's share price declined "*markedly.*"[67]

153. Mr Quella referred to his previous experience of the collapse of an insurance company during the 2008 financial crisis which had become worthless at the point that it was to be sold, and he believed that FGL would similarly not have been significant or large enough to receive a government bailout if matters worsened due to the pandemic.[68] FGL's forecasts were noticeably diminished, and it was "*challenging*" to predict the further decline that could result from the uncertainty of the pandemic.[69]

*The Expert valuation evidence*

154. The valuation evidence in this case consists of:

---

[67] {Day4/142:1-5}. Day4/142:10}.
[68] Day4/143:1-2}.
[69] {Day4/143:5-8}.



a)   The expert report of Professor Kenneth Lehn (appointed by the Company) dated 29 October 2021.

b)   The expert report of Mr Scott Davidson (appointed by the Dissenters) dated 1 November 2021.

c)   Joint Memorandum of both experts dated 24 November 2021;

d)   The supplemental report of Professor Lehn dated 23 December 2021;

e)   The supplemental report of Mr Davidson dated 23 December 2021.

155.   As indicated above the principal dispute between the experts is whether the best indicator of fair value is to be found in a DCF type valuation said to be conducted on the basis of the Company's own projections (85% weight according to Mr Davidson), or an adjusted unaffected market trading price (Professor Lehn's method).

*Professor Lehn*

156.   Professor Lehn is Professor Emeritus of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh. He is a former Deputy Chief Economist and Chief Economist of the US Securities and Exchange Commission.He was a founding editor of the Journal of Corporate Finance and in addition to serving on editorial boards of several economic journals he has published more than 50 papers, primarily in the field of corporate finance. For more than 30 years, he has taught courses at the University of Pittsburgh in business valuation, mergers and acquisitions, corporate restructuring and corporate governance.He was assisted in producing his reports by Compass Lexecon.

*Assessment of his evidence*

157.   I found him to be an experienced and clear expert witness who was unmoved in his opinions by the lines of cross examination advanced. He gave evidence in a steady, measured way and in my view can be relied on for his authority and specialist knowledge.  He met the challenges


to his evidence in full. At times he appeared to be cautious and somewhat conservative [70] but generally was a witness of real assistance to the Court and his evidence is in my view generally sound and reliable. He was careful not to speculate or stray into areas where he was not sure of his ground.

158.    Although he is an unashamed enthusiast for markets for which he described himself '*as a 9 on a scale up to 10*[71]' this was supported by a presentation of objective data, supported by empirical studies. I did not find his views, to be as the Dissenters suggested, extreme and implausible. Rather for the most part [72] I found them to be sound and well-reasoned.

*Summary of his evidence*

159.    Professor Lehn considered four methods for estimating the fair value of the Company's shares on the Valuation Date: (a) the market trading price ("Market Price"); (b) the Transaction Price; (c) a comparable companies' analysis, and (d) a DCF analysis. He concluded that the best estimate of fair value could be determined using a market price analysis, cross-checked against the Transaction Price and a comparable companies analysis. He rejected the suitability of a DCF analysis.

160.    Professor Lehn opined that the Company's shares (listed on the NYSE) traded in an efficient, well-informed market, both before and after the merger announcement, and that the Market Price of the shares reflected their fair market value. The closing price of the Company's shares on the day before news of a merger was reported was US$10.18 per share. This "unaffected price" was in his view a reliable estimate of value on that date.

161.    Subsequently, after the announcement date, the outbreak of COVID adversely affected the Company, and caused the stock price of the Company, as well as that of other insurance

---

[70] For example he gave no view on FGL's exposure to interest rate risk and credit rate risk relative to other insurance businesses or on whether Mr Davidson's distributable earnings ratio of 10% for the years 2020 - 2023 is consistent with the FGL Forecast, or whether the 29 May Update was material information.

[71] {Day 5/144:17}.

[72] I do not accept his regression analysis concluding that the fair value per share was US$8.60 because of the prevailing economic conditions.



companies to decline substantially between 5 February 2020 and 29 May 2020. Therefore, Professor Lehn used a statistical analysis to adjust the unaffected price for the changes in the economic conditions in the interim period, resulting in the 'Adjusted Unaffected Price' of US$8.60 per share on the Valuation Date. It was on this aspect that I felt unable to accept his conclusions (see below).

162.   Professor Lehn also considered the facts and circumstances surrounding the negotiation of the merger consideration and the terms of the Merger Agreement, including the fact that i) the merger consideration represented a premium to the unaffected price, ii) the publicly listed price of FGL shares declined between the date of the announcement of the merger and the Valuation Date, leading analysts to conclude that the price would decline further if the merger did not close, and iii) the unaffiliated shareholders voted overwhelmingly in favour of the transaction at the EGM.

163.   Professor Lehn concluded that the Transaction Price provided a ceiling for the fair value of the Company's shares.

164.   Professor Lehn's comparable companies' analysis confirmed that the fair value of the Company's shares had declined between the announcement date and the valuation date. This supports his conclusion that the Transaction Price exceeded the fair value on the Valuation Date (indeed, the comparable companies analysis implies a fair value of between US$5.64 and US$7.82 per FGL Share, less than Professor Lehn's Market Price based fair value figure of US$8.60 per FGL Share).

165.   Although Professor Lehn considered a DCF analysis, his conclusion, which he maintained was based on common industry valuation views, is that it was not an appropriate valuation methodology to use because measurement of the free cash flows of financial services firms is exceptionally difficult, making it hard to create a reliable DCF analysis of a financial services firm.

166.   The financial forecasts prepared by the Company's management do not include projections of free cash flows and did not factor in the impact of the COVID pandemic. Professor Lehn



concludes that a traditional DCF analysis could not be used to reliably estimate the fair value of the Company's shares in the circumstances of this case.

167.   Professor Lehn also considered a DDM as a potential alternative income approach valuation methodology. Such models use dividends as a proxy to measure the cash flows that flow to equity holders. The method is to measure actual dividends forecasted to be paid out over time .The dividend discount model approach is in his view only appropriate when the projected dividends assume that the firm *will* distribute all available cash to common stockholders. In that case, the projected dividends in the last year of the explicit forecast period can be used to project dividends in the terminal period and estimate the company's terminal value.

168.   The projected dividends in the FGL Forecasts were approximately US$9 million per year (i.e., $0.01 per share quarterly), consistent with the dividend policy the Company had adopted in December 2018. He concluded that there is no reliable way to determine what the Company's dividend payments would be in the years following the explicit forecast period. Professor Lehn concludes that a DDM could not be used to reliably estimate the fair value of the Company's shares.

*Mr Davidson*

169.   Mr Scott Davidson is a managing director of the Toronto Office of Kroll (formerly Duff & Phelps), and is head of the Canadian Disputes, Investigations and Valuations practices.

*Assessment of his evidence*

170.   I found Mr Davidson to be an intelligent and articulate witness. However, perhaps because of the positions that he had taken as an expert in relation to his DCF type valuation, he was driven to provide answers which were often unresponsive to the line of questioning in cross examination and which were sometimes obscure.



171.    He was skilled at avoiding being drawn into areas of difficulty with his opinion and was content to rely on his own convictions and leave it to the Court to decide.  Some of his theories he put forward on a "take it or leave it' basis once he was challenged.

172.    He would often sprinkle doubt on the Company's case, but not follow through with clear, consistent and cogent reasons which would lead the Court to prefer his view.

173.    To his credit he made concessions on certain points.  For example, he accepted that a more detailed explanation in his Expert Report about the level of reinvestment and consideration given to regulatory capital requirements, could have been of greater assistance to the Court[73].

174.    He left the Court with many personal and subjective judgements he had reached which led to the high valuation which he sought to justify as reasonable. Ultimately the Court has found his method to be unreliable and some of these judgments were unsupported by detailed analysis or data and biased towards a high valuation (see below).

175.    I have reached the conclusion that he did not provide the Court with a balanced view or a central estimate as to fair value by using his discounted earnings method.

*Summary of his opinion*

176.    Mr Davidson concluded that the Market Price of the Company's shares was not a reliable indicator of fair value as at the Valuation Date, and did not apply any weight to the share price.

177.    With respect to the Transaction Price, he concluded that the transaction process suffered from certain deficiencies and weaknesses and was therefore likely to be a less reliable indicator of the fundamental value of the Company's shares on the Valuation Date.

178.     Notwithstanding these reservations, he accorded a 15% weighting to the Transaction Price of US$11.06.The other 85% weighting to his valuation was based on his income approach

---

[73] {Day 8/55:7} – {Day 8/55:15}



analysis, producing a range of US$20.75 - US$26.00 per share, with a point estimate of US$23.00. This results in a fair value of US$20.78 per share, inclusive of a 2% minority discount.

*The Company's case in summary*

179.   Mr Boulton QC, who appeared for the Company together with Mr Mac Imrie QC argued that the fair value of the Dissenters shares should be determined by reference to an objective market price analysis, and amounts to US$8.60 per share at the Valuation Date, for the reasons given by Professor Lehn.

180.   He pointed out that the US$8.60 figure is considerably higher than the lowest figure suggested by the other methodologies that Professor Lehn considered. He argued that Professor Lehn explains the reasons for his conclusions on a principled, rational and data-driven basis.

181.   He submitted that the fair value of the Dissenters' shares in FGL on the Valuation Date can be determined by analysing market data, and that in all the circumstances the adjusted unaffected share price provides the most accurate estimate. This approach he said is consistent with recent decisions of the Grand Court in the Cayman Islands and is also consistent with the latest authorities from the courts in Delaware, which the Cayman Islands courts have recognised make an important contribution to the jurisprudence of appraisal litigation in light of the similarities between the two jurisdictions' appraisal statutes.

182.   Professor Lehn's view was that FGL's unaffected stock price is the best evidence of the Company's fair value because there was robust information about the Company that was publicly disclosed and the market for FGL's stock was efficient.

183.   By contrast Mr Boulton QC pointed out that the Dissenters' expert, Mr Davidson, contends that the market, comprised of highly sophisticated investors with billions of dollars at risk,failed to understand FGL and therefore grossly undervalued it.

189.   He said in opening:



> *'One point about the figure of $22.54, my Lord, is that it's in a different ballpark or, to use the valuers' analogy, it's in a different football field, to every contemporaneous indicator of value in this entire case. It's double the transaction price, it's more than double the highest price at which the stock ever traded".*

190. He maintained that there is no credible allegation that the market did not have all available material information about FGL. While FGL was a standalone public company, its shares were actively traded on the NYSE and it was extensively covered by equity analysts.

191. Again from Mr Boulton QC's opening:

> *'As is usual, my Lord, we have a whole array of contemporaneous value indicators in this case: we have the analyst targets at the time, we have the valuations performed by Houlihan Lokey, we have 4,000 daily transactions in the shares, and none of these indicators at the time suggests that the fair value of FGL's shares was higher than the transaction price'.*

192. He pointed out that Mr Davidson arrives at a per share value of FGL that is nearly twice as high as the Company's highest historic trading price. With the depth of FGL's trading market and the extent of its public information and analyst coverage, he maintained that it is highly unlikely the market would have missed this.[74]

193. Indeed, he submitted that *if* FGL was positioned to pay out over half a billion dollars per year in dividends by 2027, as Mr Davidson contends, someone in the market at the time other than Mr Davidson would have worked this out, especially since FGL shares were owned by some of the most sophisticated institutional investors and investment funds.

---

[74] Mr Boulton QC pointed to the fact that after the merger closed, certain shareholders of FNF brought a derivative action on behalf of FNF, claiming that FNF overpaid for FGL and that the over-payment was motivated by Mr Foley seeking to obtain more for his FGL shares than those shares were worth. That action was recently settled and the settlement was expected to be approved by the Delaware Court of Chancery in June 2022



194. He argued that Mr Davidson's valuation approach is particularly misplaced in this case. A financial services firm, like the Company, does not lend itself to an income-based analysis because as a regulated institution it cannot just pay out all of its income in the form of dividends. Rather, it is subject to strict capital requirements imposed by regulators.

195. Indeed, as explained by Professor Lehn, FGL should not be valued using an income-based approach because such analyses fail to accurately capture the value of financial services firms such as FGL, due to the difficulty of estimating free cash flows for such businesses.

196. Furthermore, financial services firms that operate as going concerns (and not in run-off) also need to reinvest substantial capital into their portfolios so as to maximize the long-term return to shareholders, in addition to the need to comply with regulatory capital maintenance requirements.

197. Mr Boulton QC emphasised that Professor Lehn has opined that there was an efficient market for the Company's shares (which is the precondition for reliance on the market trading price) and his evidence should be accepted.

198. Moreover, given that the vast majority of FGL's value is reflected in the value of its assets under management, which are marked-to-market in its publicly filed reports, FGL is uniquely appropriate for a market-based valuation. Professor Lehn's analysis demonstrates that the Adjusted Unaffected Price, is the most appropriate methodology for valuing FGL on a standalone basis, as of the Valuation Date.

199. Alternatively, Mr Boulton QC argued that, as Professor Lehn explains in his report, the Transaction Price US$11.06 per share based on the exchange ratio for the stock component of the merger consideration, is another market-based indication of fair value, as well as the "*upper bound*" for fair value because the Transaction Price necessarily includes elements of value resulting from the transaction that are not part of the going concern "*fair value*" of the Company, such as synergies.



200.   He rejected Mr Davidson's attempts to undermine reliance on the Transaction Price by alleging deficiencies. He argued that none of the alleged deficiencies come close to suggesting that the deal process was not an effective way of discovering the true price.

201.   He argued that the Special Committee's interests were fully aligned with shareholders' interests through their ownership of FGL stock. The Special Committee undertook a serious and comprehensive sales process with the goal of maximizing the deal price.  In the event that the Special Committee was not satisfied with the results of the negotiations with FNF, the Special Committee had the power to reject any deal that it did not believe was in the best interests of FGL shareholders.

202.   He maintained that the Dissenters' allegations about the transaction process and the Special Committee amount to 'quibbles' that FGL should have conducted the deal process differently. There were sufficient objective indications of reliability which outweighed the criticisms made of the process.

203.   He also relied on the fact that notwithstanding the decline in the value of the merger consideration from the announcement date to the valuation date, the merger was approved by approximately 99% of unaffiliated shares voting at the 29 May 2020 EGM.

204.   He submitted that Mr Davidson's *ex post facto* valuation methodology is unreliable and inappropriate.  It results in a per-share price that does not comport with the principles of fair value and is fundamentally inconsistent with the conclusions of the Special Committee and all other parties with a financial interest in the transaction at the time.

*The Dissenters case in summary*

205.   Mr Simon Salzedo QC appeared for the Dissenters.  He submitted that FNF was able to acquire FGL at a price substantially below the fair value of the shares .This was for a number of reasons.

206.    The market failed properly to understand and price FGL's prospects and fundamental value. This, he submitted, was due to the fact that the market did not accept key matters relating to



FGL which distinguished it from other insurers (such as relative non-sensitivity to interest rate risk). He submitted FGL was also undervalued because it never gave medium to long-term forward guidance, so that the market remained unaware of its growth trajectory.

207.    He argued that the market for FGL's shares was fundamentally inefficient and the market price did not reflect FGL's intrinsic value .This meant that any informational efficiency that may have existed in the market for FGL shares was irrelevant.

208.    In addition to this there was specific MNPI in relation to the growth trajectory as at the Valuation Date.

209.    This he submitted undermines the Company's valuation methods based exclusively on Professor Lehn's opinion, from an observed market trading price, and the alternative, which relies on the Transaction Price being at a premium to the market price.

210.    As he put it in opening:

"*My Lord, this is an unusual appraisal case, where the company, through its expert, is putting forward an extreme view that fair value is only and simply a market trading price, adjusted downwards from the actual market trading price observable of $10.18 to a notional value of $8.60. When your Lordship recalls that the transaction price actually agreed between the special committees was thought to be worth $12.50, which is almost half as much again, you can see what an extreme view this is.*"

211.    This all led to the conclusion, he submitted, that the Court should apply a DCF type analysis for a fundamental valuation as put forward by Mr Davidson.

212.    The Dissenters rely upon the Company's own projections as adopted by the Special Committee and put forward an income approach to valuation to arrive at a fair value of US$23 per share.



*Mr Davidson's opinion*

213.   Mr Salzedo QC argued that, notwithstanding the Company's objections to this,a DCF analysis can be reliably employed in the valuation of financial services firms ,albeit there are challenges (which Mr Davidson accepts) ,in that free cash flows are not easy to estimate.

214.   He relied on Mr Davidson's expert opinion that the fair value of the Dissenters' shares as at the Valuation Date was US$20.78 per ordinary FGL share   (inclusive of a 2% minority discount),having reduced the calculation  as a result of a 15% weighting to the Transaction Price. He argued that the methodology Mr Davidson used was appropriate and reasonable in the circumstances.

*Mr Davidson's methodology*

215.   Mr Davidson calculates the value by a discounted cash flow analysis (DCF) at US$23.00 (85% weight) and the "Transaction Price", being the value of the announced price following the triggering of a proration mechanism, of US$11.06 (15% weight), less a minority discount of 2%.

216.   The Dissenters argue that this results in a fair value of US$22.54 per ordinary FGL share (more than the US$20.78 calculated by Mr Davidson, because the Dissenters argue no weight should be given to the Transaction Price).

217.   A direct equity method is used wherein the (after-debt service) earnings accruing to the common equity holders ("Common AOI") available for distribution are discounted using a cost of equity. The discrete forecast period extends through to 2027. Mr Davidson assumes a steady state to be reached in 2027, after which he considers the distributable earnings ratio to be 90%, and he employs a terminal growth rate of 3.5%. A discount rate of 10.68% is then applied.

218.   Mr Davidson says that he adopts the Company's own projections for his DCF analysis and he adopts the fairness advisers' own assessment of comparable companies for a cross check.  The Company's own projections he says show that the Company was grossly undervalued in the stock market. Unusually, he says, the Company gave no forward guidance to the market and



did not release the projections, so the market had critically and materially incomplete information.

219.    Mr Davidson conducts three reasonableness checks on his conclusion. He rejected Professor Lehn's relegation of a DCF analysis to a cross check on market prices in respect of financial services firms in circumstances where this is a direct method of assessing the fundamental value of FGL's ordinary shares and one which can be applied.

*EMH*

*Professor Lehn's view*

220.    He records that Professor Lehn relies on the market trading price of the Company's shares as indicative of fair value on the basis that FGL ordinary shares were actively traded on the New York Stock Exchange ("NYSE") during the relevant period and the market was adequately informed about the Company.

221.    He records that Professor Lehn's view, that developed and adequately informed financial markets such as the NYSE can be relied upon to determine the intrinsic value of shares, is based on a general application of the efficient markets hypothesis ("EMH") to such markets.

222.    The EMH suggests that in an efficient market, prices incorporate information quickly and rationally, and consequently are the best available estimates of a security's fundamental or intrinsic value. Where prices incorporate new information quickly and rationally, a market is informationally efficient.

223.    The EMH is therefore premised on the view that the price attributed to shares by a market which displays informational efficiency will be probative of the fundamental value of those shares (the fundamental value of the shares being the relevant inquiry under s.238).



224. Mr Davidson gives no weight the market trading price of the Company because he says there was evidence of systematic mispricing of FGL's stock and there was no clear indicator of a market trading price at the Valuation Date.

*EMH theory*

225. Mr Salzedo QC submitted that the EMH is a contested theory with, at most, limited relevance to the present case and cannot support Professor Lehn's position, which he described as extreme. As to the EMH being a contested theory, Mr Davidson maintained that there is academic literature denouncing the premise of the EMH as flawed: informational efficiency is of limited relevance to, and is not probative of, fundamental or intrinsic value. This flaw in the EMH is evident on the face of the theory: tests of semi-strong efficiency only examine whether prices move in the "correct" direction quickly following the release of new public information. Therefore, whilst they may purport to show that a company's stock price moved timeously in response to the public disclosure of information, they have no way of measuring whether it started from the right point, nor whether the move was of the right magnitude. They therefore do not in any way establish that the stock price is reflective of the underlying fundamental value of the company.

226. Mr Salzedo QC submitted that the flaws in the EMH are exacerbated particularly where other factors capable of overwhelming the meaningfulness of any informational efficiency exist in the market. Such factors include where there is material non-public information (MNPI) which cannot be incorporated by market participants into their pricing decisions, or where market participants' exhibit behaviours or biases identified in behavioural finance theories as undermining the EMH.

227. In such circumstances, the relevance of informational efficiency even on a semi-strong basis should be considered eliminated or at least heavily diminished, and so too should trading price as an indicator of fundamental value.

228. Even assuming that the EMH is in some way relevant to establishing fundamental efficiency, it is clear, he submitted, that the EMH is at most relevant where there is evidence demonstrating



that the requirements for a semi-strong version of the efficient market hypothesis are satisfied .The semi-strong version of the EMH requires that all publicly available information (past and present) is fully reflected in securities' prices. A well-informed and liquid market with a large, widely held free float, is necessary to market efficiency in a broad sense, but these factors are not sufficient of themselves to establish that requirements for a semi-strong version of the EMH are satisfied.

229.     He argued that Professor Lehn has not demonstrated that the requirements for a semi-strong version of the EMH are satisfied in respect of FGL stock at the relevant time, and a number of factors are identified by Mr Davidson which support a conclusion that the requirements for semi-strong efficiency cannot be made out vis-à-vis the Company's stock.

*Mr Davidson's opinion on market efficiency*

230.     Mr Davidson says:

a)       there was 'clear and substantial' MNPI undisclosed to the market in the form of forecasts of FGL's future performance;

b)       the market for FGL shares was relatively illiquid and lacked a large, widely held free float;

c)       the brief "event study" performed by Professor Lehn, does not demonstrate informational efficiency in FGL's share price in the pre-announcement period, not least because it includes a total of only three events, only one of which occurred prior to the announcement of the transaction(this caused Professor Lehn to conduct another study);

d)       Professor Lehn's estimate of the value of an FGL share on the Valuation Date is 'parasitic' on the value of an FGL share on 5 February 2020, and it has not been shown that the market for FGL shares was semi-strong efficient on that date. Professor Lehn relies on the closing price of an FGL share on the last date on which the price was



unaffected by market 'noise' about the Merger (which the experts agree to be 5 February 2020). That price was US$10.18 (the "Unaffected Price").

e)   Professor Lehn uses a regression analysis to walk this price forward to the Valuation Date, and estimates that the Unaffected Price would have decreased from US$10.18 to US$8.60.Professor Lehn's estimate of the price of an FGL share on the Valuation Date is entirely referential to the price of an FGL share on 5 February 2020. He justifies the price not by reference to company specific information or projections but to movement in other companies prices.

f)   His estimate therefore cannot be probative of the fundamental value of an FGL share unless it is shown, at the very least, that the Unaffected Price on 5 February 2020 was reflective of the fundamental drivers of value of FGL.

e)   Professor Lehn has not demonstrated that the market for FGL stock was even informationally efficient on 5 February 2020, and this cannot be shown in view of Mr Davidson's identification of a number of factors to the contrary such as the existence of MNPI, FGL's relative illiquidity and narrower public float, and the market's lack of understanding of FGL's business. Fundamental efficiency on that date is still more clearly not demonstrated.

*MNPI*

231.   Mr Salzedo QC relied on a number of the factors identified by Mr Davidson which indicated that FGL's share price was not probative of fundamental or intrinsic value at the relevant time, which include: the existence of MNPI in the form of the FGL forecasts; the Credit Suisse forecast/extrapolation; and the long-term outlook and growth rates for the business. In addition he relied on the alleged lack of understanding of the Company's business by the market.

232.   Of these he described the management projections (the FGL forecasts) themselves as the most important element. The Company regularly prepared multi-year projections but these were not released to the market and the Company did not give forward guidance to the market.



233.    If the Dissenters were right about MNPI, then he submitted that the Company's reliance on market trading price is misplaced.

*COVID-19*

234.    He argued, based on Mr Davidson's view, that there was no clear indicator of market trading price as at the Valuation Date. The last date on which the closing price of ordinary shares was unaffected by the pending announcement of the merger agreement on 7 February 2020 was 5 February 2020. On that date the closing price of a an FGL ordinary share was US$10.18 (the unaffected market trading price). To determine the market trading price at the valuation date it is necessary to project that forward to 29 May 2020 to conclude on an adjusted market trading price.

235.    In Mr Davidson's view an adjusted price methodology is clearly inappropriate and speculative in this case in light of the unprecedented issue posed by the COVID 19 pandemic which caused short-term market dislocation and a decoupling of market prices from fundamental drivers of value.

236.    He argued that Professor Lehn was wrong to rely on an adjusted price methodology including a regression analysis to assess the notional market trading price of an ordinary FGL share at the valuation date at US $8.60 which represents a fall of over 15%.

*Transaction Price*

237.    Mr Salzedo QC submitted that it was clear that the Transaction Price, and the valuation which Professor Lehn has put forward, significantly undervalue the Company.

238.    As to the Transaction Price, he argued that it ought to be given no weight (even although Mr Davidson gives it a low weighting of 15%) because of a number of defects with the transaction including: a number of conflicts of interest within the SGL Special Committee; the lack of an arm's length transaction with informational asymmetry in FNF's favour; the lack of a robust sale



process generally which had within it deterrents to third party offers being made during the Go Shop period.

239. He submitted that there never was an open or competitive bidding process and that decisions were taken by the Special Committee without the proper analysis required based on finalised management projections. He pointed to the foregoing of a 'collar' which would have protected FGL shareholders from the decline in FNF's share price.

240. This all would suggest that the Transaction Price of US$11.06 was more likely to be too low, well below fair value, and that no weight should be given to it as a biased indicator.

241. As to the effect of the COVID-19 pandemic, he argued, as mentioned above, that the decline between the date of the announced price and valuation date was symptomatic of prices decoupling from fundamental drivers of value and was not probative of the alleged premium on the fair value of FGL shares as Professor Lehn maintained. Far from being a ceiling on the fair value of FGL's shares, the Transaction Price must be considered a floor.

242. Moreover following such a sharp decline in the value of the stock which comprised 40% of the Merger Consideration, the FGL Special Committee should, at the very least, have considered whether it ought to revise its recommendation prior to the EGM.

*The relevant law*

*The Companies Law*

243. Section 238 of the Act (2020 Revision) introduced into the Cayman Islands in 2009 grants a series of statutory rights to members of a company which is the subject of a merger or a consolidation.

    '238.



(1)     A member of a constituent company incorporated under this Act shall be entitled to payment of the fair value of that person's shares upon dissenting from a merger or consolidation.

(2)     A member who desires to exercise that person's entitlement under subsection (1) shall give to the constituent company, before the vote on the merger or consolidation, written objection to the action.

(3)      An objection under subsection (2) shall include a statement that the member proposes to demand payment for that person's shares if the merger or consolidation is authorised by the vote.

(4)     Within twenty days immediately following the date on which the vote of members giving authorisation for the merger or consolidation is made, the constituent company shall give written notice of the authorisation to each member who made a written objection.

(5)     A member who elects to dissent shall, within twenty days immediately following the date on which the notice referred to in subsection (4) is given, give to the constituent company a written notice of that person's decision to dissent, stating —

(a) that person's name and address;

(b) the number and classes of shares in respect of which that person dissents; and

(c) a demand for payment of the fair value of that person's shares.

(6)     A member who dissents shall do so in respect of all shares that that person holds in the constituent company.



*(7)     Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of that person's share and the rights referred to in subsections (12) and (16).*

*(8)     Within seven days immediately following the date of the expiration of the period specified in subsection (5), or within seven days immediately following the date on which the plan of merger or consolidation is filed, whichever is later, the constituent company, the surviving company or the consolidated company shall make a written offer to each dissenting member to purchase that person's shares at a specified price that the company determines to be their fair value; and if, within thirty days immediately following the date on which the offer is made, the company making the offer and the dissenting member agree upon the price to be paid for that person's shares, the company shall pay to the member the amount in money forthwith.*

*(9)      If the company and a dissenting member fail, within the period specified in subsection (8), to agree on the price to be paid for the shares owned by the member, within twenty days immediately following the date on which the period expires —*

*(a)     the company shall (and any dissenting member may) file a petition with the Court for a determination of the fair value of the shares of all dissenting members; and*

*(b)     the petition by the company shall be accompanied by a verified list containing the names and addresses of all members who have filed a notice under subsection (5) and with whom agreements as to the fair value of their shares have not been reached by the company.*

*(10)    A copy of any petition filed under subsection (9)(a) shall be served on the other party; and where a dissenting member has so filed, the company shall within*



(11)     *At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be the fair value.*

(12)     *Any member whose name appears on the list filed by the company under subsection (9)(b) or (10) and who the Court finds are involved may participate fully in all proceedings until the determination of fair value is reached.*

(13)     *The order of the Court resulting from proceeding on the petition shall be enforceable in such manner as other orders of the Court are enforced, whether the company is incorporated under the laws of the Islands or not.*

(14)     *The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances; and upon application of a member, the Court may order all or a portion of the expenses incurred by any member in connection with the proceeding, including reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares which are the subject of the proceeding.*

(15)     *Shares acquired by the company pursuant to this section shall be cancelled and, if they are shares of a surviving company, they shall be available for re-issue.*

(16)     *The enforcement by a member of that person's entitlement under this section shall exclude the enforcement by the member of any right to which that person might otherwise be entitled by virtue of that person holding shares, except that this section shall not exclude the right of the member to institute proceedings to obtain relief on the ground that the merger or consolidation is void or unlawful. (emphasis added)*



244.    The previous sections in Part XVI of the Act allow for mergers and consolidations to be approved by special resolution of the company in question, that is by a two thirds majority (66.66%), without the need for further approval by the Court.

245.    This is to be contrasted with other regimes in the Law for corporate reorganisations which require higher majorities of 90% (squeeze out) or 75% (scheme of arrangement) and contemplate Court intervention.

246.    In view of the reduced majority vote required to effect the merger, Section 238 provides an important safeguard in the context of the rest of Part XVI of the Act, allowing shareholders who do not consider the merger price to represent fair value, to seek the Court's determination of fair value.

*Fair value*

247.    The meaning of 'fair value' has been analysed in the previous decisions of this Court in a number of section 238 cases.

248.    Five section 238 cases have now resulted in judgments following trials in this Court over recent years: *Integra*[75]*;Shanda Games*[76]*;Qunar*[77]*;Nord Anglia*[78]*;* and *Trina*[79].

249.    Segal J, in the most recent decision, *Trina,* summarised the Court's approach to ascertaining fair value:

> "*In ascertaining fair value, the Court must assess and determine a monetary amount which in the circumstances represents (its best estimate of) the worth, the true worth, of the dissenting shareholder's shares (**true worth meaning the actual value to the***

---

[75] [2016] CILR 192 Jones J
[76] (unreported 25 April 2017) Segal J
[77] [2019] (1) CILR 611 Parker J
[78] (unreported 17 March 2020) Kawaley J
[79] (unreported 23 September 2020) Segal J



*shareholder of the financial benefits derived and available to him from his shares and by being a shareholder). The reference to fair requires in my view inter alia that the manner and method of that assessment and determination is fair to the dissenting shareholder by ensuring that all relevant facts and matters are considered and **that the sum selected properly reflects the true monetary worth to the shareholder of what he has lost, undistorted by the limitations and flaws of particular valuation methodologies and fairly balancing, where appropriate, the competing, reasonably reliable alternative approaches to valuation relied on by the parties**."*[80]*(emphasis added)*

250.    Segal J went on to say:

*"The assessment of the true or proper monetary worth of the share can be done in appropriate cases by assuming an immediate sale and certain conditions within which the sale is assumed to take place.  This will often be the most reliable method of capturing the full monetary worth of the share.  **But the financial worth of a share can also be assessed (absent a statutory direction to the contrary) on the assumption that the shareholder retains that share and obtains the financial benefits of so doing. This is what the Dissenting Shareholders have in mind when they refer to intrinsic value (establishing a monetary value for the shareholder's bundle of rights by reference to the financial benefits flowing from the right to participate in profits and obtain distributions in a winding up).  In both cases a DCF valuation of the company can be of assistance and relied on.  The DCF valuation generates a value for the shares by starting with a valuation of the company's cashflows, which cashflows (and assets) represent the financial benefits in which shareholders may ultimately participate, allocating that value to shareholders proportionately and then making suitable adjustments to reflect the different holdings, rights and obligations of individual shareholders (in order to base the valuation on the shareholder's particular entitlement).  In the case where there is a valuation based on an assumed sale, the DCF valuation may be relevant insofar as it represents or supports a***

[80] Ibid at §91


*calculation of what a purchaser is likely to offer and pay for the shares.  **In a case where there is a valuation based on an assumed retention, the DCF valuation is relevant insofar as it represents or supports a calculation of what the shareholder is likely to receive over time by way of dividends and distributions in a winding up.**  This approach is supported by the comments of Martin JA in Shanda ...*"[81] *(emphasis added)*

251.    I agree that it follows from this analysis that in valuing the dissenting shareholder's shares, the Court does not treat market inefficiencies as flaws attaching to or inherent in those shares. The worth of shares can be assessed by reference to the financial benefits which derive from their retention (although assuming an immediate sale is often more reliable), and market perception may be corrected[82].

252.    Segal J's exposition in my view represents a helpful description of the concept of intrinsic or fundamental value and how to measure it when the Court is assessing the fair value of dissenter shareholding.

253.    Segal J went on to find that the law was not prescriptive as to which method or methods of valuation to use, stating that the selection of valuation method was an inherently fact-sensitive exercise.  He did however make clear that the calculation should be "*.undistorted by the limitations and flaws of particular valuation methodologies…".*I respectfully agree.

254.    Segal J's analysis is consistent with the previous decisions of *Qunar* and *Nord Anglia* decided respectively a year and six months earlier, as set out below.

255.    *Trina* is on appeal to CICA with a decision awaited. I understand from Mr Salzedo QC, who appeared at trial for the Dissenters in *Trina* and conducted their appeal, that Segal J's analysis of the requirements for reliance on market price is not under appeal.

---

[81] §92 ibid
[82] §97 ibid


256.   Segal J decided that if a party asserts that any measure, including market price, is a reliable indicator of fair value, that party has the burden of proving it[83], and so where a company wishes to rely on the market price it has to demonstrate absence of MNPI and a semi-strong efficiency. I also agree with that analysis.

257.   It follows that fair value is not necessarily the same as the transaction price or the market price[84].Where the court finds that market indicators are unreliable, as in the case of an inefficient market for the particular shares in question, then other valuation methodologies may prove to be a more suitable way of assessing the fair value. The court strives to find a methodology or a blended methodology which produces a result which is the best assessment of fair value in all the circumstances of the case.

258.   In *Qunar* 2019 (1) CILR the Court (Parker J) said as follows:

> *'"What does "fair value" include?*
>
> 38    *As applied in Delaware, "fair value" is a legal rather than an economic construct. It has been in the language of s.262 of the Delaware statute since 1976.*
>
> 39    *The valuation is to be performed immediately before the merger. Fair value does not take into account advantages which accrue to the company post-merger including anticipated synergies.*
>
> 40    *Jones, J. in Integra concluded that the cost saving of going private is an inherent result of the transaction from which the dissenters have dissented. They had in effect disqualified themselves from the benefit by dissenting from the merger. He says further (ibid., at para. 70):*

---

[83] §128 -131 ibid
[84] *Qunar* § 59-60 and *Shanda* CICA §22



*"For the reason which I have explained in para. 61 above, my view is that counsel's submission leads to a result which is wrong in principle and should be rejected. The respondents have a statutory right to dissent from the merger transaction, as a result of which they cease to have the rights of shareholders and are instead entitled to receive the fair value . . . They should not be afforded the benefits of the transaction from which they have dissented. Nor should the burdens of the transaction be imposed upon them."*

41      *I agree with Jones, J.'s analysis.*

42      *The phrase "fair value" does not appear in any other part of the Law in Cayman. It is to be construed like any other Cayman statute and I do so with a view to discerning the Cayman legislative intent behind the provision.*

*……..*

**'What does fair value mean?**

58      **As I have said the phrase "fair value"' is not used elsewhere in the Law and must be construed in its particular context, that is to say the simplified regime to give a mechanism for the majority to effect a merger. The dissenters' entitlement is a quid pro quo to be paid the fair value of their shares, having had their shares cancelled as part of the transaction.**

59      **I accept the dissenters' submission that it cannot only mean, or only be a proxy for, the market or traded price for the shares. The words used could have been "market or open market value" or "traded value" if that was what had been intended.**

60      **Indeed, where the market is shown to be inefficient, illiquid or badly informed, the true or "fair value" may be something quite different to the traded price. Fair value means something other than market price. It may mean more, the same, or less.**



61      *However, it does not follow that the market price cannot be a good guide to fair value if there is efficiency, active trading and knowledge. Although as I have indicated the fair value of the shares is not necessarily the same as the merger price or the price at which the shares traded before the market was affected by knowledge of the merger, the value which the shares had just before the merger may be a good cross-check.*

*Does "fair" add anything to "value"?*

62      *In my view the word "fair" adds the concepts of just and equitable treatment and flexibility to "value." That is reflected in what matters the court will take into account in its assessment of what is "fair value" in all the circumstances. It enables the court to achieve a just and equitable result on the facts of the case.*

63      *For example, the character and motivations of the dissenters are strictly irrelevant as is the timing and amount of their investment. It does not matter that the dissenters bought after the merger announcement with full knowledge of it and before the EGM, or whether they in fact voted for the merger or not. That does not affect their entitlement to be paid the fair value of their shares. Even if they can be described as speculative investors engaged in arbitrage, rather than long-term shareholders who are being "taken out" by the majority against their will, that is not relevant to the determination of the fair value of their shares. There is a no more or less deserving dissenting shareholder in the assessment of "fair value." Fair value needs to be determined in one way for all dissenting shareholders.* [85]

---

[85] The Company in this case referred the Court to the Dissenters considerations and motivations based on a review of its documents and the public record. I have found no reason to refer to this material in the judgment and it formed no part of my deliberations in the decision. See also recent CICA decision in *58.com* of Martin JA 18 August 2022 refusing leave to appeal and confirming the distinction between materials which reveal the thoughts or motivation of dissenters and materials which are capable of demonstrating value.



> **64    Neither to my mind are the company's motivation and conduct in effecting the merger, absent oppression or unfair treatment of the minority, relevant.**" *(emphasis added)*

259.    In *Nord Anglia* (unreported 17 March 2020) Kawaley J summarised what he described as the '*governing legal approach'* in *Qunar,* adopted in the company's written submissions in that case as follows:

> '"11.    *The meaning of fair value in the Cayman Islands has not been clarified by a precise legal definition. Nevertheless, the main concepts are becoming easier to express with the benefit of recent authority. For introductory purposes, the following points are the key ones:*
>
> 11.1    *It is the Dissenters' shares in the Company that are being valued;*
>
> 11.2    *The valuation is intended to compensate the Dissenters for the fair value of their shares and reflects an economic exchange of the rights and obligations attaching to the shares for cash;*
>
> 11.3    *'Fair' adds the concepts of just and equitable treatment, and flexibility, to 'value';*
>
> 11.4    ***Fair value applies to both the Dissenters and the Company; neither side should be preferred, and fair value does not require that the price must be the highest possible****;*
>
> 11.5    *Excluded from fair value are the benefits and burdens of the merger transaction itself,*
>
> 11.6    *Minority shareholdings are to be valued as such, subject to the particular rights and liabilities attaching to the shares.*



> 12    Consistent with these principles, in this case the experts have proceed on the basis that fair value is to be expressed on a "per share" basis and have agreed that fair value refers to the value of a share in the Company as a going concern, and does not include advantages which accrue to the Company as a result of the merger, including anticipated synergies, and that minority shareholdings are to be valued as such."'(emphasis added)

259.    I again respectfully agree and I would add to this summary the facts and matters relevant to determining fair value are not only those which were available to "*on-market purchasers*" at the relevant time, but include everything needed to "…*give [the Court] a full picture of the commercial reality in which the Company was operating and would have continued to operate but for the merger*".[86]

### Delaware

260.    Guidance from Delaware jurisprudence has been found to be helpful by the Cayman Courts[87] not least because appraisal proceedings have been regularly litigated in Delaware for many years on a similar statutory basis.

### Market based evidence

261.    One notable development has been that it appears that the jurisprudence in Delaware may be moving towards market-based evidence as the best indicator of value[88]. There has been a move towards favouring the objectivity of market data over the subjectivity of DCF valuations for the well-rehearsed reasons given in some of the recently decided cases[89].

---

[86] *Trina* at §106,*Qunar* at §89
[87] *Qunar* §34 and *Shanda* [2018 (1) CILR 352 CICA § 46
[88] *Starting with Dell* 177A.3d 1,3d 37 (Del.2017) and *DFC Global* 172 a.3d 346,368 (Del .2017)
[89] Which repeat the inherent challenges in a statutory appraisal proceeding where "*a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony*" *Dell* ibid.p63



*Transaction prices and market prices*

262.    It has been said in one case that the price of a company's publicly traded shares reflects the "*market's digestion and assessment of all publicly available information*" concerning the company, leading the price to be "*more informative of fundamental value*" than any non-market metric[90] and the deal price, particularly one which is a "*substantial premium to the preannouncement price,*" is a strong indicator of the higher end of fair value "*as a matter of economic reality and theory.*"[91]

263.    A high point may be said to have been expressed in the following way by the Supreme Court in DFC Global[92] :

> '*In economics, the value of something is what it will fetch in the market. That is true of corporations, just as it is true of gold. Thus, an economist would find that the fair market value of a company is what it would sell for when there is a willing buyer and willing seller without any compulsion to buy. And, outside of the appraisal context, [Delaware courts] ha[ve] often embraced these concepts of value: "[I]n many circumstances a property interest is best valued by the amount a buyer will pay for it . . . . a well-informed, liquid trading maker will provide a measure of fair value superior to any estimate the court could impose.*
>
> *Because businesses like corporations are assumed to be valuable to their equity owners because of the profits they generate, economics and corporate finance instruct rational participants in any sale process that they should base their bids on their assessments of the corporation's ability to generate further free cash flows, and to discount that to present value in formulating their offers. Likewise, the same principles instruct stockholders who buy shares of public companies to consider the free cash flows of those companies in the form of dividends and their ability to increase them over time*.

---

[90] *Fir Tree Value Master Fund, LP v. Jarden Corp.,* 236 A.3d 313, 324-25 (Del. 2020)
[91] *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.,* 210 A.3d 128 (Del. 2019 )
[92] Ibid pp 44-48



*Market prices are typically viewed [as] superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distil the collective judgment of the many based on all the publicly available information about a given company and the value of its shares. Indeed, the relationship between market valuation and fundamental valuation has been strong historically. As one textbook puts it, "[i]n an efficient market you can trust prices, for they impound all available information about the value of each security." More pithily: "For many purposes no formal theory of value is needed. We can take the market's word for it." But, a single person's own estimates of the cash flows are just that, a good faith estimate by a single, reasonably informed person to predict the future. Thus, a singular discounted cash flow model is often most helpful when there isn't an observable market price.*

*For these reasons, corporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading value of its stock—can be subject to close examination and bidding by many humans with an incentive to estimate its future cash flows value, the resulting collective judgment as to value is likely to be highly informative and that, all estimators having equal access to information, the likelihood of outguessing the market over time and building a portfolio of stocks beating it is slight.*

*Other realities emphasize why real world transaction prices can be the most probative evidence of fair value even through appraisal's particular lens. As the preceding discussion emphasizes, fair value is just that, "fair."* It does not mean the highest possible price that a company might have sold for had Warren Buffett negotiated for it on his best day and the Lenape who sold Manhattan on their worst. Rather, as the Court of Chancery has put it in another context:

'A fair price does not mean the highest price financeable or the highest price that fiduciary could afford to pay. At least in the non-self-dealing context, it means a price that is one that a reasonable seller, under all of the circumstances, would regard as



*within a range of fair value; one that such a seller could reasonably accept.'(Cinerama)*

*Capitalism is rough and ready, and the purpose of an appraisal is not to make sure that the [dissenters] get the highest conceivable value that might have been procured had every domino fallen out of the company's way; rather, it is to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction.'* (emphasis added)

*Approach taken in this case*

264. Delaware jurisprudence is helpful to look when solving problems perhaps new to Cayman law and practice, but it is not Cayman law [93] and is not to be preferred to Cayman law and practice where it differs.

265. There is no presumption in Cayman law that markets are efficient, or that a market for a share at a given time produces a trading price that approximates to fair value. Those matters must be proven on the facts of the case on the balance of probabilities.

266. As indicated above, where a company contends that the market trading price is indicative of fair value, the company must demonstrate both that there was no material non-public information ("MNPI") and that the market for the relevant shares at the relevant time was semi-strong form efficient.[94]

267. If there is sufficient evidence demonstrating semi-strong efficiency for a particular share at a particular time in a given market, then in the absence of MNPI and in the absence of evidence

---

[93] *Shanda CICA p 35*
[94] *Trina* at §§128 – 131



that that the shares were undervalued by the market[95], it may be appropriate to place reliance on the market price.

268.    The experts agreed in this case that the fair market value of an asset generally is defined as the highest price expressed in terms of money or money's worth at which the asset would change hands in a transaction between a willing buyer and a willing seller acting at arm's length in an open and unrestricted market, where neither are under any compulsion to buy or sell and both have knowledge of the facts[96]

269.    As indicated above, Cayman Islands law creates no presumption as to which valuation methodology or methodologies will be suitable in any particular appraisal.  Each side bears the evidential burden of presenting and proving their particular case to the "balance of probabilities" standard.

270.    As to the expert opinions advanced to assist the Court, the Court is free to accept or reject any particular approach and may substitute its own.  The Court needs to disregard distortions and biases in any method which renders the calculation unreliable, or not a 'central estimate'.

271.    Equally as a general matter when it comes to DCF valuations, and accepting that each case is different and to be approached on its own facts, this Court has been cautious in accepting the subjective inputs that expert valuers instructed by dissenting shareholders use .Some of these inputs with regard to growth rates and the like can have a disproportionate effect on the calculation.

272.    The Court is also cautious because the exercise is often carried out some years after the transaction in question, and in the context of hotly contested appraisal litigation.

---

[95] *Nord § 110*
[96] *Lehn* §63, *Davidson* § 15.9



273. Having said this,the DCF methodology can be an accurate measure of fair value, although its reliability will depend "*upon the reliability of the models/projections, the various assumptions and the validity of the inputs*"[97].

273. As to market price, the share price of a liquid, well-traded security can provide an approximation of the fair value of the security, absent reasons to doubt rational explanations for unexpected price movements.

274. The question for the court is not whether large well-regulated markets are perfect or produce perfect results. The question is whether they are operating efficiently for the particular shares and are as such ,reliable indicators of share values where it is shown that the market price is an unbiased estimate of the true value of the shares at the relevant time.

**Decision**

*The particular factual, commercial and regulatory context*

273. This case involves a transaction at the start of a global pandemic involving a US life insurance company listed on the NYSE. The counterparty was also publicly listed and operated in the US. Both companies were subject to extensive regulation in the states in which they operated.

274. FGL was subject to a risk-based capital (RBC) ratio which the Iowa State regulator monitored to ensure that the Company had sufficient capital to meet its obligations. The state regulators oversee and approve dividend payments to shareholders.

275. There was an extensive disclosure regime which covered the provision of information to the market and to the regulators. FGL had to make regular public filings of detailed statutory financial statements on a statutory accounting basis (which is different from US GAAP accounting which it also complied with, but which is less conservative) so that the regulators

---

[97] *Qunar § 73*

220901 In the matter of FGL Holdings – Ruling - FSD 184 of 2020 (RPJ)



could assess and monitor the adequacy of capital and reserves when considering solvency, capital adequacy and whether the Company could pay certain dividends.

*Market price*

276.    Mr Davidson concludes that no weight should be attributed to market trading price in this case because there is evidence of systematic mispricing of FGL's stock and there is no clear indicator of market trading price at the Valuation Date. He says this renders irrelevant any informational efficiency that may have existed in the market for FGL's shares, because market prices can diverge materially from underlying intrinsic value.

277.    On this fundamental point I do not accept the Dissenters case that the market for FGL's shares was inefficient and the market price did not reflect FGL's intrinsic value for the reasons set out below.

278.    However, I also do not accept that Professor Lehn's adjusted price methodology to render a price of US$8.60 as at the Valuation Date,as also explained below.

*Flaws in EMH*

279.    The Dissenters argue that the EMH and the associated tests are constructed to only test for and establish informational efficiency, and then infer fundamental efficiency ,and there is no way of testing fundamental efficiency itself.

280.    It may well be the case that there is no scientific way of testing a market's fundamental efficiency, or even that for a single firm, or a single traded security such as a share in FGL . However I accept that one can deduce from informational efficiency ,by an examination of whether prices move quickly following the release of new public information and in the 'right' direction by reference to that  information (or not) , that the market is generally efficient or not efficient as Professor Lehn explained.



281.    I accept that the test is not a perfect one,It is true that the test only shows that a company's stock price moved timeously in a particular direction in response to the public disclosure of information and does not measure whether it started from the right point or whether the move was of the right scale. Indeed a market could at times react out of all proportion to the information disclosed.

282.    It may also be the case that it is difficult to assess whether the market has impounded information to the correct extent, and it is possible for stock to be mispriced, but still correctly react to new information. There are also documented cases of market dislocation ,for example during 'bubbles' where market prices for entire sectors have diverged from what might be referred to as fundamental value and could be said in hindsight to have been inefficient. This all led Mr Davidson to say that 'the jury was still out' on EMH.

*Market prices and the expert evidence*

283.    However, Professor Lehn, who demonstrated a depth of expertise in this area, stuck to his guns notwithstanding being cross examined on these imperfections and I accept Professor Lehn's expert view that market efficiency can be and usually is evaluated by empirical tests of how quickly the price of a security responds to new information, not by analysing whether market participants are rational or whether all information is available to all market participants.[98] As to empirical tests Professor Lehn referenced Professor Eugene Fama who said in his seminal work, "*event studies generally confirm that the adjustment of share prices to events is quick and complete* '[99].

284.    The semi-strong version of the EMH requires that all publicly available information (past and present) is fully reflected in securities' prices.A well-informed and liquid market with a large, widely held free float is also necessary.  I accept Professor Lehn's opinion that both are present in this case.

---

[98] Supplemental Lehn Report,§ 16.
[99] Eugene Fama, *"Two Pillars of Asset Pricing,"* Prize Lecture, 8 December 2013, at 368



285. I accept Professor Lehn's view, supported by academic research, that the market for shares listed on the NYSE is semi-strong form efficient by reference to an analysis of the *Cammer* factors that are routinely used by US courts to assess market efficiency and by conducting an event study from which he determined that FGL's shares traded in an efficient market[100]. In particular he said that a "*cause-and-effect relationship, over time, between "unexpected corporate events or financial releases and an immediate response in the stock price*"" can be probative of efficiency.[101]

286. I accept Professor Lehn's view that a market price will be the most reliable estimate of fundamental value if it is shown that "*the market for the security is semi-strong efficient and if there is no MNPI*"[102].

287. Professor Lehn's view is that stocks traded on the NYSE are semi-strong efficient and if that is to be displaced one needs good empirical evidence with which to do so.

288. I accept his expert view on this point and reject the Dissenters argument that his view is an 'unbalanced and absolutist' one in the context of appraisal case law in the Cayman Islands.

289. It follows that I do not accept Mr Davidson's opinion that the market is not probative of fundamental or intrinsic value for the reasons he gives. Mr Davidson did not demonstrate any specific expertise in market efficiency. He did not perform an event study of FGL shares.

290. Mr Davidson performed a relative liquidity analysis of whether the FGL stock is as liquid as some other companies. Mr Davidson relies on six liquidity measures to assess the relative liquidity of FGL's shares: (i) the annual trading volume as a percentage of free float, (ii) the median bid-ask spread, (iii) the dollar volume of daily trading, (iv) the weekly trading volume as a percentage of the shares outstanding, (v) the number of trading days to turn-over average market capitalization, and (vi) the average number of trades per trading day. Applying these

---

[100] Lehn Report, §77 (regression analysis) Lehn Report, Appendix D (market efficiency analysis)
[101] {Day 5/132:7}.
[102] {Day 8/16:7}.



six measures to FGL and the eight comparable companies referenced in the Houlihan Lokey Fairness Opinion, Mr Davidson concludes that FGL's market was 'relatively illiquid.'

291. Mr Davidson also identified that 41%, of FGL's total public float was held or controlled by the affiliated shareholders. Adjusting FGL's public float to account only for its Unaffiliated Shareholders gives a value of 59% (the "Adjusted Public Float"). This Adjusted Public Float is accordingly meaningfully lower than the average for small- mid- and large- cap companies. He concluded that in view of FGL's relatively low liquidity and Adjusted Public Float, the Company's stock was less likely to be informationally efficient on a semi-strong basis than its peers.

292. I accept the Company's submission that looking at the eight companies to do a relative liquidity analysis is not germane to the question of whether FGL's shares are themselves liquid. Showing they are not as liquid as other companies does not assist the analysis. Mr Davidson also ultimately concluded that the market for FGL's shares was liquid[103] and he confirmed this at trial[104].

293. Professor Lehn's event study in his opinion determined that the market for FGL's shares responded in predictable ways to the release of new information[105].He maintained this view even though he was cross examined on the basis that only one event considered in Professor Lehn's initial "event study" preceded the relevant date for his analysis, and there was selection bias in the methodology he used in his later event study which sought to capture the pre-announcement period. He also maintained this view when it was pointed out to him that there was an unexpected increase in FGL's share price without any clear explanation.[106]As I have said he stuck to his guns and I accept his opinion.

---

[103] Davidson Report at §17.8.
[104] Day11/40:12-14}.
[105] Supplemental Lehn Report, §35, footnote 89, Lehn Report at § 77 ,Exhibit 3 ,Appendix E – Event Study Analysis
[106] Mr Quella said in his affidavit that the Special Committee was concerned that there may have been a leak of news of the potential transaction due to FGL's stock price increasing by 18% despite the absence of any new information being released to the market: *Quella 1 §41*



*Decision on market prices*

294.     I therefore have accepted what may be said to be the orthodox expert view, that when the market for a security is efficient, market prices generally provide the best indication of fair value because transactions for securities listed on stock exchanges, such as the NYSE, are between willing buyers and sellers, under no compulsion to buy or sell, who, in an efficient market, are transacting at prices that reflect all publicly available information.

295.     This is because market prices reflect a collective view from the market often involving expert professionals and thousands[107] of participants and investors who are constantly assessing the future economic returns of holding a share. These participants follow companies within sectors very closely both with regard to their public financial outputs and filings and by interactions with company management through earnings calls and investor presentations.

296.     However, I do not proceed with any assumption as to the reliability of the market as of right. To establish reliance on the market price in this case, as a matter of Cayman law, as stated above the Company has to demonstrate the absence of MNPI and semi-strong efficiency and has the burden of proving this on the balance of probabilities.

297.     I am persuaded that the Company has done so in this case. The market in my view provides a reliable indicator of value in this case and has not been displaced on the evidence as an inappropriate indicator. Professor Lehn demonstrated that the market participants were adequately informed, FGL shares were actively traded, and the market for FGL shares was efficient during the period leading up to the EGM. I have concluded that there was a well-informed market which was liquid and there was a large widely held free float. It is therefore appropriate to have regard to the market price in any assessment of fair value.

---

[107] In this case over 4,000 daily buyers and sellers



298. It is also relevant to note that as a public company, FGL was required to publicly disclose a large amount of detailed information, including: annual and quarterly reports that included financial statements for the relevant period (and Form 8-Ks and Form 425s) that disclosed material events or information that the Company was required to or chose to disclose before its next scheduled quarterly or annual filing. Moreover, as a regulated insurance company, FGL's US insurance subsidiaries were required to file, and publicly disclose, financial statements with state insurance regulatory authorities and the National Association of Insurance Commissioners ("NAIC") that were prepared in accordance with Statutory Accounting Principles ("SAP").In addition to these required filings, the Company held conference calls with analysts and investors following the release of its quarterly financial results and issued press releases frequently.

299. I accept Professor Lehn's main conclusions that:

   i) the best estimate of fair value can be determined using a market price analysis, cross-checked against a comparable companies analysis and the Transaction Price.

   ii) The Company's shares (listed on the NYSE) traded in an efficient, well-informed market, both before and after the announcement of the merger, and that the market price of the shares reflected their fair market value.

*Failure to understand FGL*

300. The Dissenters argue, as an important theme of their case, that the market never properly understood the actual value of FGL stock in the relatively short period for which it was listed, and as a result the market trading price of the Company's shares significantly and consistently departed from the fundamental value of those shares.

301. This they argue is attributable to the existence of MNPI, the market's lack of understanding of the Company's business, and the market not having enough time before the merger to grasp the clear positive momentum evident in the Company's performance.



302.     These factors they say allowed FNF to acquire FGL at a price substantially below the fair value of the shares.

304.     It is necessary to examine the evidence relevant to these arguments bearing in mind that it is for the Company to prove the market was efficient and reliable.

*Mr Blunt*

305.     Mr Davidson referred to Mr Blunt's expressions of frustration during the Management Meeting that market analysts and investors failed to appreciate the differences between FGL and other insurance companies [108].In Mr Blunt's opinion the improvements to the business made since 2017 were not reflected in the share price.

306.     It was argued by the Dissenters, in keeping with Mr Blunt's view, that that the market undervalued FGL's shares because the market did not properly understand its business model or its position vis-à-vis interest rate risk, credit risk and liquidity risk. It was conceptually 'lumped in' with other life insurers for example, who were more exposed than FGL was to the ups and downs of their asset portfolios and the interest rate environment.

307.     Mr Davidson also relied on statements made by Mr Blunt that FGL was well situated to perform in a low-interest rate environment, as opposed to its life insurance industry peers, and noted that FGL management had publicly communicated this message to the market.[109]

308.     An example of Mr Blunt's views is in an M&A call on 7 February 2020. Mr Blunt explained:

> *'The only thing I would -- sorry, the only thing I'd add to that, which is important because you ask a question, what's the market missing? I think our frustration in the F&G side for a while now has been not a lot of differentiation within our space. So*

---

[108] {Day9/132:1-11}.
[109] Davidson Report, paragraph 14.76 -14.79



*we're an insurer with a young, pretty sticky book of liabilities. We're effectively a spread lender, we don't have a lot of legacy assets that were priced many, many years ago. And so from an earnings standpoint, it trades at a ridiculously low multiple. My humble opinion, because it gets treated as a price to book, despite the fact that it has almost nothing in common with a lot of the other kind of mainline traditional insurers that are sitting on a bunch of legacy assets. So if you remember, our liabilities can be repriced on a regular basis. So that, I would say, is what the market has missed from the beginning'.*

309.   Another example is the view which he expressed in FGL's Q1 2019 Earnings Call:

   *'Our differentiated approach to investments is possible because of our stable liability profile. Given the predictable nature of our book, we can prudently assume more liquidity risk; importantly, not credit risk, in our investment portfolio at higher yields relative to our peers.'*

310.   In my assessment Mr Blunt's views, which I accept were genuinely held and which are important as they come from the CEO of the business, do not lead to the conclusion that the market did not understand FGL's business model and that there was therefore a systematic mispricing and undervaluation of FGL's stock.  They are the views of one person and not in any way determinative of the issue.

311.   It is more likely in my view that the market understood what was said about FGL's non sensitivity to interest rate risk and that incremental yield in FGL was not being attained at the price of taking on undue credit risk. The market would also have noted the improvements made to the business since 2017 and its positive momentum.

312.   The market would have analysed, weighed and assessed Mr Blunt's views as CEO and put these views into their overall assessment. There is a difference between the market understanding Mr Blunt's views and accepting that they should have the consequence as to pricing he was hoping for.



313. One analyst, Goldman Sachs, appeared to disagree with Mr Blunt's explanation of how FGL attained higher yields by taking on liquidity risk rather than credit risk[110].

314. The market would in my view have been well aware of Mr Blunt's views of FGL's growth prospects, the positive progress it had made, and its ability to succeed in a low-interest rate environment as expressed publicly in numerous earnings calls .They in all likelihood would also have understood his views and put them into their assessments and analysis as well as his opinion that the stock was under-priced, relative to the Company's peers.

*Sophisticated investors and traders*

315. Professor Lehn pointed out that most of the outstanding FGL ordinary shares were held by institutional investors.  These are entities one can presume to be generally well informed and who will have extensive research and analytic capability.

316. The statistics provided by the Company show that analysts from seven different brokerage firms covered the Company and 78 different 'market makers' traded FGL ordinary shares during 2018 and 2019.

317. In addition, 222 different institutional investors held, bought, or sold FGL ordinary shares during the four quarters before the Announcement Date.

318. This presents a picture of active investors who would have been well informed and aware of the Company's prospects and value.

319. I accept Professor Lehn's evidence that these statistics imply that there was "*significant investor interest*" in the Company, which "*in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information*."[111]

---

[110] Day 6/39:6} – {Day 6/39:16}.
[111] Lehn report §24



320. Mr Salzedo QC referred to this as perhaps the most important theme of the Dissenters case. I accept the proposition that it would be appropriate to look beyond the market price if there was MNPI and if the shares were undervalued by the market [112]. A key aspect of Mr Davidson's rejection of the market approach was his view that there was MNPI, which in his opinion meant that the unaffected market price could not accurately be adjusted and that the Transaction Price accepted by shareholders is not evidence of a ceiling on fair value, even if the market for the shares was semi-strong efficient[113].

321. In particular, the Dissenters argue that the FGL Forecasts (as of 5 February 2020 and the sales line item as of 29 May 2020) , the Credit Suisse extrapolation, and management's view that the Company was on an upward trajectory, each amount to MNPI.

*The FGL Forecasts*

322. The time period related to any alleged lack of information about management projections is important in this regard, as is what constitutes materiality. It is common sense, as Mr Davidson acknowledged, that projections become more unreliable the further out they extend[114].

323. In this case the pandemic arguably rendered the forecasts stale by the time of the EGM, showing how even carefully prepared projections may fail to be reliable due to unforeseen external events.

---

[112] *Re Nord Anglia Education Inc* (unrep. 17 Mar. 2020) § 110
[113] Davidson Report §14.9(a)
[114] {Day10/47:20} - {Day10/49:19} *("I think that is always the case, that the further one looks out into the future, the more difficult it is to predict with great precision. I think that's inherent in projections, I think that's inherent in business valuation. I think it's common sense.").*



*Materiality*

324.	As the experts noted at trial[115], using the US approach adopted in *TSC Industries, Inc. v. Northway, Inc*[116]*.,* which was reiterated in *Basic v. Levinson,*[117] a fact is material if there is "*a substantial likelihood that **a reasonable shareholder** would consider it important."(emphasis added).*

325.	Under the US approach, information is material where there is "*a substantial likelihood that the disclosure of the omitted fact would have been viewed by **the reasonable investor as having significantly altered the total mix of information made available**."*[118]*(emphasis added).*

326.	Professor Lehn said the conceptual basis for determining materiality is whether the information would have *"a significant impact on the trading decision of a reasonable investor"* [119]*.*This seems to me to be a sensible working definition.

327.	On materiality, I accept that forward-looking statements contained in projections which were unknown to the market could affect the decision of a reasonable shareholder as to whether to purchase or sell a security.  The question is whether on the facts that happened in this case.

*Findings relevant to the FGL forecasts*

328.	It was not the Company's general practice to publicly disclose long-term forecasts or internal projections of its future performance.No criticism was made of that.  The practice of not disclosing internal projections was known in the market.

---

[115] Day8/2:16} – {Day8/3:11}; {Day9/57:20} – {Day9/58:18}.
[116] 426 U.S. at 449
[117] 485 U.S. 224, 231 (1988)
[118] Basic, 485 U.S. at 224, 231-232
[119] {Day 5/194:21}; {Day 5/188:21}.



329.    However, I do not accept the Dissenters argument that management's views on the long-term growth of the Company were unknown to the market (and material) because that was not specifically disclosed in the form of forecasts/projections.

330.    As noted above, there was a large quantity of publicly available information available to the market about the Company .Its shares were actively traded.  An extensive disclosure regime was in place for disclosure to the market and to the regulators.  The Company was closely covered by equity analysts.It made public filings and held investor calls.  There was publicly available information about assets under management.

331.    I accept Professor Lehn's opinion that analysts would have understood the "general trajectory" of the business, developed their own projections for FGL (that he says were in line with the FGL forecasts) and made use of FGL's public information to create models that he says were close to the FGL forecasts.  He was of the view, which I accept, that the FGL forecasts were not substantially different from analysts' consensus forecasts with respect to common AOI or ROE.

332.    My assessment is that the market was able to make assumptions which aligned with the Company's expected growth trajectory and continually assessed its performance and potential future performance in its analysis.  It was not significantly hampered in these assessments and in the trading decisions made by the non-availability of the Company's internal forecasts in this case.

333.    The forecasts prepared for the period 2020- 2023 were taken into account by Houlihan Lokey which issued its fairness opinion relying on them and concluded that the Merger Consideration of US$12.50 per share, to be paid 60% in cash and 40% in FNF stock, was fair from a financial point of view .[120]

---

[120] {Day8/27:11-12} (Professor Lehn noted that Houlihan Lokey incorporated its review of the FGL forecasts into its fairness opinion); Houlihan Lokey Written Fairness Opinion



334. The Special Committee also took them into account and with the advice and assistance of its financial and legal advisors, recommended that FGL shareholders vote in favour of the Merger. Although they were supplied to FNF and not more generally I do not accept that FNF was informationally privileged by comparison, or compared to any other possible buyer, so that it was better able to assess whether the price it was paying was a good one.

335. The FGL forecasts were in fact made publicly available in the Proxy (albeit in summary up to 2023) issued in April 2020. Over a month after that FGL shareholders voted overwhelmingly in favour of the transaction.

336. The shares voted in favour of the proposal to approve the Merger Agreement accounted for approximately 99.9% of the shares present at the EGM. This is evidence that the value of the Merger Consideration on the Valuation Date compared favourably to the FGL's shareholders' assessment of the fair value of an FGL ordinary share as of this date.

337. Approximately 70% of FGL shareholders were institutional investors who, in the opinion of Professor Lehn, performed "*sophisticated analysis to determine how they were going to vote on mergers*," *and they simply would not have voted to approve the transaction if the FGL Forecasts were in any way a "game changer*[121].This seems to me to be a reasonable conclusion.

*The experts and market reaction*

338. Professor Lehn made the point that it was remarkable that Mr Davidson's view was that notwithstanding this result, he alone had identified information which caused a US$2 billion increase to the value of the Company and this was not picked up by anyone else.[122]This has in my view considerable force.

---

[121] Day6/162:6-21}
[122] Day6/96:23} – {Day6/97:16}.



*There was no market reaction*

339.    In addition, I accept the Company's broad case that Professor Lehn demonstrated that Mr Davidson's analysis of MNPI does not establish that the allegedly non-disclosed information was material. It is contradicted by the empirical evidence because the market did not react to its publication.

340.    The forecasts were publicly filed with the SEC on 1 April 2020 (in FNF's Form S-4,)again on 20 April 2020 (in FNF's Definitive Form S-4,) and in FGL's 27 April 2020 Definitive Proxy.The reaction to FGL's disclosure of the Proxy Statement did not, according to Professor Lehn, result in a statistically significant change.[123]

341.    I accept the Company's case that if Mr Davidson was right that the FGL Forecasts revealed that the Company's intrinsic value was more than twice the then market price, the market price of FGL's stock would have reacted accordingly ,and it did not.[124] To my mind, it makes no difference that the analysts had different price targets (I accept the Company's case that  they were all within a band of US$10-US$12.50 ,)or whether they were conducting intrinsic valuations of the shares or predicting short term price movements based on comparable market prices for other companies.

342.    In addition there was no analysts comment that the FGL forecasts revealed for the first time some previously hidden value.

343.    The fact that there was no reaction in my view is consistent with the conclusion that the forecasts are in line with what the market analysts were expecting as far out as the analysts were prepared to project. The view among analysts, after the release of the FGL forecasts, was that

---

[123] I note that the Proxy specifically cautioned investors that the FGL Forecasts *"are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this information statement are cautioned not to place undue reliance on this information."*

[124] Lehn Report, Exhibit D-1  (chart tracking the share price and the per-share value of Merger Consideration from 5 February 2020 to 1 June 2020



FGL's share price would substantially decline if the merger was not completed and they did not increase their assessments of the fair value of FGL ordinary shares[125].

344.    Professor Lehn said in his evidence "*not a single analyst mentioned the FGL forecast in the reports that they released on FGL following [the release of the definitive proxy statement on 27 April, 2020]*"[126].

345.    It is a reasonable inference to draw in my view that they were not material and confirmed the market's view of the Company's value at the time, even if an element of this was due to the fact that the shares were trading on the basis of transaction arbitrage[127] and not fundamentals after 5 February 2020.

*Analysts*

346.    As I have said ,I accept Professor Lehn's opinion was that analysts understood the "general trajectory" of the business from the work he has done [128] and are likely to have developed their own projections for FGL that were in line with the FGL Forecasts.  It is also the case, as the Company has shown, that prior to the release of the FGL Forecasts, analysts made use of FGL's public information to create models that were close to the FGL Forecasts[129].Again, the FGL Forecasts were not substantially different from analysts' consensus forecasts with respect to Common AOI or ROE.

---

[125] Supplemental Lehn Report, § 36*; ("analysts stated that the price of FGL ordinary shares would decline substantially if the acquisition was not completed.") ("Lehn Supplemental Report");* {Day5/189:17} (Professor Lehn gave evidence that four analyst reports released after the FGL Forecasts opined that the FGL share price would decline if the merger were not consummated.

[126] {Day5/46:16}

[127] Accepted by Professor Lehn:Day 6/109:17}, {Day 6/116:25}, {Day 6/176:12}.

[128] 6 February 2020 - Houlihan Lokey Project Z Presentation – Selected Comparison of Management Projections vs. Wall Street Analyst Estimates; Professor Lehn Exhibit S-1, Management Estimates vs. Wall Street Research

[129] Houlihan Lokey Project Z Presentation dated 6 February 2020, Selected Comparison of Management Projections vs. Wall Street Analyst Estimates); JP Morgan, FGL Holdings: Initial Thoughts on Potential Deal with Fidelity National Financial (including illustrative DCF that is in line with the FGL Forecasts) Email from Wes Carmichael to Lisa Foxworthy-Parker showing that Citi, Credit Suisse, Goldman Sachs, RBC, Sandler O'Neill, and UBS estimates were almost identical to the FGL Forecasts.



*Done deal and stale information*

348.     The Dissenters suggested that FGL shares did not positively react to the announcement of FGL's fourth quarter 2019 results, the issuance of the Proxy, and the announcement of FGL's first quarter 2020 results, because investors believed that the merger was a 'done deal' or that the information was stale because of the onset of the pandemic.

349.     There is some force in this from the timing of the disclosure in April 2020.However,I do not find it credible that the market was not actively monitoring this information even though the perception at the time was that the deal was likely to conclude. Assuming that the market did believe the deal was all but done, and the reason the FGL investors did not react positively was because they believed that FNF would benefit from the merger (which seems to have been the general sentiment), one would have expected at least FNF investors to have positively reacted to the disclosures, but they too did not.

350.     I do not believe it is reasonable to draw an inference that the market analysts did not read and consider the Proxy and have proper regard to FGL's projections .I accept Professor Lehn's opinion that analysts had access to a significant amount of information about FGL's business[130].There is no reason to believe that they did not review anything new which came out from the Company.

351.     I also do not accept the Dissenters argument that it makes any difference that analysts only ever had views for about two further years .They were likely to be interested in the information and how it fed into value. I accept Professor Lehn's view that there was nothing in the Proxy material that was material to their valuation and the disclosed portions of the FGL forecast did not alter the analysts' already-determined price targets[131].

352.     They are likely to have been tracking developments closely and may well have taken the view that the FGL Forecasts were similar to the analysts' projections for 2021 and 2022 and were

---

[130] Lehn Report, §64 noting that FGL was required to file SAP statutory financial statements with state insurance regulators, which were publicly available
[131] {Day 6/101:21}.



therefore not material. Indeed at one point in his evidence Mr Davidson said that the FGL Forecasts tracked closely with consensus estimates and would not have been surprising to analysts when they were released.[132]

353.    As to the sales line item I do not accept that this can be MNPI and the market needed it to be fully informed.  Mr Davidson said in his evidence:

> '*Q.*      *But the fact remains that, whatever the sales figures had been, they would not have changed your valuation at all, would they?*
>
> *A.*      ***Well, they are part and parcel of what's underneath the derivation of the common AOI, as presented.  Just like all the other elements of the business, which are developed through the multiyear planning process, and the like. So the ultimate manifestation of it may be those common AOI figures but in context.*[133]*'*(emphasis added)

354.    The Company pointed out that Mr Davidson did not incorporate sales into his valuation and relied on AOI which was available in the FGL forecasts.

*Other arguments on MNPI*

*Regulation FD*

355.    It is the case that Ms Foxworthy -Parker said at the Management Meeting:

> "*Yeah, I agree, Chris.  And I would clarify **the multiyear plan is classified as material, non-public information under Reg FD**, so that plan, those numbers,   quantitive numbers, in terms of targets were not shared externally.*"*(emphasis added)

---

[132] {Day9/79:24} - {Day9/80:6} ("*Q: [Y]ou can't say … that the [FGL Forecasts] would have been a surprise in any way? A: No, that's fair. I think the figures speak for themselves…*").
[133] Day 8/109:9} – {Day 8/109:17}.

220901 In the matter of FGL Holdings – Ruling - FSD 184 of 2020 (RPJ)

Page **84** of **139**



356. It is clear she was referring to MNPI in a specific context. The SEC regulation in question is not about valuation .It controls selective disclosure of information so that the whole market receives information at the same time,not just the selected analysts or investors.

357. I accept the Company's case that materiality under "Reg FD" is being assessed in a different context and for a different purpose. Ms Foxworthy -Parker was not giving evidence on the meaning of materiality more generally.

*Credit Suisse*

358. I have found that the FGL forecasts were not material to valuation, and so Credit Suisse's extrapolation of those forecasts for a period that is four years into the future is likely to not be material to valuation either. In addition, the following matters support that conclusion.

359. The Credit Suisse extrapolation itself, whilst it may have had '*management guidance for 2024'* was not created by FGL from a base factual layer. The Company's management had not formed a view of 2024. Credit Suisse took information from the FGL forecasts that was subsequently made available in the Proxy and performed an arithmetical exercise to extend them by one year. This was not a "bottom-up" model which incorporated any new data from FGL.

360. I accept the Company's case that Credit Suisse extrapolated using "*near identical percentage growth for 2024 as the [FGL] projection from 2023,*" and held constant the 2023 estimated margins for operating income, GAAP income, and common AOI as a percentage of revenue[134].

361. Houlihan Lokey, the financial advisor to the FGL Special Committee, did not rely upon the Credit Suisse extrapolation in analysing the fairness of the transaction. There is no evidence that the Credit Suisse extrapolation was provided to FNF.

362. The Credit Suisse extrapolation was provided to the Special Committee, but it did not alter its view that the Transaction Price was fair.

---

[134] {Day3/81:3–14}



363. As I have said I accept Ms Foxworthy -Parker's evidence that the Company provided no inputs for 2024 other than the FGL forecast through 2023 and that the Company's only involvement was to check and validate Credit Suisse's mathematical calculations.

364. In sum, the Credit Suisse extrapolation was not in my view material to a reasonable investor's assessment of fair value and it makes no difference that it was not publicly disclosed.

*The 29 May update*

365. The Dissenters case is that this was MNPI because it would have given the inside view of management on the impact of the onset of COVID and the Q1 2020 earnings reports which was not available to the market. The argument made by the Dissenters is that management's view was that sales were not to be reduced for 2021-2023 and that FGL would recover in full. This does not reflect Ms Foxworthy- Parker's evidence.

366. Ms Foxworthy-Parker gave evidence that these projections ,which were also to adjust for the impact of the merger, were still drafts as of 29 May 2020 (which is clear on the face of the document) and did not represent management's finalised view or opinion of value as of 29 May 2020.[135]

367. I accept her evidence to the effect that that this was still a work in progress. The fact that they showed a reduction in sales for 2020, but not 2021, 2022 and 2023 ,does not in my view mean the Company had determined the effects of the pandemic were short term and manageable or had any clear lines of sight. She said the update reflected the "*early tea leaves on COVID'.*[136]

367. The Company points out that they also reveal a decrease in AOI in 2023 (the final projected year) and reveal a lower value because of the impact of the pandemic.

---

[135] {Day7/176:11} - {Day7/178:14}
[136] {Day 3/101:24}.



368. Ms Foxworthy-Parker also made the point, which I also accept, that the draft cannot speak to the value of stand-alone FGL because its purpose was to reflect the impact of the merger[137].

369. The Company explained in response to an information request from Mr Davidson that the *'document is an interim rolling sales flash forecast reflecting actual year-to-date sales through February 2020 and projected sales only through the end of 2020'.*"I accept that they had not been revised for 2021-2023 because management had not yet worked out what the impact of COVID might be on the subsequent years.

370. Ms Foxworthy Parker did not recall whether there were any changes to the sales projections for 2021, 2022 and 2023 when management did engage in in June 2020[138].

371. As to the views of management on growth that '*the business was going to continue to grow modestly," and "not fall off a cliff."* '[139]these are not the types of comment that are MNPI.[140]The views were repeated publicly in any event.

*Conclusion*

372. The Company has shown that the factors alleged to have been MNPI have had no impact on the market or indeed the transaction. They were in my view not material for the reasons stated above.

373. I also give weight to the fact that at the EGM, 99.9% of the unaffiliated shareholders present (representing 78% of all unaffiliated shareholders) all of whom were on notice of the FGL forecasts (via the Proxy),[141] voted in favour of the transaction. Of the 213 million FGL shares eligible to vote, only 1,678 shares were voted against the merger.

---

[137] {Day3/97:6} – {Day3/98:19}.
[138] {Day 3/113:16}
[139] *Day9/126:22} - {Day9/127:1}*
[140] I note that in Nord, Kawaley J regarded statements from management as "*sales patter*" and "*talk[ing] up*" future prospects
[141] Although only in summary and without the fifth year



374.    The shareholder base was sophisticated and must be reasonably assumed to be focused on maximising the value of its investment.  It is in all the circumstances a fair inference to draw that those unaffiliated shareholders believed that the Transaction Price exceeded the value of FGL stock at the time.

375.    Likewise the Special Committee and members of management were in possession of the FGL forecasts (and the Credit Suisse extrapolation) and this did not alter their view that the Transaction Price was fair, and in the case of Mr Blunt "*an absurdly good price after COVID'*.

376.    I accept the Dissenters argument that one cannot speculate about the motives of a particular shareholder in relation to their voting decision, but the figures indicate that the shareholders as a body overwhelmingly considered that the value of the merger consideration was acceptable. Even though the Transaction Price had fallen  from US$12.50 to US$11.06 , the large body of unaffiliated shareholders almost all approved the deal .It can be reasonably inferred that they would not have done so in such overwhelming numbers if the belief  was that the FGL forecasts (as of 5 February 2020 and the sales line item as of 29 May 2020) , the Credit Suisse extrapolation, and management's view that the Company was on an upward trajectory ,revealed that the Company was worth significantly more than the Transaction Price offered.

377.    There is however a feature of this case which makes reliance on market price as an unbiased indicator less clear at the Valuation Date.

*The market price on the valuation date*

378.    Professor Lehn relies on the closing price of an FGL share on the last date on which the price was unaffected by market 'noise' about the merger (which the experts agree to be 5 February 2020). That price was US$10.18 (the "Unaffected Price").

379.    He then uses a regression analysis to walk this price forward to the Valuation Date, and estimates that the Unaffected Price would have decreased from US$10.18 to US$8.60 (a fall of over 15%).



380. I accept the Dissenters argument and Mr Davidson's view that the market's cumulative downturn during the relevant period (5 February to 29 May 2020 ) renders market-based approaches less reliable at the Valuation Date.

381. The Company argues that the evidence showed that the market's behaviour during the relevant period was rational. Not all stocks suffered declines in market value during that time[142] There is also evidence of a cause-and-effect relationship between information disclosures and price movements[143].

382. Notwithstanding these factors I accept the Dissenters case that establishing a reliable indicator of market trading price as at the Valuation Date is problematic in this case . This is not for the reason given by the Dissenters that the unaffected price on 5 February 2020 was not reflective of the fundamental value of FGL and the price on the valuation date was parasitic on this.In my view the market for FGL stock was informationally efficient at that date ,the Company has shown there was no MNPI and the market for an FGL share was efficient .

383. However ,the announcement of the merger as well as well as the effect of the COVID 19 pandemic ,which caused market values world -wide to plummet ,cause difficulty in assessing the actual value of FGL's shares from the observed trading prices on this critical date.

384. I accept Mr Davidson's view that the novel issue posed by the Covid-19 pandemic, caused unprecedented short-term market dislocation from 20 February 2020.This is well documented and amounted to the steepest short term decline for US stocks in history and was sharper than the financial crisis (10 October 2007 onwards), the burst of the dot-com bubble (5 September 2000 onwards) and the stock market crash of 1987 (26 August 1987 onwards).The S&P 500

---

[142] Delivery services companies performed well for example, unlike airline stocks, demonstrating that the market was reacting efficiently in response to continually developing information about industry and company specific risks and opportunities

[143] For example, on 29 October 2019, the price of FGL ordinary shares increased by 7.85% after S&P Dow Jones Indices announced that FGL ordinary shares would be added to the S&P SmallCap 600 Index effective 1 November 2019. Moreover, on 6 February 2020, after Reuters reported that FNF was "*nearing a deal to acquire*" FGL, the price of FGL ordinary shares increased to close at US$12.15 per share, up US$1.97 (19.35%) from the previous day's closing price


experienced a decline of 34% from an index level of 3,386 on 19 February 2020 to a low point of 2,237 on 23 March 2020 .I accept that this market volatility caused market prices to depart from underlying drivers of value and that persisted as at the Valuation Date.

385.  Mr Davidson is of the view that any attempt to estimate a hypothetical adjusted market trading price on this date is speculative and inappropriate. This seems right in my assessment.

386.  I therefore do not accept Professor Lehn's evidence that one can achieve a central estimate by way of a statistical exercise on comparable companies and to roll forward FGL's stock price.

387.  Mr Davidson points out that Professor Lehn's analysis shows that the methodology which he employs to "walk forward" market prices from the pre-Announcement Date to the Valuation Date might well have resulted in errors of 20% (for Athene and Brighthouse) or more . On this particular judgment call I do not accept Professor Lehn's view that that the Unaffected Price would have decreased from US$10.18 to US$8.60.

*Mr Davidson's valuation (schedule 2 to his Report)*

*Approach*

388.  As is well known ,a traditional DCF valuation calculates projected cash flows for a  business for an explicit period .It takes into account the time value of money  by applying a discount rate which also takes into account risk. There is then a terminal value calculation at the end of the explicit forecast period.

389.  The Court approaches a DCF valuation of a company on the basis that it can be a reliable indicator of value and is a commonly used valuation method. As the Court has said in the context of s.238 cases ,the DCF methodology can be an accurate measure of fair value, though its reliability will depend "*upon the reliability of the models/projections, the various assumptions, and the validity of the inputs*"[144].

---

[144] *Qunar* at §73



390.    The question in this case is whether it is an appropriate method to give weight to (Mr Davidson says almost full weight to) in the context of a financial services business like FGL and against the Court's conclusions as to the general reliability of the observed trading price of FGL (until the pandemic hit) and the price for which FNF acquired FGL.

391.    For the reasons explained by Professor Lehn which I accept[145] and which are discussed in Professor Damodaran's articles and textbook,[146] financial services businesses cannot be valued using a traditional DCF model without encountering real difficulties.

392.    I accept Professor Lehn's summary on this when applied to FGL which can be distilled into four main difficulties:

    a)      the measurement of free cash flows, which are used in DCF analysis, is exceptionally difficult for financial services firms like FGL.

    b)      the FGL forecasts do not include projections of free cash flows,

    c)      unlike other businesses, a large portion of a financial service firm's liabilities results from the firm's sales of financial products to its customers. FGL's liabilities largely consist of contract holder funds and future policy benefits that result from the sale of insurance products to its customers. However, FGL also uses proceeds from the sale of insurance products to purchase assets. This raises a difficult issue that is critical for DCF analysis regarding whether these liabilities should be treated as debt or as an operating liability.

---

[145] See {Day7/12:9} {Day7/14:3}. Professor Lehn explaining how DCF models work and why they do not lend themselves to insurance company valuations and critiquing Mr Davidson's model. *Highfields Cap., Ltd. v. AXA Fin., Inc.,* 939 A.2d 34, 54 (Del. Ch) is an example of a Delaware case which makes the same observation.
[146] See Aswath Damodaran, *"Valuing Financial Service Firms,"* 1 Journal of Financial Perspectives (2013) 1-16 (*"There are two key measurement problems that you face in valuing financial services firms. **The first is that the cash flows cannot be easily estimated, since many of the ingredients needed are not clearly defined … the nature of their businesses makes it difficult to define both debt and reinvestment, making the estimation of cash flows much more difficult."***)(emphasis added)



d)   it is difficult to measure reinvestment for financial services business like FGL. Professor Lehn noted that neither Houlihan Lokey, nor Credit Suisse, nor any equity analyst report he reviewed, used a traditional DCF analysis to estimate the value of FGL, which supports his opinion that a traditional DCF analysis is not a reliable method for doing so.

393.   Alongside these specific difficulties as they relate to FGL, there is also the caution a Judge has in s.238 cases, in applying the subjective views of one expert with his or her own DCF model, applied some time after the date of the transaction, who comes to a view different from the 'ball park' collective view of the market.  This too in the context of hotly contested appraisal litigation when certain subjective inputs can have a disproportionate effect on the ultimate value arrived at.

394.   The Court is faced with the question of whether the dividend discount model (DDM)[147] or perhaps better termed 'free cash flow to equity" (FCFE) approach used by Mr Davidson is an approach which is capable of rendering an unbiased estimate of fair value in this case, the Court having assessed each individual component and the approach as a whole as to its reliability.

395.   The Dissenters argue that the free cash flow to equity approach is appropriate because it concerns cash flows within the business that are 'attributable to the equity.' They say the method which is to assess the company's cash flows which are attributable to equity holders which are then discounted at the cost of equity, not the weighted cost of capital is appropriate. The Court disagrees that this presents a reliable method in this case for the following reasons.

*Flaws in the model and conclusion*

396.   The main flaw in my assessment is that Mr Davidson's projected dividends do not reflect the amounts that the  Company would expect to be able to pay to shareholders in real commercial terms.

---

[147] Mr Salzedo QC clarified in closing argument that the challenge with applying a dividend discount model to FGL is that the projected years would be too far out to predict what the dividend payouts would actually be.



397.    I accept what Professor Lehn says:

> "In my opinion, I think a fair reading of what he has done indicates that he did not do
> a free cash flow to equity model.…"Well … he is doing … the present value of
> distributable earnings … not free cash flow.And to me, that is fundamental, that he is
> not valuing a stream of cash flows, he is valuing a stream of distributable earnings."[148]

398.    I accept the Company's case that the FGL forecasts reflect that the Company expected to
continue making nominal, discretionary dividend payments of US$0.01 per share quarterly
throughout the forecast period, which corresponds with a payout ratio of less than 3 percent of
FGL's projected AOI in each year of the forecast period.

399.    Professor Lehn notes that the estimation of distributable earnings for the years 2020 - 2024
exceeds and is different from the projected "*common dividends*" in the FGL forecast and Credit
Suisse 2024 extrapolation .This is because Mr Davidson's analysis measures the present value
of the cash flows which will be 'available' for distribution to a shareholder of FGL over the life
of the business .That is not the same exercise as assessing what sums will in fact be distributed
in any given year .

400.    For the reasons set out below no reliable evidence was presented at trial to demonstrate what
FGL's dividend capacity over and above its forecasted dividends would have been, given
regulatory restrictions and the need to preserve its RBC ratios.

400.    I have reached the conclusion that there is no reliable method provided by Mr Davidson for
estimating dividend payments after the explicit forecast period and that his model is not a
reliable method of estimating the fair value of FGL stock.

401.    I should add that even were I persuaded that it was an appropriate method, I have reached the
conclusion that Mr Davidson's analysis is not reliable for estimating the value of FGL because
it contains too many speculative and biased inputs on the basis of assumptions that are not

---

[148] Day7/17:6; Day7/17:15

220901 In the matter of FGL Holdings – Ruling - FSD 184 of 2020 (RPJ)



reasonable (or real world) and the concluded price is therefore not a reliable estimate of fair value.

*Analysis*

402. The crux of Mr Davidson's analysis is contained in his one-page DEA model, Schedule 2. The forecast years estimated are from 2022 -2027 and then a terminal year. Mr Davidson took cashflows for the first five years from the FGL forecasts, and derives the figures until 2023. There is then the Credit Suisse extrapolation.

403. I accept the Company's case that although Mr Davidson justified his "DCF approach" as being based on a bottom up FGL forecast (for the period 2020-2023), in fact almost all of the value calculated by Mr Davidson derived from his own extension to the FGL forecast out to 2028 and his own subjective valuation inputs[149] .

*Cash flows to equity*

404. As I have said above, Mr Davidson seeks to identify cash flows to equity which value what a shareholder may in due course receive (dividends available for distribution) and looks at the timing and the risk of those cash flows over time.

405. Fair value can be determined, as Segal J said in *Trina,* on the assumption that a shareholder retains the share and ultimately obtains the financial benefits of so doing .However, this notional value cannot exist in a vacuum and must be of a likely realisable benefit to the shareholder.

406. There needs to be an anchoring of this exercise in factual reality so that the value is related to the likelihood that the benefits would ultimately have flowed to shareholders and they would share in the benefits. Such benefits could ultimately be achieved by a shareholder in a variety of ways: eg, by dividends; share buybacks; liquidation; on market share purchases; a takeover;

---

[149] See Davidson Report, Schedule 2, footnote 1.



an appraisal action; or in some other way tangible way. However the actual benefits ultimately obtained may be very different from the 'projected distributable earnings' depending upon factors relating to any one of these methods at the relevant time it occurs, and the commercial realities of the business and regulatory environment. In order to assess fair value one needs to have some reasonable method of determining these contingencies. Mr Davidson has not provided the Court with a reasonable method to do so.

407. Professor Lehn's opinion, which I accept, is that Mr Davidson's method is not really a DCF valuation because it is not estimating the value of the company's equity by discounting expected cashflows to the equity at the cost of equity.

408. I accept the Company's case that if the money is not distributed, but is used in other ways to support the business through investment in capital projects or invested because of the tightly controlled regulatory position, it cannot logically be a cash flow to equity.

409. The issue is highlighted by the following evidence Mr Davidson gave:

> "*In my mind, that's not the measure that we are trying to get here. Whether they are actually distributed or not, they are available. And that, in my view, is the appropriate measure of the net benefit that accrues to the common shareholders here in each year, whether actually paid out, whether actually dividended out, whether the company would have continued on dividending only $9 million a year, as it had, or not ...*")[150].

410. It is not clear how and when the shareholder would ever realise the notional value of 'available dividends' in reality .Mr Davidson in answer to this said it would be when the business is acquired '*at that value'* or through '*some mix of dividends and share buybacks or other payouts and some lift in the price of the business on the stock exchange that reflects that value*'[151]-(see below).

---

[150] Day8/57:14} {Day8/58:4}
[151] Day11/60:20} – {Day11/61:3}.


411.    When the Court asked him to explain whether it was realistic to assume dividend payments in excess of US$9 million annually[152], Mr Davidson stated:

> *'I'm not saying the dividend policy would or should change. What I'm saying is different, and I think the focus on dividends is a bit illusory because I fully acknowledge they've made a decision to pay out $9 million a year in dividends and you would get the wrong answer if you said, okay, well, let me just take that stream of dividends forever as a shareholder, if that's what I'm going to get, and present value that in some fashion and convert that into a dollar amount. That wouldn't—that would only reflect the dividends amount—the dividends amounts that are coming out to you.* **It wouldn't reflect the earnings capacity of the business and the value that's built in the business.** *Similarly, on the other hand, if you said, well, let's say they didn't pay dividends at all, the value can't be zero. That makes no sense. So I don't focus on the dividends as the on/off switch here. What I'm trying to get at, and I think what fundamental value is trying to get at or intrinsic value is trying to get at,* **is a measurement of what the business will earn,** *not how much it will actually pay out in dividends to shareholders but what it will earn over the course of its carrying on of business.*
>
> *Justice Parker:   And in your opinion, that should go to the intrinsic value of the share?*
>
> *Mr Davidson:   Correct.*
>
> *Justice Parker:   Even though that shareholder – what way does that shareholder have of realising that value?*
>
> *Mr Davidson:* **Well, in a perfect world, there is someone who comes along and acquires the business at that value because that is the true underlying value or, over the course of time, there are some mix of dividends and share buybacks or other payouts and some lift the priceof the business on the Stock Exchange that reflects that value. But at the end of the day, it is a value that accrues to the shareholders and that's what we are trying to measure.**
>
> *Justice Parker:   I follow that. I follow that.*
>
> *Mr Davidson:   Yes.*
>
> *Justice Parker:   And doesn't that drive you into regulatory problems for this company?*

---



*Mr Davidson: In terms of it not being able to be paid out?*

*Justice Parker: Correct.*

*Mr Davidson**: I don't believe so because what I've captured, if you accept my work, is the value above and beyond what is required to be set aside first of all for required capital**.* (emphasis added)

412.    An attempt to quantify the economic benefits that would theoretically accrue to a shareholder in each successive year[153] without a reasonable basis for concluding that these were 'real cash benefits' which would be likely to flow to shareholders is not in my view a sound approach.

413.    In this case the Mr Davidson's theory divorces itself from the reality of FGL's capacity for dividend payments. I accept the Company's case that one cannot value these 'benefits' to shareholders because there is no specific year in which dividends are paid out, they are  only 'available' or 'distributable' through the calculation of earnings to the business.

414.    In sum, I accept the Company's case that these are not cash flows to equity because they are not being distributed. There is no cash flow, but rather a notional number which Mr Davidson subjectively ascribes as a value to a shareholder.  It reflects the earnings capacity of the business and so is said to be the value that is 'built' in the business.  That may be so, but I accept the Company's case that this is not an appropriate method to use for assessing the fair value of the Dissenters shares in FGL.

*Ratio of distributable earnings*

415.    Mr Davidson gives a 10% common AOI calculation for distributable earnings from 2020 through 2023 and then adds 10% each year to reach the terminal year, by which time he gets to a position where 90% of it is distributable. This takes the calculation beyond the Company's forecast period and into the realms of speculation.

---

[153] {Day8/71:11-14}



416.    Mr Davidson gave no satisfactory explanation as to why this ratio makes sense ( which he said took into account the reinvestment needs of the business) in the light of the comparable growth rates or macro-economic matters Professor Lehn had pointed out.

417.    The relevant exchanges are:

> '*Q.     What do you mean by: "That is precisely what that reinvestment is."*
> *Risk-based capital ratios are not the same as reinvestment, are they?*
> *A.      They are driven by reinvestment so that reinvestment of capital -- reinvestment effectively into capital in the firm grows total adjusted capital, which is a component of the calculation of risk-based capital. So it was precisely that dynamic that I had in mind when I was selecting the percentages of available -- or percentages available for distribution that I use in my projection in schedule 2.*[154]
>
> *Q.      Yes, but, Mr Davidson, I put this to you already: you can't simply wave a magic wand and say that, because you referred to reinvestment needs, you must have been thinking about risk-based capital ratios. They might be related, Mr Davidson, but they are not the same, are they?*
> *A.      The reinvestment feeds the total adjusted capital, which feeds the RBC ratio. So there is effectively no other reinvestment need. This is not a business that requires, for example, significant capital expenditures, as one might have in a manufacturing business. This is not a business which requires significant, one-time capital expenditures in respect of the build-out of a new division or the build-out of a new facility or the new addition of a substantial body of employees. This is directed at precisely this.*[155]

418.    In his Expert Report, Mr Davidson did give some explanations. He says he (i) estimated the distributable earnings ratio to be 10% for the years 2020 - 2023 "*having regard for a robust level of reinvestment to support FGL's anticipated supernormal growth of approximately 17%*

---

[154] {Day 8/46:10} – {Day 8/46:21}
[155] {Day 8/50:22} – {Day 8/51:12}



*year-over-year"*, and (ii) gradually increased that ratio throughout the remainder of the discrete forecast period to reach 90% in 2027, with the remaining non-distributable 10% being reflective of the "*need for a moderated level of reinvestment in support of the slowing forecasted growth/trajectory of the business over that period*" and the "*relatively lower required level of reinvestment*" once the business reached a "*steady state*".

419.    He also said in evidence:

> A.       ...... *So when we get to the end of 2023, we have in the forecast an understanding of what total adjusted capital is, we have an understanding of what the required total adjusted capital is in order to satisfy the 400 per cent RBC ratio. I have effectively over the subsequent period left behind another $1.2 billion of my common AOI by virtue of the inverse of the percentages. So that effectively flows to capital, and I've also had regard for what the required capital was in order to meet the test in 2023, and if one grows that at some reasonable proxy of growth that I've used in AOI, it takes you to roughly the same place. So I'm content that by the time I get to the terminal year, I'm in a place where I'm not requiring additional investment in adjusted capital. So at that point -- and that's why that percentage distributable creeps up in those later years -- at that point, I'm comfortable that I have satisfied the requirement in terms of the RBC ratio and it's then a question of how much further investment is required, and I leave behind another 10 per cent a year[156].*

420.    He said that because he had considered reinvestment, RBC requirements and regulatory restrictions on dividends his model was 'akin to" an actual forecast of distributions to equity holders.[157] I cannot accept this assertion without supporting evidence and good reasoning for his general statements.

421.    As to reinvestment he said:

---

[156] {Day 11/102:21} – {Day 11/103:17}.
[157] {Day8/66:10}



*JUSTICE PARKER:       What about reinvestment?*

*A.       So the reinvestment question. I think by the time we get to my terminal year, there is no further need to reinvest, save and except for the growth that is to come. And the growth that is to come is the 3.5 per cent. So through this period, I have, by design -- and I know we have debated whether the 14 percentages are exactly right, but I have by design, had very low percentages of distributable that have ramped up as growth has ramped down. So I'm trying to marry up what is routine over this period to satisfy the growth. By the time I get to my terminal year, I'm comfortable we have a capital base that's in place that is sufficient. We are generating the AOI that I'm showing and then the question is how much more of that do we need to set aside really just to satisfy the 3.5 per cent growth. And I know, to be fair, Professor Lehn took exception to whether the 10 per cent that I leave behind was sufficient for the 3.5 per cent growth but that's -- in my mind, that's the essence of the question at that point in time[158]*

422.    His subjective judgment does not seem to me to be reasonable or 'real world' because it was that 'distributable earnings' were calculated not to be actual cash coming out in those years or cash that a regulator would allow to be distributed in a particular year[159].

423.    As I have explained above, he was attempting to quantify the benefits that would theoretically 'accrue' to a shareholder in each successive year[160]. It seems to me that he has failed to establish that the Company could realistically remain in compliance with regulatory requirements if it were ever to make the distributions in the amounts he assumes.

424.    His approach to what proportion of AOI would be distributable in the future, which as I have said, he estimated to be 90% in the terminal period, is also speculative without a sound reason to underpin this percentage.

425.    In sum, I cannot accept the reliability of his subjective judgements.  Mr Davidson has not adequately shown his 'workings' with regard to analysis of the regulatory constraints on what

---

[158] {Day 11/119:7} – {Day 11/120:3}
[159] {Day8/57:1–11}; {Day8/71:8–20}.
[160] {Day8/71:11-14}.



could be paid to shareholders (based on statutory income and risk based capital ratios RBC's) and detailed estimates as to FGL's investment requirements to fund future growth I accept Professor Lehn's opinion that the Company could not grow at the rates assumed by Mr Davidson and remain in compliance with its regulatory capital requirements.

426.    Professor Lehn has also commented that when more modest distribution percentages are used, in line with the assumptions of the FGL forecast, the resulting per-share value falls to below the merger consideration .This shows that subjective inputs can make a huge difference to the value derived.

427.    As I have said Mr Davidson did not provide calculations supporting his claim that he has considered regulatory restrictions or RBC ratios, only his subjective opinion and general statements without adequate reasoning.

428.    By comparison a reasonable source of information for these 'workings' (statutory income ,reinvestment and RBC ratios) can be found in the Milliman report  of 5 February 2020[161] where their model showed that distributable earnings at the Company were negative for each of the years between 2021 and 2028[162] ,because there was a predicted requirement for additional capital contributions to fund future growth and to maintain FGL's combined RBC ratio at or above its 400% target (before taking account of COVID).

*Stale Forecasts*

429.    Another problem is that Mr Davidson based his approach on the FGL forecasts, which had not been revised as a result of the effects of the pandemic. He himself had dismissed the Milliman report for this very reason.

430.    FGL's updated forecasts as of May 2020 illustrate that the then current projections for common AOI were "*substantially lower than the FGL forecasts for each of the forecast period*"[163]. For

---

[161] Milliman Report, Table I-A
[162] Milliman Report, Table III
[163] Supplemental Lehn Report,§ 150



the reasons given in accepting Ms Foxworthy Parker's evidence I do not find that the 29 May update developed the FGL forecast to make it reliable to use in an income based analysis such as that performed by Mr Davidson. Nor do I accept that the Company had determined that the effects of the pandemic were likely to be muted for FGL in the short term. The position was uncertain and in fact the impact of the pandemic lasted longer than many expert commentators were predicting as at the Valuation Date.

*Synergies*

431.    As Professor Lehn showed, if the May 2020 projection of Common AOI is used instead of the projection from the FGL forecasts, the resulting estimated value per-share is reduced by 6 – 6.5% from Mr Davidson's estimate[164]. In fact the May 2020 projections also reflected the anticipated benefits of the FNF acquisition and so the calculation understates the impact of the pandemic on FGL's stand-alone value. In this regard I accept the analysis and evidence referred to in Professor Lehn's supplemental report at § 150.

432.    Mr Blunt explained the immediate impact in his evidence:

> "*because of the merger, FGL was able [to] achieve a ratings upgrade and an infusion of capital when it was most needed, which allowed [it] to continue selling and to capture market share from AEL and enter into the bank and broker-dealer channels earlier than [it] would have otherwise.*"

433.    Analysts also recognized these benefits. If the merger had not occurred, FGL "*would not have been able to pursue [the same] business strategy*" and "*would not have had a choice but to cut back on sales in order to preserve capital….*" I accept the Company's case that it is likely that FGL's forecasts for Common AOI would have been even lower absent the acquisition.

434.    While Mr Davidson urges the Court to find that FGL's outlook improved or at least remained the same by the EGM date, in fact, the Company points out that FGL experienced one of its

---

[164] Supplemental Lehn Report, §151



worst quarters ever on 6 May 2020 when it released its results for the quarter ended 31 March 2020, reporting a loss of US$346 million[165].

*Credit Suisse extrapolation*

434.    I have dealt with the fact that I do not place weight on the Credit Suisse extrapolation for the reasons set out above .I accept Ms Foxworthy- Parker's evidence that the Company provided no inputs for 2024 and simply checked the mathematical calculations. The 'validation' by the Company that Mr Davidson describes in his evidence is no more than a checking of the arithmetic and cannot be properly equated with a Company forecast.[166]

*Using AOI*

435.    The direct equity method employed by Mr Davidson, wherein the (after-debt-service) earnings accruing to the common equity holders available for distribution are discounted using a cost of equity is ,as I have found, inappropriate for the reasons stated above.  The additional problem with using AOI, as the Company points out, is that AOI  is not a metric from which one can derive cash for distribution to shareholders[167] .

>   Q.      So you start with AOI?
>
>   A.      Correct.
>
>   Q.      That's not a measure of cashflow in any sense, is it?
>
>   A.      It is not a measure of specific cashflow in that year, that is correct. Over the long term, AOI and pure cashflow must merge -- or converge once you get into a period

---

[165] FGL Form 8-K dated 6 May 2020

[166] {Day9/88:16} – {Day9/89:2} *(Mr Davidson: "So I'm comfortable that we are -- we have the company's view as to best estimate forecast through 2023. I'm comfortable that we have a 2024 amount that been validated by the company,"); {Day9/106:7-14} (Mr Davidson: the Extrapolation "is, in my view, a meaningful data point. It has been developed in first instance by Credit Suisse, I accept that. Credit Suisse has directly asked the company whether or not it is reasonable and the company has validated it[.]")*

[167] {Day3/49:23} (Mr Blunt: *"AOI is not cash."); {Day11/129:1–15} Company Response to Information Request 3.6(b) {H/71/1} ("There is no direct link between common AOI and the amount available for distribution to common shareholders").*



*of steady state but it is, in my mind, an appropriate measure of -- an appropriate measure for the quantification of what is **accruing to the shareholders here**.* [168]

*JUSTICE PARKER:     Can I just understand, so that we are on the same page, what you mean by "common AOI".*

*A.     Yes, certainly. The company discloses an amount. I can't recall exactly what their precise definition of it is but it is meant to be a non-GAAP measure.*

*JUSTICE PARKER:     Right.*

*A.     **Of adjusted operating income that is attributable to the common shareholders**[169](emphasis added)*

436.   After-tax common adjusted operating income (AOI)  is an adjustment to GAAP  operating income (which makes it a non -GAAP item ) .It is an accounting measure, not a cash flow measure.That may be why the language of 'accruals' and 'attribution' are used in Mr Davidson's answers.

437.   Mr Davidson also said*:*

> *'it as a non-GAAP measure that best portrays the*
> *financial results of the business --*
> *JUSTICE PARKER:     Right, thank you.*
> *A.     -- for measurement of what accrues to the common shareholders, and I highlight that as well because it is, in effect, after debt service, after the payment of dividends to the preferred shares, which is very important, and it is after tax, so that it is a true measure of what accrues to the common shareholders after having regard for all of the servicing of the debt and taking care of the preferred shares, so this truly is the common AOI.*
> *JUSTICE PARKER:     So "common" meaning as distinct from preferred equity holders?*

---

[168] {Day 8/67:12} – {Day 8/67:21}.
[169] {Day 8/68:7} – {Day 8/68:14}.



*A.     That's quite right. Or as distinct from just all of the equity holders. So it has already serviced the preferred shares, we don't then need to make a further deduction.*[170]

438.   I accept the Company's case that the difficulty with using this to calculate 'distributable dividends' is that it is not derived from a statutory accounting basis on which dividends are calculated by US insurance companies and approved by the regulators.

439.   It is therefore not directly applicable to the Company in its operative reality where its ability to pay dividends, or 'dividend capacity', was determined using statutory accounting.

440.   I accept the Company's case that this is a further fundamental flaw in the analysis .One can have positive adjusted operating income with no positive cash flows to the equity if AOI is never adjusted to be a cash flow.

441.   Mr Davidson seemed to accept this[171]. He accepted that the Company's statutory income figures are substantially lower than the common AOI figure used in his Schedule 2 analysis[172].

442.   Despite the fact that the Company's regulators would focus on statutory income in determining what could be paid to common shareholders, Mr Davidson started with common AOI. I accept the Company's case that this is not appropriate when, as the Company pointed out statutory income is about 70% of common AOI as the regulator would be focussed on what cash can be paid in dividends .I accept the Company's case that this makes a material difference when one considers that Mr Davidson distributes 90% of common AOI in the terminal period.

443.   Overall, I am satisfied that regulatory restrictions in place would prevent FGL from paying out the hundreds of millions of dollars per year in dividends Mr Davidson projected.  In addition,

---

[170] {Day 8/69:1} – {Day 8/69:18}.
[171] Day8/71:15-20} (Mr Davidson: "*I fully recognise-- fully recognise -- that there is a regulatory overlay on top of this associated with STAT income that would constrain, you know, whether or these amounts could technically be paid out as dividends in each year. That's a different exercise and a different calculation.*"
[172] *Day8/70:17-21}.*



the Company points out that the AOI forecasts for 2025 through the terminal year of his analysis were solely developed by Mr Davidson without reference to the Company. His projections follow the same form as the Credit Suisse extrapolation and apply a growth rate that he has selected to the prior year's AOI estimate. I do not accept that this method provides reliable unbiased forecasts.

*Terminal growth rate*

*Perpetual growth*

444.    As we know unforeseen global events, such as economic recessions, pandemics and global conflicts can materially affect the growth of businesses worldwide.

445.    In this case Mr Davidson assumed a 3.5% perpetual growth for FGL.  Putting aside macro economic factors, it is clearly inapposite to unduly rely for this proposition on Mr Blunt's comment, which was made in the management meeting:

> "[*i*]*t wasn't that we thought like the world is going to end in 2024 and everything was going to fall off a cliff*".

446.    At the FGL business level there needs to be evidence to show that this steady rate of growth is realistic by reference to matters such as: reinvestment needs; cash to pay commissions; the regulatory environment; the competition, and a sound growth strategy.

447.    As the Company has pointed out, over 90% of the value Mr Davidson derives from his earnings analysis is from the period 2025 through the terminal year and so almost all of the Schedule 2 valuation comes from figures that he has created, and does not come from the Company

448.    I accept Professor Lehn's  view that terminal value  'steady-state' assumptions should be based on the general growth characteristics of the industry .Mr Davidson's assumptions that the Company will outperform its competitors in perpetuity are not credible  against this benchmark.



449. As stated above Mr Davidson explained that his distributable earnings ratio is based on the fact that an adequate capital base is built up in the previous years under Mr Davidson's analysis, and an accommodation for continued growth at 3.5% per year after the terminal year .There was this exchange in his evidence:

> *JUSTICE PARKER: Can I ask just, while you are pausing there for a minute, at that extreme end of the percentage of the distributable earnings ratio, which you take to be 90 per cent for the terminal year, why do you say that is a reasonable, reliable assessment of what would be distributable on your analysis?*
>
> *A.        So I think there is two pieces to that. The first is that, on my judgment -- and I won't go back over it all again, but in terms of the amounts that have not been distributed, by the time I get to that point in time, I'm comfortable that we have an adequate capital base, 1 and what we are then asking ourselves, the question we are then asking ourselves is, okay, having satisfied that, and we are generating -- use the top line, $736 million a year in AOI, how much of that do we need to be retained? The answer to that, in my mind, is only some small portion to accommodate the growth, and by "the growth" I mean the 3.5 per cent. But the balance of it is really free to be distributed. I won't go back and say that that necessarily means it's a dividend at that point in time or the like but that's what I'm trying to measure here, is what is the remaining free economic amount that flows to the common shareholders.[173]*

450. I accept the Company's case that it is an unrealistic assumption to project, as Mr Davidson does, that FGL's income would grow every year from 2028 onwards at 3.5% without fail. The life insurance industry as a whole projected long-term growth of only 0.7% as he accepted in his report, and  the insurance industry had declined over the prior five years[174].

451. I accept Professor Lehn's opinion that use of the 0.7% industry growth rate (which, if

---

[173] {Day 11/117:15} – {Day 11/118:13}.
[174] Davidson Report; Appendix G, §1.19 & note 649 (citing "Life Insurance &Annuities in the US (52411a)," IBISWorld, December 2019, at 8)



adjusted for the expected long term inflation rates in Professor Lehn's evidence gives a nominal growth rate of between 1.87% and 2.09%) and more reasonable earnings distributions ratios ,results in far lower per-share valuations than Mr Davidson's US$23.09.[175]

452.    Even if FGL was in the 'growth distribution continuum' I accept   Professor Lehn's opinion was that  it is *'implausible to assume that FGL would grow in perpetuity at a substantially higher rate than the overall industry*".[176]

453.    I find that there is no reliable basis to assume more than inflationary growth from the available material for FGL.  In this regard I accept Professor Lehn's opinion that it is not appropriate to rely on the consumer price index as a measure of inflation which Mr Davidson has done to support a 2% rate of inflation. I prefer Professor Lehn's view that commonly accepted measure of inflation growth would result in lower expected inflation rates than 2%.[177]

*Distributions*

454.    As a general matter,it is common sense that high distributions to shareholders diminish the amount of capital that a company can reinvest ,which has a knock-on effect on growth prospects. I accept Professor Lehn's view that the perpetual growth rate must be tied to an explicit reinvestment rate in the terminal year because growth does not '*emerge from nowhere.*' His view, which I accept, was that growth is a function of reinvestment, and reinvestment for an insurance company like FGL mainly consists of investment in regulatory capital.

455.    Moreover, I accept the Company's case that it makes no real-world sense to say that the Company would have had available dividends for distributions that relate to shareholder value of US$623 million by year 2028 (and that figure growing at 3.5% per year every year) so that the fair value for the shares equates to twice the market price. In my view the Dissenters in this case could not realistically have had any reasonable expectation that they would obtain

---

[175] Supplemental Lehn Report,§ 149
[176] Supplemental Lehn Report,§ 148
[177] Supplemental Lehn Report,§§ 146-147



US$23.00 per share for their FGL stock as of the Valuation Date, with or without the merger, as Mr Davidson suggests.

456.    It has to be remembered that the Company was forecasting paying shareholders dividends of US$9m per year.

*Discount rate*

457.    A discount rate of 10.68% is applied by Mr Davidson.  I accept the Company's case that using the Duff & Phelps'/Kroll's standard benchmarking tools in the way he did caused Mr Davidson to bias his valuation upwards.

458.    Mr Davidson used the Duff & Phelps/Kroll Cost of Capital Navigator tool to determine the risk-free rate used as an input to his discount rate. The Duff & Phelps/Kroll risk-free rate is updated quarterly and indicates a certain risk-free rate depending on the date of valuation.

459.    The Company pointed out that to arrive at his discount rate, Mr Davidson chose a risk-free rate that was not indicated for the relevant EGM Date.  He also used his own Schedule 2 valuation of FGL to determine its size premium when the Duff & Phelps/Kroll benchmark called for the use of FGL's market capitalisation as a valuation input.

460.    Duff & Phelps/Kroll recommended the use of a 3% normalised risk-free rate as of the Valuation Date. Mr Davidson agreed that a valuer relying on the Navigator on 29 May 2020 would have used a 3% risk-free rate, if they had taken the indicated rate directly from the Navigator[178]. Instead, he used a 2.5% rate, which did not go into effect until 30 June 2020. He conceded that in order to use this rate, he had to "*change the valuation date to 30 June*" in the Navigator[179].

461.    Mr Davidson also used the Cost of Capital Navigator to determine FGL's size premium. The tool requires an input of "Market Value of Common Equity" ("Common stock price times

---

[178] {Day11/135:4–11}.
[179] {Day11/139:14–20}.



number of common shares outstanding. Also known as the market value of common equity" or the market capitalisation). Mr Davidson agreed that Duff & Phelps uses market capitalisation to sort companies in order to determine their size premium[180].

462.    The Company points out that instead of entering FGL's pre-announcement market capitalization of US$2.28 billion, Mr Davidson entered US$5.094 billion. This is the amount derived from his Schedule 2 analysis. I accept the Company's case on this that he used his own fair value figure to generate a discount rate which is supposed to have been used to derive his fair value figure in the first place. This is not a reasonable or unbiased approach.

463.    I also accept the Company's case that the premise of the Duff & Phelps/Kroll size premium is that risks and returns sought by investors vary by market capitalisation and not by some measure of intrinsic value.[181]

464.    The Company has also pointed out in this regard that Houlihan Lokey used the same Duff & Phelps/Kroll Cost of Capital Navigator tool to generate its size premium but by contrast to Mr Davidson, they entered FGL's market capitalisation, as of the date they were performing the valuation. The resulting size premium was much higher than Mr Davidson's[182]. Mr Davidson's use of his own Schedule 2 value generated a size premium of 0.79%. Had Mr Davidson used FGL's market capitalisation as the tool required, it would have generated a size premium of 1.34%.

465.    I accept the reasoning of the Company and the points it makes as to the appropriate discount rate .I accept the case that had Mr Davidson used the Duff & Phelps/Kroll tool in the conventional manner, he would have arrived at a discount rate of 11.87%, which would have resulted in a significant decrease to his per-share valuation.

---

[180] {Day11/144:18–23}.
[181] See *Re Shanda Games Limited* (Unreported, Grand Court, Segal J, 25 April 2017) at §175, *Re Trina Solar Limited* (Unreported, Grand Court, 23 September 2020) at §292
[182] February 6, 2020 - Houlihan Lokey Project Z Presentation – FGL Cost of Equity Calculation



*Is the Schedule 2 analysis a reliable method in the circumstances of this case?*

*Not a reliable method in this case*

466.    For all the reasons given above, I have come to the view that Mr Davidson has not used an appropriate valuation method in this case and that it cannot be corrected by the Court attempting to substitute its own unbiased indicators. I am satisfied that it is an unreliable method for the calculation of the fair value of the dissenters' shares.

*In summary*

*Discounting cash flows*

467.    As has been identified, Mr Davidson described his approach as a "discounted cash flow" approach and Mr Davidson's Schedule 2 purported to discount "distributions", which he explained in his evidence did not mean that he valued "*actual cash flows*", but rather "*distributable earnings available to common shareholders*".

468.    As a preliminary matter I accept the Company's case that there is no support for such a "discounted distributable earnings" approach in any of the valuation literature and Mr Davidson was unable to cite any example of a report where he himself had taken the same approach[183].

469.    I accept the Company's case that the premise of discounting in a discounted cash flow analysis is to discount cashflows to a net present value from the year in which those cashflows arise, and it makes no sense to discount back distributions from a specific year if they are not being distributed in that year.

468.    If the cash flow is not paid as dividends to shareholders it is not likely to sit in the business earmarked for the benefit of shareholders.  It will be reinvested in the business whether as working capital or held as regulatory capital to satisfy the regulators.

---

[183] {Day8/74:24} – {Day8/75:8}.



*Statutory income*

469.     To model dividends to shareholders I accept the Company's case that one needs to use the statutory income calculation which allows for the RBC ratios which applied to what could in reality be distributed to shareholders and in which year.

*Biased inputs*

470.     I have reached the view that Mr Davidson's inputs (earnings growth after 2024, the long term growth rate, the discount rate, and the proportion of AOI that was "distributable") were biased rather than central estimates.

471.     I accept Professor Lehn's evidence that Mr Davidson assumes distributable earnings ratios for the years 2022 – 2024 which are inconsistent with the FGL forecasts and the Credit Suisse extrapolation which both project dividends of US$ 9 million in each year from 2020- 2023[184].

472.     As Professor Lehn points out, Mr Davidson estimates significantly higher "distributions" over that same period, from US$18 million in 2020 to US$107 million in 2024.

473.     In doing so Mr Davidson effectively ignored the Company's actual forecasted dividends (US$9 million per year), which were used by both Houlihan Lokey and Credit Suisse in their contemporaneous valuations.

474.     Not only are his projections of a different order of magnitude from the Company's forecasted dividends, his estimate of "distributable" earnings is based entirely on his personal judgement as to the portion of common AOI that FGL would need to support the levels of growth that he assumes in his analysis [185].

---

[184] Supplemental Lehn Report, §140
[185] {Day11/90:15-17} (Mr Boulton: *"Every number to the right of 2024 on the top line comes from you?"* Mr Davidson*: "That's correct."*).



475.    This is not supported by the Company's factual evidence, or by any matter suggesting the Company could realistically distribute nearly US$2 billion to common shareholders between 2020 and 2028. This was unsupported by the facts developed at trial and is in my view untenable.

476.    Professor Lehn also points out that Mr Davidson's estimated distributable earnings are significantly higher than the payout ratio of FGL's peer group companies[186].

477.    I found Mr Davidson's evidence to be unsatisfactory when it came to explaining what would happen to distributable earnings if the funds in a business such as FGL's were not distributed, perhaps as Mr Boulton QC pointed out ,because Mr Davidson had never valued an insurance company before.

478.    Mr Davidson suggested at one point that they would not be reinvested but instead would be left behind as 'redundant cash' in the Company. It is not credible that the Company would allow redundant cash to be kept in that way. The Company points out that in any case he had not discounted it back from the date when it was ultimately distributed[187].

479.    I have reached the view that I cannot place any weight on Mr Davidson's Schedule 2 analysis as it is inherently unreliable for the reasons I have given. It follows that I also reject his view that in and of itself his Schedule 2 analysis gives any support for the Dissenters case that investors did not understand FGL or that the FGL forecasts represent MNPI.

*Reasonableness checks*

480.    Mr Davidson conducted three reasonableness checks on his conclusion: (i) a comparable companies analysis reliant on price-earnings growth ("PEG") ratios, (ii) a valuation of FGL based on its Justified Price/Book Ratio ("Justified P/B Ratio"), and (iii) a valuation based on comparable transactions.

---

[186] Supplemental Lehn Report, 141, noting that the comparable companies with the highest payout ratios have asset management businesses which generate cash
[187] {Day8/62:15-22}.



481. I accept the Company's case that Mr Davidson's approaches are flawed and do not provide a useful "reasonableness check" of Schedule 2 for the following reasons identified by the Company.

482. Mr. Davidson's calculations ignored changes in share prices and earnings forecasts that occurred during the period between 5 February 2020 and 29 May 2020. Schedule 2 has an effective date of 29 May 2020. Mr Davidson's "reasonableness check" seems to have ignored the onset of COVID.

483. Mr Davidson also used two metrics (1) PEG Ratio and (2) Justified Price-to-Book Ratio that are criticised in the academic literature. McKinsey characterised the PEG Ratio as *"seriously deficient'* and also said *"there is no mathematical derivation that says you can simply divide [P/E] by the [growth] and produce a significant result."* [188]The Justified Price-to-Book ratio assumes that a company has a constant return on equity and a constant earnings growth rate forever. This view is also inconsistent with academic literature which indicates that returns that exceed a company's cost of capital generally will be competed away over time. The Company has also pointed out that that the PEG Ratio and Justified Price-to-Book ratios were not used by any financial institution (Houlihan Lokey, Credit Suisse (in 2020 or 2017), Bank of America Merrill Lynch, Rothschild, and Jefferies), or indeed any analyst to value FGL[189]. Instead, all of those parties used standard and widely used metrics: (1) Price-to-Earnings or (2) Price-to-Book multiples.

484. I accept the Company's case that these metrics demonstrated that the multiples implied by the Merger Consideration were directly in line with FGL's closest comparables, AEL and Athene.

---

[188] Day10/107/:3-23}.
[189] Two reported it



*Other matters considered*

*Highfields*

485.    During the trial, the Court asked whether any Delaware cases had ever addressed the appraisal of an insurance business. Counsel for the Company has located only one, *Highfields Capital, Ltd. v. AXA Financial Inc.*[190]   In *Highfields* the Delaware Court of Chancery was tasked with appraising a life insurance company.  The decision pre dated *Dell* and the shift we have seen in the Delaware jurisprudence away from DCF valuations.

486.    Although the dissenters' expert presented a DCF valuation, the Court of Chancery found it unreliable as it used GAAP-derived earnings information, which, the company's expert opined "*do not equate with cash flows in the life insurance business due to capital retention and dividend maintenance requirements*."  He also opined that it also made no allowance for reinvestment.  The DCF in *Highfields* was also a projection only based on one year's figures ,which was also unsatisfactory to the Court.

487.    The Court of Chancery found that GAAP earnings were not useful because state regulation reduces the free cash flows an insurance company has available for distribution to stockholders.

488.    Apparently the evidence at trial showed that industry experts and executives did not consider a DCF analysis a particularly important framework for valuing a company whose primary business is selling life insurance. The evidence in that case suggested that actuarial appraisal was the preferred valuation methodology in the insurance industry.

*489.*    In this case neither expert has used an actuarial appraisal, but that does not mean the Court cannot have regard to what was decided in *Highfield.*

*490.*    The Court of Chancery also found that DCF analyses "*has much less utility in cases where the transaction giving rise to appraisal was an arm's-length merger, where the data inputs used in*

---

[190] *Highfields Capital, Ltd. v. AXA Financial, Inc.,* 939 A.2d 34, 36 (Del. Ch. 2007)



*the model are not reliable or where a DCF is not customarily used to value a company in a particular industry."*[191] These issues have had echoes in this case.

491. The Court ultimately accorded the transaction price, less synergies, a 75% weighting and an actuarial appraisal a 25% weighting.

*Milliman*

492. As I have indicated above, the Court has had regard to the fact that the Milliman Report dated 5 February 2020 (compiled as at 30 September 2019) was prepared for use by FGL in connection with assessing the fairness of the Transaction Price and was according to Mr Quella, considered by the Special Committee.

493. Not only was it prepared for use in the transaction at issue in order to assist on a valuation of FGL, it is based on a value measurement using actuarial techniques which I accept are routinely used in the insurance industry.

494.  It is made up of three components: the value of FGL's in-force business; FGL's adjusted net asset value; and the value of future new business.

495. The Milliman report included a DCF-like analysis in its actuarial appraisal.  The report itself was in the agreed trial bundle but did not really become prominent until trial when Mr Quella was cross examined about it by the Dissenters.  Mr Davidson refers to it in his supplemental report at §9.49 as an example of a DCF like analysis.

496. The Dissenters say that if the Company had indicated that it intended to rely on the Milliman report as a valuation, then the Dissenting Shareholders would have considered whether to cross-examine Professor Lehn on his views on the matter .They submit that without any support from either expert it would be unsafe and wrong in principle for the Court now to adopt the figures in Milliman as themselves indicating a reliable valuation.

---

[191] Ibid.§52-53



497. Before Professor Lehn gave evidence Mr Boulton QC says the Company wrote to the Dissenters to say the Mr Davidson would be asked questions about Milliman.

498. In addition, the Dissenters made reference to it in their written opening and chose to put the Milliman report to Mr Quella in relation to the transaction process (but not Mr Blunt or Ms Foxworthy Parker).

499. I have concluded that it is not unfair to the Dissenters or unsafe for the Court to have regard to it. Both Mr Quella and Professor Lehn confirmed that the Milliman Report applied actuarial experience in estimating the value of an insurance business and was "as close as you can get" to a DCF[192].

500. The Company points out that like Mr Davidson's analysis it also uses the FGL forecasts but unlike Mr Davidson's analysis, it was prepared on the basis of statutory accounting, which is, as the Court has found, a more accurate estimate of cash flows for an insurance company like FGL.

501. It provides a detailed analysis of FGL's existing business and its book value. It built up its cash flow projections policy by policy, and type of policy by type of policy .The method to calculate the value of the enterprise (including the holding company) was that the value of FGL's debt obligations and the preferred shareholders stock obligations was deducted from the enterprise value and any cash held at the level of the publicly-traded holding company was added, before calculating the implied per share value.

502. Milliman modelled RBC ratios for ten years. Maintaining an RBC ratio of 400% the distributed earnings are negative in every year from 2021 to 2027. It indicates that Milliman were not predicting any capacity to make material distributions over that period and FGL was instead going to make capital contributions to the operating companies. In 2029 the position changes and there is capacity to distribute US$81.8m.

---

[192] Day 4/137:3-10}.


503.   The Company points out that Milliman's calculation results in an implied value of between US$8.34 and US$16.85 per share, for the range of discount rates (8%, 10%, and 12%) used by Milliman (all of which predated the impact of COVID on risk). Using the discount rate of 10.68% [193]that Mr Davidson uses results in a value of US$10.67 per share.

504.   Milliman's actuarial experience and reputation in estimating the value of an insurance business and the work they did in assessing FGL's share value at the relevant time provides in my view two good reasons to have regard to it as a valid 'ball park' sense check for the Court.

505.   As to it being 'stale'. I accept that it was prepared much earlier than the Valuation Date[194] .It was using the most up to date financial statements as the 2019 earnings were not disclosed until 26 February 2020.

506.    Mr Salzedo QC urged the Court to conclude that the Milliman projections were over-prudent, overcautious and understated compared to the fair value of the Company.  He submitted that it assumed no new business after ten years and that every cent that could be distributed in 2019 and 2020 was distributed (to hit the 400% target) and did not properly reflect FGL's 'growth continuum.'

507.    Milliman notes that a valuation of FGL's reinsurance subsidiary ,which was a new business venture as of 2019 was reflected ,[195]so it is not right to say as the Dissenters do ,that because it did not value F&G Reinsurance Limited (F&G Re) it was incomplete.  I accept the Company's case that if the transaction completed F&G Re would be sold and the subsequent sale of that business in late 2020 for US$181m would have had no material impact in the context of the overall value.  In addition would the report was prepared pre-COVID which had a much greater impact.

---

[193] Which the Company says is too low -the Kroll cost of capital navigator tool would suggest  a higher rate
[194] Adjusted book value was too high -over the first 6 months of 2020 book value reduced by US$240m due to COVID
[195] '*The projections and Appraisal Values reflect an internal reinsurance structure that FGL plans to implement in order to achieve the following benefits'.*


508. Mr Salzedo QC submitted that the Court had no evidence from either expert that it is useful in terms of value. It might be relevant as a floor and nothing more.

509. The Court has regard to Milliman for what it is and in the context in which it was prepared. It is not adopting the figures contained in it to settle upon the fair value of the Dissenters shares, but it is nevertheless relevant as a cross check.

*Conclusion on Mr Davidson's DCF analysis*

510. I reject the Dissenters essential case that fair value was substantially above both the market trading price and the Transaction Price and that the most appropriate way to estimate the fair value of an FGL ordinary share is by relying on Mr Davidson's approach.

511. More particularly I reject the Dissenters case that his approach can reliably be used at all in this case to reliably estimate the value of FGL's shares. The particular analysis undertaken by Mr Davidson on a 'free cash flow to equity' basis cannot be relied upon and his reasonable tests are also not appropriate to validate his concluded fair value estimate of US$23 per share.

*Standing back*

512. This outcome cannot reasonably be said to be objectively unfair to the Dissenters.

513. When one tests the fair value of the Dissenters shares as at 29 May 2020 against what they could have reasonably expected to realise for them if the merger had *not* been completed (as was quite possible at the relevant time because of COVID) it is probable they would have been left holding shares with a market value less than they paid for them. The Company would not have had the benefit of the considerable support that FNF provided by reason of the merger.

514. I accept that the Court is not required to examine in detail the mechanisms by which the dissenting shareholders might have realised the value of their shares had the merger not been approved. The Court proceeds on the basis that the merger was completed and this is an appraisal action to determine the fair value of their shares.



515. However, there is still a need to align the fair value outcome with the operative reality of the Company at the relevant time. It was a highly regulated US public company listed on the NYSE and it faced the COVID pandemic. The Court needs to reach an outcome which is fair to both the Dissenters and the Company.[196] The Court does not accept the outcome Mr Davidson reached which was a value 88% higher than the Transaction Price.

516. I do not believe that the Dissenters (having dissented from the merger) could have had any reasonable expectation that they would achieve a price of US$23.00 per share for their FGL stock as of the Valuation Date, even with the merger.

517. I endorse the comments of Briggs LJ (as he then was)[197]

> "*It is axiomatic that in any complicated process of valuation, the valuer must take the relevant aspects of the world as he finds them (unless constrained by his instructions), and that he must, after looking at each element of the process, stand back and ask himself whether his provisional valuation makes commercial or business sense, viewed in the round*"

518. Another way of stating this is that it is a fundamental principle of valuation to take things as they are in reality on the valuation date ,except to the extent that the exercise requires a departure from reality.[198] There is nothing in this case that requires the Court to depart from reality.

---

[196] As Kawaley J recorded in Nord Anglia: *'Fair value applies to both the Dissenters and the Company; neither side should be preferred, and fair value does not require that the price must be the highest possible"*
[197] *Chilukuri v. RP Explorer Master Fund* (2) ([2013] EWCA Civ 1307, at § 52
[198] See *Lewison LJ* ibid § 59



*Other contemporaneous valuations*

519.   When looking at the equity value per share of Mr Davidson's *ex post facto* valuations
       (US$20.75-US$23.00) compared with other indicators of value at the time  ,the following
       matters are relevant (bearing in mind (iv) and (v)  were after the pandemic hit):

       i)      The FGL stock price range prior to 5 February 2020 (from 2017) was between
               US$6.09 and US$10.70.

       ii)     The unaffected stock price on 5 February 2020 was US$10.18.

       iii)    The analysts' price targets as of 6 February 2020 range between US$9.00 and
               US$11.00.

       iv)      Professor Lehn's comparable companies valuation as of 29 May 2020 was
               between US$5.64 and US$7.82.

       v)       Professor Lehn"s adjusted unaffected market price as of 29 May 2020 was
               US$8.60.

       vi)     The Transaction Price was US$11.06.

520.   In addition, the Houlihan Lokey fairness opinion range as of 6 February 2020 was between
       US$9.48 and US$14.28 .They concluded that US$12.50 as a price per share was fair.

521.   Notwithstanding Mr Davidson's criticisms of it I have reached the view that Houlihan Lokey's
       fairness opinion was reliable as a contemporaneous independent analysis as at 6 February
       2020.The work was performed before COVID struck  and they had access to the FGL forecasts.
       It is another reasonable cross check.  I do however agree with him that it was rendered four
       months before the Valuation Date and therefore cannot speak directly or accurately to fair value
       as on that date.

522.   In addition the Milliman Report dated 5 February 2020, with relevant adjustments, indicates a
       value per common share of US$8.34 to US$11.87 at discount rates of 10% and 12%, and
       US$10.67 at Mr Davidson's discount rate of 10.68%.  Milliman indicated that the Dissenters
       would not receive more than a nominal value by way of dividend before 2029.



523.     It can be seen that Mr Davidson's Schedule 2 results in a value that exceeds every other external professional valuation of FGL and the views of senior executives at the Company at the time.

*Deal process*

*Alleged deficiencies*

*Headline findings*

524.     I do not accept the Dissenters case that there was a combination of factors of which rendered it impossible for a potential bidder to succeed against FNF.

525.     I do not accept that there were decisive deterrents to any third-party offers being made during the Go-Shop period, owing to the entrenched positions of both FNF and Blackstone, the entering into of Voting Agreements which did not deprive the Preferred Shares of their rights to veto potential acquirers, and the informational asymmetry in FNF's favour.

526.     I do not accept that FNF was in a materially privileged position in relation to satisfying itself that the price it was paying was a good one.

527.     Nor do I accept the argument that there was never an open or competitive bidding process which could have demonstrated the robustness of the price which was negotiated primarily between Mr Chu and Mr Foley.

528.     I also find that the evidence does not show that the Special Committee was conflicted, or that it permitted the taking of vital decisions on price without proper analysis based on finalised management projections, or that there was  the inappropriate  'foregoing ' of a collar which would have protected FGL shareholders from the decline in FNF's share price.

529.     It follows that I reject, on the facts as I have found them, the conclusion the Dissenters invite me to draw that the sales process was not competitive, or that it strongly favoured FNF ,or that



it reduced any incentive for FNF to offer a price which was equal to or greater than fair value ,rather than below it.

530.   Overall the Dissenters drew much attention to alleged flaws on the deal process but fell short of proving that the process rendered the Transaction Price unreliable.

531.   Flawlessness in the process is not required in order to place weight upon the Transaction Price. The question is whether the deficiencies in the process which the Court has examined in detail on the evidence available, lead to the conclusion that the price achieved from the process is an unreliable indicator of fair value.

*Voting arrangements*

532.   It is the case that FGL entered into voting agreements with a number of its major ordinary shareholders and preferred shareholders.  The Voting Agreements required most of these shareholders to vote in favour of the merger, subject to certain limitations.

533.   If the FGL Special Committee had changed its recommendation, then the voting agreements entered into between FGL and certain parties [199] contained an Adverse Recommendation Change clause which stipulated that the parties should instead vote in proportion to the votes of other shareholders.

534.   The FGL Special Committee however agreed to the exclusion of any clause requiring the Preferred Shareholders to vote in favour a superior proposal recommended by the FGL Special Committee .The Preferred Shares were therefore not subject to the requirement of proportionate voting in the event of an adverse recommendation, as there was no Adverse Recommendation Change clause included in the Voting Agreements relating to the Preferred Shares .This was made public on 7 February 2020 and so potential bidders would have been made aware of it.

---

[199] Subsidiaries of FNF, BilCar LLC and Mr Foley



535.    It would have been better if the Special Committee was successful in persuading the preferred shareholders, such as GSO and FNF, to give up their veto rights over any other proposed merger.[200]  It can be said to be a flaw in the process.  However, I do not accept that these voting arrangements rendered the Go shop process nugatory as the Dissenters argue.

*Mr Chu*

536.    One of the principal lines of attack was to suggest Mr Chu was hopelessly conflicted and should not have been given the negotiating authority he was allowed to have.

537.    The assertion was made that Mr Chu preferred to sell at an undervalue and obtain "an ongoing annual participation fee" of US$6-7m per year through MVB, which it was asserted would allow him to make up in less than two years any value lost in failing to negotiate the price up by 50 cents to the US$13.00, which the Special Committee had initially considered to be attractive.

538.    Mr Chu did not attend the trial as a witness and is therefore unable to give his answer to these serious allegations.  I am satisfied on the evidence that was adduced that the allegations have not been proven to be the case.  Moreover that Mr Chu would have preferred these interests over his other responsibilities in this way is inherently unlikely given his stated reputation and standing, quite apart from his personal significant shareholding in FGL.

539.    I have formed the view that it was a safe and justifiable decision by the Special Committee to allow Mr Chu to lead the negotiations with his industry and buyer-specific knowledge.  I also find that  the Special Committee conducted arm's-length merger negotiations through Mr Chu that resulted in a reliable deal price and made the important decisions themselves as  a Committee.

---

[200] It is to be noted that at one stage Mr Davidson,who accepted he had never been intimately involved in a like transaction, conceded that he had not *"identified ... something specifically wrong in the [deal] process* {Day9/172:21}- {Day9/173:2}



*Conclusion on deal process*

540.    In my view the evidence shows that the process allows for the deal price to be a persuasive indicator of fair value.   I have found that there is nothing of substance in the Dissenters challenges to the *bona fides* of the process, its robustness, independence or allegations about conflicts of interest and/or elements which favoured a lower price outcome.

*The reasons in more detail for concluding that the deal process resulted in a price which is a reliable indicator of fair value*

*Independence and advice in the negotiations*

541.    The FGL Board, except the two directors associated with FNF, met to discuss the Special Committee's composition, disclose any potential conflicts, and appoint committee members. During this process, the Board sought guidance from its experienced external deal counsel. Independent legal and financial advisors with strong market reputations supported the Special Committee throughout the deal process.

542.    The Special Committee excluded conflicted members when required, such as FNF directors Messrs. Foley and Massey who took no part in the negotiations on behalf of FGL. The Special Committee members' interests also aligned with those of FGL shareholders because the Special Committee members all held substantial amounts of FGL stock.[201]

543.    The evidence shows that the deal price was a result of months of arm's-length negotiations, a careful analysis of FGL's public and private information, and a go-shop process in which FGL made efforts to secure a superior bid.

544.    FNF could not force a vote in favour of the transaction and only held 17% of the shares. Mr Massey had confirmed to Mr Foley that FNF were also willing to be 'a buyer *or* a seller'.

---

[201] The Special Committee members held the following number of beneficially owned FGL shares: Chinh Chu - 14,923,539; James Quella – 967,335; Tim Walsh – 40,816; Keith Abell – 222, 119; Patrick Baird – 30,816.



545.    The FGL Special Committee negotiated two price increases from FNF, from their original offer of US$11.00, to US$12.25, and then again to US$12.50. This latter price represented a premium of 23% over FGL's share price on the day prior to the merger, and a 41% premium over the share price two months prior to the announcement

*Collar*

546.    When FGL indicated that it was not prepared to enter the deal without a collar, FNF instead proposed walkaway rights in the event of a decline in the value of either FNF or FGL stock. The Special Committee held firm and refused to accede to FNF's demand that each side have a right to terminate the Merger Agreement if the market prices of either FNF or FGL stock declined by over 20%.

547.    This refusal turned out to be of importance, as neither FNF nor FGL foresaw the extent of the impact of the COVID pandemic at the time, which caused the market prices of the stocks of FGL's most comparable companies to decline by between 25.1% (AEL) and 37.1% (Athene).

548.    FNF may have well have chosen to terminate the Merger Agreement following the decline in the value of FGL and FNF's share prices if they had been given the contractual right to do so.[202] I accept Mr Quella's evidence that investors were concerned that FNF would use the effects of the pandemic as a reason to withdraw from the merger.[203]

*Mr Chu*

549.    As stated above, I accept that it was understandable and reasonable for the Special Committee to appoint Mr Chu to serve as its chairman and to facilitate negotiations, determining that he

---

[202] Day4/122:12-21} (Mr Quella: *("FNF came back and said, 'You cannot have -- you know what they said because it's written. 'We will give you the upward, downward but if we take that, then we get walkaway rights,' and the walk-away rights really meant that they could walk away from the deal and that was a big give in exchange for what they were prepared to do, and it turns out in hindsight, they could have walked away because the stock declined by 34 per cent, so I 'm actually glad that we didn't do that in that context.").*
[203] {Day4/137:25} – {Day4/138:22}



was the most "*appropriate person to lead negotiations.*'[204] Mr Quella convincingly explained that Mr Chu was the right person to negotiate the transaction against a strong counter-party, and did so with skill.

550.    I have come to the view on the available evidence that the incentives worked on Mr Chu and other members of the Special Committee to support achieving the highest price for the non-affiliated FGL shareholders.

551.    It has not been shown that Mr Chu was prepared to put his fiduciary and other responsibilities to one side.  Nor that he was prepared to override experienced business executives on the Special Committee, with the advice of their deal counsel, to conclude a low transaction price so that he could earn a fee of US$3.75 million, rather than sell his own 15 million shares for the best possible price.

552.    Mr Chu would seem to have been incentivised to get the highest possible value for FGL, above any other interest, given the financial interest he had in FGL, assuming the Company was to be sold.  I do not accept against the size of this ownership interest, that he was conflicted by the relatively smaller upside he stood to gain personally if the merger closed from the entity he owned and controlled at Blackstone.[205] There is no reason to doubt that the Company's case that Mr Chu would have used his knowledge of FGL, extensive professional connections, and history of dealings with Mr Foley and Blackstone to help achieve the best price he could.

553.    There has been no factual evidence from Mr Chu or anyone else from the Special Committee apart from Mr Quella.  Mr Quella himself owned a substantial number of shares in FGL.[206]He gave evidence that Mr Chu had "*the deepest and most profound… experience as a deal negotiator and transaction specialist combined with an "impeccable reputation" and*

---

[204] Day4/137:22-24
[205] Mr Davidson in response to Mr Boulton QC acknowledged Mr Chu's financial incentive in securing the best deal price, indicating that for every one dollar increase in the transaction price, Mr Chu stood to gain an additional US$15 million {Day9/189:9-13}.
[206] See FGL Form 10-K, dated 2 March 2020, at 130 showing that Mr Quella owned 967,335 FGL shares



*"stunning" record'[207].*There is no evidence advanced to the contrary Mr Chu was in the result unable to get Blackstone to bid, but he seems to have leveraged their interest to create some insecurity for FNF and to raise the price, according to Quella[208].There is no good reason to doubt his evidence.

*Go Shop process*

554. The evidence shows that there had been months of discussions between FNF and FGL both formal and informal before the Special Committee was able to "*[extract] the best price that [it] could for shareholders."[209]*

555. A 40-day "Go-Shop" period commenced from 7 February - 18 March 2020, in which Credit Suisse on behalf of FGL contacted 42 potential acquirers. As to the allegation that FNF and Blackstone had entrenched positions that put off potential buyers, it has not been suggested that there were any other buyers who the Special Committee and its advisers had overlooked or failed to identify.

556. It is not possible to infer that the lack of bids was due to anything wrong with the process. The timing, price and commercial factors relating to the potential acquirers and the target would be much more likely to be factors to explain the interest levels.

557. Mr Quella said:

> Q.      In this case you did not expect, for all the reasons we discussed, that a genuine competitive bid would come forward, did you?

---

[207] {Day4/137:25} – {Day4/138:22} (Mr Quella testifying that, *"among [all the] bankers and investors in the world, Chinh Chu would be one of the most prolific and accomplished, with an impeccable reputation and with a track record that is, quite frankly, quite stunning"*
[208] {Day4/139:15} – {Day4/140:7} (*"We kind of held out to FNF that, you know, Blackstone was still in the mix because we wanted them to feel, you know, some sense of insecurity that their bid might not be matched or offers would be better*
[209] *Quella* 1 §70



> *A.*     *I didn't put it as a high probability but it was a concerted and vigilant and intense attempt on our part as a special committee to find another bidder and to make available to the company the dynamic tension of having two multiple parties bid.*[210]

558.     Only one potential acquirer Kuvare, entered into a Non-Disclosure Agreement (NDA) with FGL. Kuvare received the Confidential Information Memorandum and the Company's projections[211] on signing the NDA .Any other potential bidder could have likewise done so. FGL in my view reasonably decided that in order for Kuvare to obtain data-room access and access to management engagement, it would need to first put forward a credible indicative bid and an indication of the sources of its funding. As Kuvare never did so, it never received such access.

559.     This was not a barrier to entry but a sensible and reasonable stipulation in my view.  There was concern that Kuvare, a competitor of FGL, was attempting to access confidential information by entering the NDA without any genuine intention to bid.  Mr Blunt said  that he was reassured by the fact that they would not receive data room access or management time until a credible and financeable offer was put forward [212]

560.     Nor do I accept that there was informational asymmetry in FNF's favour such that the playing field was not level for other bidders.

561.     The provisions of the merger agreement allowed the company to consider a competing takeover proposal after the end of the go shop. The go shop process was itself sufficiently open to permit superior bids.

562.      As I have recorded, I accept Mr Blunt's evidence that he was told by his head of M&A and another senior executive that they both believed that the Transaction Price exceeded fair value and no topping bigger would emerge from the go shop process. Kuvare, signed an NDA but

---

[210] {Day 4/117:11} – {Day 4/117:18}.
[211] But not as Mr Quella accepted the full FGL forecast Day 4/64:5} – {Day 4/64:7}.
[212] {Day 3/36:3} – {Day 3/37:9}.



ultimately did not submit a bid. Athene, according to Credit Suisse did not bid on the basis that valuation was a challenge ,presumably against the price required.

*Blackstone*

563.    I accept Mr Quella's evidence distinguishing the Blackstone entities involved with FGL."Blackstone Tactical Ops" ("BTO") was the owner of FGL common equity. GSO was the owner of the Series A Preferred Shares. BIS managed FGL's investment assets through the IMA[213]. Mr Quella explained that BTO and GSO each had its own rights and obligations to different investor bases. There were no overlapping officers, each entity would act independently of the others, and each pursued their own strategies.[214] These were, as the Dissenters accept, all separate legal entities.

564.    There was a suggestion by the Dissenters that 'Blackstone" as a group would have favoured FNF above a superior bidder in order to protect the IMA.  This would be on the basis of an improper trade-off within the Blackstone Group in which BIS obtained enhanced rights, but BTO and GSO ignored their fiduciary duties to their investors by failing to secure the highest price possible for their shares.  .

565.    It has not been shown that any of the Blackstone entities operated in a way which involved an improper trade off, a breach of any fiduciary obligation or which gave rise to a conflict-of-interest.  It has not been shown that Blackstone as a group had some coordinated interest with regard to FGL or the transaction or that anything improper was proposed or achieved. It is much more likely in my assessment that the fiduciary responsibility at each entity to its shareholders governed its intention and conduct, which was to maximise the value of its own investment in FGL, notwithstanding the provisions of the IMA.

566.    Furthermore, the IMA automatically renewed, regardless of whether FNF or another acquirer (or no one) acquired FGL. BIS did not need to do anything to protect its IMA as it had a

---

[213] {Day4/26:2-22}.
[214] Day4/27:17} – {Day4/29:1}.



perpetual duration. I accept that the IMA was simply a part of the Company's operative reality. Any potential buyer could have realised the benefits of the Company's relationship with BIS. The evidence shows that Blackstone's investment management fees were reasonably secure. Similarly Mr Chu's interest in MVB did not create a conflict of interest. Since MVB received its fees from Blackstone, through the automatically renewing IMA, its fees were going to be paid irrespective of the outcome of the Merger negotiations.

*Preferred shareholders*

542.  I also accept Mr Quella's evidence that the Special Committee had tried to get the preferred shareholders to commit not to veto any transaction that it recommended, but that they were unsuccessful because the preferred shareholders saw no need to give up those rights.

*567.*  Mr Quella's evidence rings true to me that the Special Committee did everything it could to "*get as many favourable parts of the transaction as possible,*" "*there are two sides to a negotiation*," and FGL could not force the Preferred Shareholders to give up rights they did not want to give up[215].

568.  In conclusion none of these alleged deficiencies lead to the conclusion that the deal process resulted in a price which is an unreliable indicator of fair value.

*Transaction price*

*Approach*

569.  In assessing the merger or transaction price in s.238 cases the Court bears in mind that "*Fair value*" and "*Merger price*" are not the same .Whilst these may equate in some cases this is not necessarily so. There may be other better methods to assess the fair value of dissenter shares.

---

[215]  {Day4/42:11-16}.



570.　　However, in conjunction with reviewing other methods which the Court is considering for their reliability, the Transaction Price can be evidence of fair value where the transaction process was properly conducted so as to ensure that the market was adequately tested and there is sufficient evidence that market conditions were such as to facilitate an arm's length transaction with all potentially interested parties.

571.　　I would respectfully apply and adopt Segal J's analysis in *Trina* [216] where he referred to sufficient evidence of '*market efficiency, fair play, low barriers to entry, outreach to all logical buyers*' and a well-designed sales process. The precise weight to be given to the transaction price depends upon the court's assessment of the process and whether it achieved these objectives, as well as the reliability of other methods.

*Decision*

572.　　The Transaction Price, in my estimation having regard to all the evidence provides a sound indicator of value because the sales process was well designed, at arm's length and represented a transaction between a willing seller and buyer. There were no serious competing bids which were either prevented from being made, or having been made, unreasonably rejected.

573.　　This case involves two U.S-listed public companies and what I have found to be a reasonably robust transaction process. Based on the facts of this case, a market-based approach yields the most reliable measure of fair value and I have concluded that the Transaction Price achieves the fairest outcome in all the circumstances. The DCF type analysis proposed by the Dissenters is not appropriate or suitable to determine fair value for FGL.

574.　　I have concluded that FGL and FNF engaged in an appropriately designed and reasonably robust transaction process resulting in a deal price that was seen by all interested parties to be fair at the time[217]. The large shareholders said to be conflicted benefitted from a higher price

---

[216] *Trina* §156 relying on *Dell*
[217] An institutional shareholder in FGL, Driehaus Capital Management LLC ("Driehaus"), contacted Mr Blunt specifically to convey that it had *"never considered the intrinsic value of the business to be anywhere near as low as $12.50/share"*.



and in my estimation sought to obtain the best price achievable in their own best interests and in the best interest of the unaffiliated shareholders.

575.   The process had adequately low barriers to entry for potential bidders .As indicated above, one potential bidder (Kuvare) received the extensive Confidential Information Memorandum and the Company's projections on signing an NDA .Kuvare and any other bidder could have received more detailed information about the Company's business on providing an indicative bid and an indication of the sources of its funding.

576.   I am satisfied that the provisions of the merger agreement in relation to termination fees, the 'go shop' process and matching rights were customary in the market[218] and there is no evidence to suggest that any potential bidder was dissuaded from making a bid.

577.   FNF certainly had a head start in the process for reasons relating to the previous corporate history, but was not so entrenched that it could not be dislodged by a serious competitive bid.

578.   I have had regard to the fact that the Transaction Price was, according to Professor Lehn, at a premium (22.8%) to the unaffected price and that the market price declined substantially between the date of the announcement and the Valuation Date.  Indeed it represented a 8.6% uplift on FGL's 5 February 2020 unaffected share price during the period between the announcement of the merger and the Valuation Date.

579.   This meant that on the one hand FGL's shareholders were left in a better position than investors in comparable companies whose stock prices declined substantially.[219]

580.   However, on the other hand it represented an 11.5% decrease from the announced price (US$12.50), hardly any increase on the first offer (US$11.00) made and rejected and 7.8% lower than the second offer (US$12.00) which was rejected.

---

[218] Day10/31:4-12}; {Day10/34:1-12}.
[219] 25.1% (AEL) and 37.1% (Athene).



581.   Nevertheless in circumstances where earnings were likely to fall, discount rates to rise and US$240m was wiped off the book value in the first six months of 2020, it was a good price in the context of the timing of the deal in relation to the uncertainty created by the pandemic. It fell less than any of the comparable companies because of the large cash component built into the Transaction Price.

582.   I also have considered the fact that leading analysts concluded at the time that the price would decline further if the merger did not close and that unaffiliated shareholders voted overwhelmingly in favour of the transaction at the EGM.

583.   Professor Lehn gives the Transaction Price no weight which logically means that in his view it provided more than fair value to the company.  He describes the Transaction Price as a ceiling for the fair value of the Company's shares.  The Dissenters also give it no weight, although Mr Davidson gives it a 15% weight.

584.   Having carefully weighed the factual evidence relating to the transaction process and in particular  the alleged deficiencies and weaknesses in it, I have reached the conclusion that it was not flawed or deficient so as to render the Transaction Price unreliable.

585.   The price achieved in my assessment was the culmination of an arms-length negotiation between the buyer and seller [220] at a fair market value. The Special Committee did its best in all the circumstances to realise the best deal for the unaffiliated shareholders who had all material information available to them. Mr Davidson accepted that unaffiliated shareholders would have been aware of the same alleged conflicts of interest that he identified in his report, as they were fully disclosed in the Proxy[221].

586.   The only other shows in town, Kuvare, Athene, and Blackstone did not bid which may well be partly because they each thought the price was too high [222].Mr Davidson accepted that the price

---

[220] Mr Davidson accepted that both Blackstone and FGL were willing to sell {Day10/21-11:8}.

[221] Day9/179:14-21}; {Day9/200:1-7}.

[222] {Day10/13:24} - {Day10/15:2}; {Day4/139:3} - {Day4/140:7}; {I4/126/2} (Email stating *"Athene and Apollo asked for an NDA but Wheeler (Athene's President) said it may be challenging to get to the right valuation."*).


could explain why there were no topping bids, and that at least one potential reason for the absence of competition was that the price offered was a full one[223].

587. It is also in my view probable that the onset of the pandemic may have dissuaded other potential bidders and rendered them more cautious.

*Covid*

588. In Professor Lehn's opinion although the Unaffected Price of US$10.18 provides a reliable estimate of the fair value of FGL's stock on 5 February 2020 (the last trading day before the Reuters report), it does not provide a reasonable estimate of the fair value of FGL on the Valuation Date, because it does not account for changes in economic conditions during the Interim Period .

589. In view of the declines in market prices , credit ratings[224] and financial performance of FGL and comparable companies over the period between 7 February and the shareholder vote on 29 May 2020[225] it is clear that COVID had a huge impact on stock values. There was a clear and obvious market downturn when assessed on the Valuation Date. FGL's book value fell and the market prices of comparable companies also fell. I do not accept the Dissenter's case that in view of such a decline in the value of the stock (which comprised 40% of the Merger Consideration,) the FGL Special Committee should have considered whether it ought to revise its recommendation prior to the EGM. It was in my view entitled to make a judgment call on the fairness of the price achieved in all the circumstances at the relevant time.

590. However, I accept Mr Salzedo QC's argument that the decline between the date of the announced price and Valuation Date was symptomatic of prices detaching from drivers of value and was not probative of the premium on the fair value of FGL shares contrary to the view Professor Lehn put forward.

---

[223] Day10/21-15:4}; {Day10/28:5-21}.
[224] Fitch ,Moodys and Standard and Poor
[225] Professor Lehn has shown in his report § 58 Chart 1 that the value of FGL's most comparable companies fell between 37.1% and 25.1%



591. In my view it would not be just and equitable to find a fair value for the Dissenters shares which adjusted the unaffected market price down to US$ 8.60 .Although the market generally believed the pandemic would have a substantial impact on the insurance industry when it hit in February 2020, there was subsequently a correction in the global markets as the pandemic began to be better understood and managed.

592. The statute requires application of the phrase “fair value” and 'fair' adds the concepts of just and equitable treatment, and flexibility, to 'value' for both Dissenters and the Company.I have concluded that Professor Lehn's Adjusted Unaffected Market Price approach should not be adopted as the sole determinant of fair value in this case. I accept Mr Davidson’s view that an adjusted price methodology is too speculative in this case in light of dislocation of market prices from the drivers of value on the valuation date.

593. The adjusted unaffected market price which reflect the economic impact of the pandemic also does not produce a value which I consider to be fair in all the circumstances. I therefore reject Professor Lehn’s view that an adjusted price methodology, including a regression analysis to assess the notional market trading price of an ordinary FGL share at the valuation date should be US $8.60 (which represents a fall of over 15%.)

594. The intrinsic value of FGL as at 29 May 2020 can be better and more fairly assessed as being the Transaction Price.

*Transaction price too high or too low?*

595. In reaching my view that the Transaction Price provides the best indicator of fair value in this case, having regard to all the circumstances ,I have considered Professor Lehn’s view that it may well be generous reflecting "*an upper bound on the fair value of an FGL ordinary share*" as it includes some elements of value resulting from the transaction that are not part of the going concern “*fair value*” of the Company, such as synergies .The buyer (FNF) expected gains would be achieved by the introduction of FGL's complementary annuity and life insurance business into FNF’s existing insurance business.


596.    It also may well have exceeded the assessment that was made of value by the shareholders who voted overwhelmingly in favour at the EGM. The Transaction Price also reflects the fact that the cash portion of the Transaction Price was fixed before COVID impacted FGL and, in particular, its securities portfolio, which FGL was required to mark-to-market. The stock component of the Transaction Price was tied to the value of FNF's shares, which declined. Assuming the efficiency of the market for FNF's shares, it would be unfair to hold that a shift in FNF's market price is indicative of an equivalent shift in the fair value of FGL's ordinary shares.

597.    Notwithstanding these considerations it is in my view the fairest outcome in the circumstances of this case.  Both parties supported the view that any component to which the court gives weight in its determination of fair value must be an unbiased indicator. The Court has adopted this approach to find a central and sound estimate.

598.    I have concluded that the Transaction Price of  US$11.06  is not a biased indicator, and indeed is the best central indicator of fair value  and should be given full weight .It is an estimate which the Court considers is equally likely to be below fair value ,as it is to be above it .

599.    I also note that recent Delaware cases have said that transaction prices generally are a better indicator of 'real price' than market price because the buyer has 'really thought about it'.  A transaction price can be the best indicator of fair value even if the buyer group might pay more[226].I have noted that  there is good contemporaneous evidence from Mr Blunt who was himself a substantial shareholder[227] at the time and as CEO  described it as a 'fair price' as of 7 February 2020 and an '*absurdly  good price'* by 29 May 2020 having taken some soundings from his senior team.[228]No doubt investors were considering the impact of the pandemic on

---

[226] *Columbia* 2019 WL 3778370 (Del.Ch.Aug.12 2019) p 59 , *Aruba*  210 A.3d 128 (Del.2019) and *Stillwater* 2019 WL 3943851 p 34 §38
[227] FGL Form 10-K, dated 2 March 2020, at 130 showing that Mr Blunt owned 821,348 FGL shares
[228] *See* {Day3/46:21} - {Day3/47:2} (Mr Blunt :*"So whatever I thought of fairness -- and I thought it was a fair price before -- afterwards, I made the logical leap the business is going to be worth less. How much less is obviously the point of the debate here, but in my mind, it was logical that it wouldn't be worth, it would probably be worth less. So that was the rationale.");* Management Meeting Transcript at 181- 182 *(Mr Blunt: "there was a view of the price when the deal was struck in February, which, again, I thought felt like a fair price, my head of*



FGL at the relevant time and all interested parties seemed to think it would be best if the deal completed.

600.    Taking all these matters into account in my view it provides a sound unbiased indicator and central fair value estimate and in my view is neither too low nor a 'ceiling'. A fall from US$12.50 as at 6 February 2020 to US$11.06 on 29 May 2020 (11.5%) in my view renders a fair overall outcome.

*Conclusion on fair value*

601.     The Court's assessment of the fair value of the Dissenters shares is the Transaction price, which had a blended cash/share value of US$11.06 per share.

*Minority discount*

602.    It is a general principle of share valuation that the court should value the actual shareholding which the shareholder has to sell and not some hypothetical share because in a merger the offeror does not acquire control from any individual minority shareholder. Accordingly in the absence of some indication to the contrary or special circumstances a minority shareholder's shares should be valued as a minority shareholding and not on a *pro rata* basis[229]. In an appropriate case based on the specific valuation evidence before it the court could however find that find no discount was required at all[230]. It is a fact specific exercise.

603.    Mr Davidson applies 2% having regard to the Dissenters minority shareholding position [231]arising from his DCF type approach. Professor Lehn provided no response.

---

*M&A thought it was a fair price, my chief investment officer thought it was too high a price, I would say, post-COVID, it was an absurdly good price.*").
[229] *Shanda [2020] UKPC 2 § 42*
[230] *Shanda* ibid § 55 and see *Qunar* §§403 and 406 and *Nord Anglia* §246
[231] Mr Davidson's selection of a 2% discount was chosen '*having regard to the full intrinsic value that flows to the benefit of the minority shareholder'.*

604.    In this case I am not persuaded that a minority discount is required to take into account any value attached to control, which should not be attributed to minority shares. The Court has decided that fair value in this case equates to the Transaction Price. There is no evidential basis for deciding the facts which arise from a requirement to value the Dissenters shares as minority shares rather than simply as a *pro rata* proportion of the Company shareholding as a whole.

605.     I therefore do not apply any minority discount as part of the valuation exercise in the circumstances of this case.

_____

**THE HON. JUSTICE RAJ PARKER**
**JUDGE OF THE GRAND COURT**