# EXHIBIT 10

[2009 CILR 553]

## LYXOR ASSET MANAGEMENT S.A.

*v.*

## PHOENIX MERIDIAN EQUITY LIMITED

*Court of Appeal*

(Chadwick, P., Forte and Mottley, JJ.A.)

**24 September 2009**

*Injunctions—anti-suit injunctions—injunction against foreign proceedings—on application to enjoin foreign proceedings, to show compelling reason to prevent other party from invoking legitimate right under foreign law (e.g. "unconscionable" to allow it to proceed)—not "unconscionable" to seek Title 28 depositions under US law if substantial and late amendment to defence and since US courts aware of dangers of oppression—safeguard may also be provided so that transcripts not used at trial without court order*

The respondent company brought proceedings in the Grand Court to recover the full value of its investment in a group of funds administered by the appellant.

The respondent, an investor in two Cayman funds which were managed by the appellant company, a wholly-owned subsidiary of a French bank, had redeemed the units it held in both funds before their maturity date and challenged the appellant's valuation of its investment. The appellant had only recently amended its defence, having first claimed the redemption price had to be reduced to take into account the right of its principal to be compensated for early redemption of its right to borrow units of the funds, and now clarifying it as a charge for the principal's role as leverage financier. As part of the respondent's trial preparations, it sought depositions from the appellant's key witnesses—both officers of a company in the group of its principal resident in the United States—under §1782 of Title 28 of the US Civil Procedure Code. The appellant applied for an injunction restraining the respondent from continuing proceedings in the United States to compel the witnesses to give depositions.

The Grand Court (Smellie, C.J.) held (in proceedings reported at *2009 CILR 342*) that the appellant's application seeking an injunction would be refused since it had not met the threshold test that it would be "unconscionable" to allow the respondent to proceed and it had therefore not overridden its legitimate right to invoke the procedure. Further, the US courts were well aware of the dangers of vexation and oppression under the procedure and there was no suggestion that Cayman law regarded double cross-examination as an abuse of process (since O.24, r.16 of the Grand Court Rules provided for pre-trial discovery by way of depositions).

On appeal against refusal to enjoin the Title 28 proceedings, the appellant submitted that the Grand Court, in considering whether the proceedings were unconscionable, had erred because (a) it relied on the US courts to protect witnesses from oppression; (b) it determined that Cayman law was not hostile to pre-trial cross-examination; (c) the respondent should have been restricted to the Cayman discovery process; and (d) it treated the principal as if it were the real party to the proceedings rather than the appellant but did not give it the status of being a participant in the action.

**Held,** dismissing the appeal and giving directions on the use of the depositions at trial:

(1) The decision of the Grand Court to refuse the injunction would be upheld since there was no basis to indicate that the lower court had erred in principle. The Grand Court had been correct to proceed on the basis that the US courts would provide adequate protection against potential abuse of the depositions or oppression of the witnesses. Protection was provided by the Federal Rules of Civil Procedure with the depositions taking place before a court reporter and the deponents would be accompanied by counsel, who could object to any question on the ground that it was embarrassing or oppressive. Moreover, there was no evidence that (a) the appellant would be exposed to any potential for oppression since the deponents were not its employees; (b) the employers of the witnesses had objected to the proceedings; nor that (c) it might discourage the witnesses from appearing at the trial. Further, it would be open to the Grand Court to restrict the use which could be made of the deposition transcripts, including their admissibility as evidence at trial, and this would provide further safeguards against abuse of process (paras. 43–47; para. 61).

(2) It was clear that the rules in Part II of O.24 of the Grand Court Rules made provision for discovery by oral examination and, while not identical to Cayman procedure, the proceedings under §1782 were not going far beyond the equivalent Cayman discovery process and thus it could not be said that Cayman law was hostile to pre-trial cross-examination (paras. 48–52).

(3) It was irrelevant that the respondent could have been confined to the ordinary Cayman process—through requesting better particulars or administering interrogatories—since *prima facie* a party who could invoke a legitimate right under foreign law would be entitled to do so and thus the relevant issue was whether it was acting oppressively by trying to rely upon it. Given the circumstances of the case— with the late and substantial amendment of the defence—it could not be said that the respondent was acting in abuse of process by seeking the depositions of the witnesses in New York rather than seeking interrogatories in the Cayman Islands (paras. 56–58).

(4) Finally, the Grand Court was entitled to recognize the commercial reality of the proceedings and that the principal's interest in the outcome

was a factor which indicated that it was not oppressive to allow the §1782 proceedings. Nor did it matter to the exercise of the respondent's legitimate right under US law whether the principal was treated as a participant in these proceedings. There was therefore no evidence that the Grand Court had erred in making its decision and since it was not for an appellate court to substitute its own view, the appeal would be dismissed. Further directions would be added that the transcripts of the depositions were not to be used at trial without an order of the Grand Court and that the appellant would be able to apply to have parts of the transcript redacted if they were to question the credit of the deponents (paras. 53–55; paras. 59–65).

**Cases cited:**

(1) *Armstrong v. Armstrong*, [1892] P. 98; (1892), 61 L.J.P. 63; 66 L.T. 384; 8 T.L.R. 339, referred to.

(2) *Nokia Corp. v. Interdigital Technology Corp.*, [2004] EWHC 2920 (Pat), referred to.

(3) *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487; [1986] 2 Lloyd's Rep. 317, referred to.

(4) *Sternson Ltd. v. CC Chemicals Ltd.*, [1982] 1 F.C. 350; (1981), 124 D.L.R. (3d) 76; 58 C.P.R. (2d) 145; 36 N.R. 507, considered.

**Legislation construed:**

Grand Court Rules 1995, O.24, r.16: The relevant terms of this rule are set out at para. 49.

United States Code, Title 28, §1782: The relevant terms of this section are set out at para. 24.

*C.J.D. Style*, *Q.C.* and *C.D. McKie* for the appellant;

*G. Halkerston* and *Ms. M. Hudson* for the respondent.

1. **CHADWICK, P.,** delivering the judgment of the court: This appeal is from an order made on May 22nd, 2009 by the Chief Justice in proceedings ("the Cayman proceedings") brought by Phoenix Meridian Equity Ltd. ("Phoenix"), a company incorporated in the Cayman Islands, against Lyxor Asset Management S.A. ("Lyxor"), a company incorporated under the laws of France, and Scotiabank & Trust (Cayman) Ltd. (formerly, the Bank of Nova Scotia Trust Co. (Cayman) Ltd. and, hereafter, "Scotiabank"). Scotiabank has taken no part in the Cayman proceedings.

2. The issue raised by the appeal is whether the Chief Justice erred in principle in refusing an application on behalf of Lyxor for an order restraining Phoenix from continuing proceedings in the United States District Court for the Southern District of New York under §1782 of Title 28 of the US Civil Procedure Code ("the §1782 proceedings") in the

course of which it seeks to depose two individuals—Mr. Samuel Rosenberg and Mr. Anthony Phlipponneau—who have given witness statements in, and are potential witnesses at the trial of, the Cayman proceedings.

3. The appeal was heard, with expedition, on July 6th and 7th, 2009 at a special session of the court. At the conclusion of the oral argument we dismissed the appeal and gave directions as to the use that could be made at the trial of the action of transcripts of oral depositions that Phoenix proposed to take from the two witnesses in New York. We stated our reasons for taking that course, but indicated that we would put our formal judgment into writing and hand it down in due course. We now do so.

**The underlying facts**

4. Phoenix is the sole investor in two funds—Patriot I Protected Fund ("Patriot I") and Patriot Focus Protected Fund ("Patriot Focus") (together "the funds")—of which Lyxor is the manager and Scotiabank is the trustee and registrar. Lyxor is a wholly-owned subsidiary of a French bank, Société Générale S.A. ("SG"). The funds are established by supplemental deeds under the Patriot Cayman Trust, an exempted trust established under the Trusts Law of the Cayman Islands by deed ("the trust deed") dated March 12th, 2003.

5. The object for which the funds were established was to provide leveraged exposure to a diversified portfolio of alternative investments as well as some degree of principal protection if held to maturity. The funds are identical in structure but differ in the amounts of leverage and principal protection which each respectively provides. Each was the subject of a fund specific memorandum ("FSM"). Each FSM provides that, on launch date, the fund would invest 100% of its assets in a corresponding leverage fund—respectively, the Patriot I Leveraged Fund and the Patriot Focus Leveraged Fund—and would simultaneously enter into swap and option agreements with SG. The swap and option transactions were described in the FSMs in these terms:

"The swap and option strategy will provide investors with partial protection of the principal of their investment . . . The fund will receive from SG (i) a put option on zero coupon and (ii) a put option on units of the [leveraged fund], and [(iii)] give SG the right to borrow units of the [leveraged fund] for hedging purposes."

The swap and option transactions were implemented for each fund pursuant to a confirmation of stock lending agreement executed between Lyxor, as manager on behalf of the fund, and SG.

6. The maturity date of the funds was December 31st, 2015 but the FSMs provided that, from March 16th, 2007 ("the lock-up date"), unit holders were entitled to redeem their units prior to the maturity date. On

redemption prior to the maturity date, unit holders are entitled to receive a price in cash calculated by reference to the net asset value ("NAV") of the units at the time of realization. The realization price is to be calculated in accordance with the valuation rules in Schedule 1 to the trust deed. Put shortly, the valuation rules require the NAV to be calculated by valuing the assets of each fund and deducting the liabilities attributable to that fund.

7. The financial statements in respect of each fund for the year ended January 31st, 2007 were delivered on June 1st, 2007. The balance sheets for the year end each include, under "Liabilities," an item described as "Over the counter option" ("the OTC option"). Note 2(c) to the financial statements explains that the OTC option is "valued at its fair value based on the price provided by [SG]." As at January 31st, 2007, the liabilities said to be represented by the OTC option are US$68,339,256 (in the case of the Patriot I Fund) and US$14,648,856 (in the case of the Patriot Focus Fund). The treatment of the OTC option as a liability of the fund is reflected in the figure for its NAV published by Lyxor weekly on its website.

8. Phoenix challenges the treatment of the OTC option as a liability of the fund. It is said on behalf of Phoenix that, as at July 17th, 2007 (shortly before the issue of these proceedings), the effect was to understate, by some US$112,872,710, the amount that would have been payable by Lyxor to Phoenix had Phoenix then given (as it was entitled to do) a redemption notice in respect of its investment in the funds.

**The Cayman proceedings**

9. These proceedings were commenced by the issue of a writ of summons on July 25th, 2007. The amended statement of claim (dated September 25th, 2007) sets out the grounds on which Phoenix based its contention that the OTC options (as described in the FSMs) could not have a negative value: that is to say, could not constitute liabilities of the funds. It is asserted that since the lock-up date (March 16th, 2007), Phoenix had desired to redeem the units which it held in both funds and that it had been informed by both Lyxor and SG that the realization price would be based on the NAVs shown on the Lyxor website. It is further asserted that it is wrongful and impermissible for Lyxor and SG to take that position: it is said that—

"the realization price payable on the [units] should be calculated without taking account of any part of the alleged 'liabilities' referred to in para. 20 hereof [attributable to the OTC option] and should instead be calculated based on the Leveraged Funds' NAVs."

The relief claimed includes a declaration to that effect and an order that Lyxor and Scotiabank forthwith permit immediate redemption by Phoenix

of the units which it holds in the funds "at a realization price, payable in cash, calculated based on the Leveraged Funds' NAVs."

10. On October 25th, 2007, Phoenix filed an application for summary judgment on its claim. In response to that application, Lyxor relied on an affidavit sworn on December 2nd, 2007 by Samuel Rosenberg, then a managing director of SG Americas Securities LLC ("SGAS"), a member of the Société Générale group based in New York, and Head of Equity Derivatives Sales for the North American region. Mr. Rosenberg stated in his affidavit that he had been the principal contact within the Société Générale group for Phoenix and its advisers. He deposed to the circumstances in which Phoenix came to invest in the funds and to the negotiations which (as he said) had taken place between those acting for SG and those advising Phoenix.

11. Lyxor served a defence on or about December 3rd, 2007. The allegations in that defence accord closely with those in Mr. Rosenberg's affidavit: indeed, Mr. Rosenberg confirms (at para. 3 of his affidavit) that the facts and matters stated in the defence are true (in so far as they are within his own knowledge) and true to the best of his information and belief (paras. 35 and 36 of the defence are in the same terms so far as material as paras. 12 and 13 of the affidavit).

12. The thrust of the defence was that Phoenix and its advisers understood from the outset that (i) the assets of the funds would include a bundle of rights and obligations under financial instruments to be entered into between Lyxor and SG (the interest rate put, the principal protection put and the final NAV averaging swap and the right to borrow, respectively described and defined in para. 35 of the defence); (ii) account would be taken of the fair value of that bundle of rights and obligations (together "the derivative") in calculating the NAV of units in the funds; (iii) the value of the derivative could be negative; and (iv) if the value of the derivative were negative, the NAV of units in the funds would be less than the NAV of units in the corresponding leveraged fund.

13. The reason why it was said that the value of the derivative could be negative appears from Mr. Rosenberg's affidavit of December 2nd, 2007:

"41 As appears from [Lyxor's] defence, [Lyxor's] case is that s.2 of the confirmation [of stock lending agreement] does not entitle [Lyxor] to terminate a loan at any time. The language of s.2 is clear, providing only for a right to make a request. In any event it was not the intent of the parties that there should be a right to terminate without a request by one party being accepted by the other party. I refer above [at paras. 12.4 and 16.4] to the fact that the right to borrow was essential to the economics of the structure, partly because it enabled SG to hedge its exposure under the principal protection put. Without the right to borrow, the transaction would

have been wholly uneconomical for SG which would never have assumed substantial potential liabilities for no return. Section 2 gave the parties the right to make a request but they were of course required to act in good faith both in making any such request and in responding to it. [Phoenix] had subscribed to units in the protected funds on terms that SG had the right to borrow all the units in the leveraged funds held by the protected funds until the maturity date (December 31st, 2015). It was perfectly understood between [Lyxor] and SG that in the event of early redemption [Lyxor] would be asking SG to surrender that valuable right and that it would do so only if it were compensated by payment of the value of the right to borrow. I am advised that this is what was required by the duty under French law to act in good faith."

14. The right of SG to be compensated by a payment in the event that the right to borrow units held by the funds was terminated by the decision of Phoenix to redeem its investment in the funds prior to the maturity date—a right which, if it is established, arises under the financial instruments entered into between Lyxor and SG (to which Phoenix is not a party)—has been referred to (wrongly as Lyxor contends) as a claim by SG to charge a "levy" on early redemption.

15. The application for summary judgment was dismissed by Henderson, J. on December 18th, 2007. He was persuaded that, in so far as the financial instruments entered into between Lyxor and SG were determinative of the redemption price payable to Phoenix, those instruments were to be construed according to the laws of France (as to which expert evidence would be required) and, in so far as the redemption price fell to be determined by reference to the documents under which the investment was offered to Phoenix ("the offer documents"), those documents were to be construed in the light of industry practice (as to which again expert evidence would be required).

16. Having failed to obtain summary judgment on its claim, Phoenix sought the determination, as a preliminary issue, of the question of what were its contractual rights under the offer documents. That application, made by a summons dated May 20th, 2008, came before the Chief Justice in July 2008. He dismissed the application. He took the view (expressed in the ruling which he delivered on July 28th, 2008) that ". . . what should have been a dispute amenable to resolution simply by construction of written documents, is to become a dispute involving personal recollections of a complicated factual matrix and a contest between experts." It was not a dispute suitable for resolution by the determination of a preliminary issue of construction.

17. The proceedings came back before the Chief Justice at a case management conference on September 2nd, 2008. At that hearing, the

Chief Justice gave directions for documentary discovery, for the exchange of witness statements and expert reports, for a pre-trial review on March 29th, 2009 and for a three-week trial to begin on May 4th, 2009. Lists of documents were exchanged and requests for further and better particulars of both statement of claim and defence were served in December 2008. On February 2nd, 2009, the Chief Justice made an order for a split trial: with the determination of the damages (if any) suffered by Phoenix to follow the determination whether or not the derivative could have a negative value (or, as it was put by the Chief Justice, whether SG could charge a "levy" on the early determination of its right to borrow units of the funds).

18. On February 20th, 2009, the parties exchanged witness statements. The witness statements served on behalf of Lyxor included statements made on February 19th, 2009 by Mr. Rosenberg and by Mr. Phlipponneau. Mr. Phlipponneau is also a managing director of SGAS: he works in the Global Equities and Derivatives Solutions Division of Société Générale Corporate & Investment Banking, which is, itself, a division within SG.

19. On March 11th, 2009, Henderson, J. gave Lyxor leave to amend its defence. An amended defence was served on the following day. The amendments were both extensive and substantial. In particular, it was alleged, for the first time, that Phoenix was aware, from earlier transactions with SG described in Mr. Rosenberg's witness statement of February 19th, 2009, that SG would make a charge to the funds for the liabilities which it assumed under the derivative, and that—

"it is standard market practice in the financial services industry with respect to principal protected products for the provider of a principal protected product to charge for the principal protection feature. Since no explicit payment was made for this feature either at inception or periodically, any participant in the said market would have understood that the derivative provided for in the offering documents would be valued (and therefore the components of the derivative paid for) on the basis that SG was through [Lyxor] entitled to be paid by the leveraged funds management and other fees (previously described to [Phoenix] as dividends and agreed to as such)."

20. It was said (at para. 41(A)), again for the first time, that Lyxor had at all times calculated the NAV of units in the funds "in accordance with the requirements of the offering documents." The methodology is described at para. 41A(5):

". . . The trading function of SG in New York obtains the NAV of the Leveraged Funds from [Lyxor] in Paris. SG then, using its options pricing model, which employs a hybrid equity interest rate model commonly used in the financial services industry with respect to principal protected products, calculates the value of the derivative by

calculating the value of a zero coupon bond that pays 80 or 50 (in the case of the Patriot I Protected Fund and the Patriot Focus Protected Fund respectively) at the maturity date of the protected funds and also calculating and adding to that the value of a call option on the final year average of the Leveraged Funds with a strike price of 80 or 50 (again in the case of the Patriot I Protected Fund and the Patriot Focus Protected Fund respectively), and then subtracting from that sum the NAV of the leveraged funds (formerly the value of the interest rate put was added as well, but that expired in March 2007). This yields the mark to market of the derivative. To this is added the NAV of the leveraged funds and the unrealized margin, which results in the NAV of the protected fund. This information is provided to [Lyxor], which performs validation functions before releasing the weekly NAVs for publication . . ."

21. It was said, again for the first time (at para. 41(A)(6)), that that methodology complies with Schedule 1 to the trust deed and the FSM for the protected funds. Paragraph 41B is in these terms:

"In the premise, upon their true construction the offering documents provide that, in the event that [Phoenix] chooses to redeem its units in the protected funds before the maturity date at a time when the NAV of the protected funds is less than that of the leveraged funds, [Phoenix] is entitled to be paid by [Lyxor] a price calculated by reference to the NAV of units in the protected funds and [Lyxor] is obliged to pay SG the mark to market of the derivative."

22. Further—although Mr Rosenberg had asserted in his affidavit of December 2nd, 2007 ". . . that s.2 of the confirmation does not entitle [Lyxor] to terminate a loan at any time. The language of s.2 is clear, providing only for a right to make a request"—it is pleaded (at para. 57(1) of the amended defence) that "the confirmations are not clear on the question whether [Lyxor] is obliged to pay SG the mark to market of the derivative on early redemption . . ."

23. On March 27th, 2009, the matter came back before the Chief Justice for pre-trial review. On the application of Phoenix, the Chief Justice vacated the trial date (set for May 4th, 2009) and directed that the trial be relisted to commence on September 28th, 2009 with a time estimate of four weeks. It is common ground that he did so in order to give Phoenix time to respond to what he saw as the substantially new case advanced by Lyxor in its amended defence.

**The §1782 proceedings**

24. §1782 of Title 28 in the US Civil Procedure Code is in these terms (so far as is material):

"§1782. Assistance to foreign and international tribunals and to litigants before such tribunals

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made . . . upon the application of any interested person . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure . . ."

25. On October 20th, 2008, Phoenix obtained an order under that section from the United States District Court for the Southern District of New York. The order required SGAS to produce documents at the offices of the New York counsel for Phoenix and provided for Phoenix to serve on SGAS subpoenas for deposition testimony at a future date without the need for a further application. SGAS did not move to discharge that order. We were told that, in due course, documents were produced to Phoenix by SGAS pursuant to that order.

26. Rule 30(b)(6) of the Federal Rules of Civil Procedure—which apply to deposition testimony under §1782 in a case (such as this case) where the order does not prescribe otherwise—provide that a party may name a corporation as the deponent and, where that has been done, that the corporation named must then designate one or more officers to testify on its behalf. On March 19th, 2009, Phoenix gave notice—pursuant to the §1782 order which it had obtained on October 20th, 2008 and r.30(b)(6)—requiring SGAS to identify and produce for deposition one or more officers or employees "who consent to testify on its behalf and are most knowledgeable as to" the 11 matters specified. Those matters included:

"The negotiation of, decision to enter into, and documentation of the Patriot investment structures between Lyxor and Société Générale, including without limitation any and all derivative components included therein, any payment terms intended to arise thereunder and the method of calculation of any such payments."

It is common ground that SGAS has identified Mr. Rosenberg and Mr. Phlipponneau as the persons to testify on its behalf in respect of the matters specified in the notice of March 19th, 2009.

27. Rule 30(d)(1) of the Federal Rules of Civil Procedure provides that unless otherwise ordered by the court, "a deposition is limited to 1 day of 7 hours." Rule 30(d)(3)(A) provides that "at any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." We were told

that, in practice, the deposition would take place before a court reporter who would be a notary public; that the individual deponent would, or could, be accompanied by counsel for SGAS; and that counsel could object to questions put to the deponent and, if so minded, take that objection to the District Court.

**The application for an anti-suit injunction**

28. On March 20th, 2009—that is to say, on the day after Phoenix had served its notice requiring deposition testimony in the §1782 proceedings—Lyxor applied by summons in the Cayman proceedings for an order that Phoenix be restrained from continuing or seeking to enforce the §1782 proceedings "to the extent that those proceedings seek the deposition of Mr. Samuel Rosenberg, Mr. Anthony Phlipponneau (both residents of the State of New York) or any other officer, director, managing agent or employee of [SGAS] resident in the USA" whether by seeking to enforce the deposition notice of March 19th, 2009 or otherwise. The summons sought an order directing Phoenix to withdraw or discontinue the deposition notice.

29. The application was supported by an affidavit sworn on March 24th, 2009 by Mr. John Driscoll, Director of Litigation and Regulatory Affairs for SG in New York. He stated that both Mr. Rosenberg and Mr. Phlipponneau—whom he described as important witnesses for Lyxor—had indicated to him "that they are currently willing to appear at trial in the Cayman Islands to give oral testimony." He confirmed his view that, having examined the deposition notice, he was satisfied that "in respect of almost all of [the 11 topics there set out] the most knowledgeable person(s) at SGAS are Mr. Rosenberg and Mr. Phlipponneau." He referred to a letter from Lyxor's counsel instructed in the Cayman proceedings in which it had been asserted that the deposition notice was "an improper and unconscionable interference" with the forthcoming trial in the Cayman proceedings for three reasons: (i) that it would be an unnecessary diversion of the parties' legal and other resources to prepare for and attend such depositions; (ii) that the testimony sought at the depositions would be duplicative of the testimony to be given at trial; and (iii) that it would be vexatious and oppressive for Phoenix to subject Lyxor's witnesses to double cross-examination. He went on to say this:

"16 If Phoenix is not restrained from deposing Mr. Rosenberg and Mr. Phlipponneau in the United States, then they will be subjected to examination by Phoenix twice: first in the United States by deposition and then again in the Cayman Islands at the trial. The inevitable result, should Phoenix not be restrained in the manner sought, would be the duplication of evidence and the time and expense associated therewith.

17 In the circumstances I respectfully submit that Phoenix is acting in an unconscionable manner by seeking to depose Mr. Rosenberg and Mr. Phlipponneau in the United States and that this is an unjustified and improper interference with the due process of the Cayman Grand Court and the fair conduct of this proceeding."

30. In response to the application, Phoenix relied on an affidavit (his ninth affidavit) sworn on March 26th, 2009 by Mr. Howard Kaplan, attorney-at-law and a member of the New York firm representing Phoenix in the United States. He explained—and it is not, we think, in dispute—that the test applicable to discovery under §1782 in the United States, including discovery by way of deposition testimony, is that the discovery should be relevant and potentially useful. He said this:

"19 The discovery which Phoenix seeks pursuant to r.30(b)(6) satisfies the standard for discovery under §1782 as it would be relevant and useful. The topics Phoenix identified in its 30(b)(6) notice are unquestionably relevant as they relate directly to the subjects raised by Mr. Rosenberg in his February 19th witness statement. Moreover, given the switch in defences in the Cayman litigation, the false statements in the affidavits Lyxor has submitted to the Cayman court, and the complicated subject-matter at issue, these depositions will clearly be useful in dealing with the obfuscation SGAS and Lyxor have pursued over the course of the past 18 months. *These depositions will also be helpful in testing the credibility of key witnesses before trial.*

20 The 30(b)(6) deposition testimony Phoenix seeks will also be useful in helping Phoenix prepare for trial. Phoenix expects the deposition testimony to help identify additional documents and witnesses, including other clients of Société Générale and SGAS who may have had disputes with Société Générale similar to the dispute at issue in the Cayman litigation. The testimony will assist Phoenix in understanding how Société Générale and SGAS interacted with other non-parties to the Cayman litigation, including Phoenix's financial and legal advisers as well as Permal. The 30(b)(6) testimony Phoenix seeks will also assist Phoenix's experts in the Cayman litigation by providing them with information concerning the processes Société Générale and SGAS used to value the Patriot Funds, and how they accounted for various fees charged to the Patriot Funds." [Emphasis supplied.]

31. The application came before the Chief Justice on April 3rd and 6th, 2009, that is to say, shortly after his order of March 27th, 2009 (vacating the trial date of May 4th, 2009) to which we have referred earlier in this judgment. On May 22nd, 2009, the Chief Justice dismissed the application, for reasons which he set out in the ruling which he handed down on

that day. It is clear from that ruling that he had in mind the amendments to Lyxor's defence which had led to the vacation of the trial date. He said this (*2009 CILR 342, at paras. 2–3*):

"2 . . . The dispute [in the Cayman proceedings] is over the sum of approximately $100m. which Lyxor claims it is entitled to withhold on behalf of its parent, SG. This large sum is in respect of what SG now claims as an 'undisclosed margin' or profit to which it is entitled for its part as investment adviser and leverage financier to the Phoenix funds.

3 Lyxor's claim on behalf of SG has only recently been clarified in the pleadings. Until then, it was rather differently pleaded in terms of a penalty or levy which SG was entitled to impose because of Phoenix's early redemption of its investments."

32. He went on to note (*ibid.*, at *para. 6*) that Phoenix had argued before him that it should be allowed to pursue the depositions of Mr. Rosenberg and Mr. Phlipponneau "because Lyxor has significantly changed its case in a manner which is inconsistent with the earlier sworn affidavit of its chief witness, Mr. Rosenberg." He observed that it was contended (*ibid.*) that "the deposition of Mr. Rosenberg and his colleague, Mr. Phlippponneau, will provide significant 'litigation benefits' to Phoenix (and, it is hoped, this court) in the trial to take place here in this action." He then set out (*ibid.*, at *para. 7*) the three main reasons which had been advanced by Lyxor in support of its application for an anti-suit injunction. Two of those reasons were, in substance, a restatement of the points made in the letter from Lyxor's counsel to which we have referred: the third was that the area of inquiry defined by the 11 topics which are the subject of the deposition notice "is far too broad and intrusive."

33. The Chief Justice observed that the application raised an important issue of Cayman civil procedure (*ibid.*, at *para. 8*):

"[W]hether the Cayman courts should intervene to prevent depositions in the United States, ordered by the US court to be given by deponents who are residents there, when the deponents are potential witnesses in a Cayman action in respect of which it is clear that the Cayman court is the only appropriate forum for the ultimate trial of the action."

34. Smellie, C.J. set out what he saw as competing issues of principle (*ibid.*, at *paras. 10–14*):

"10 . . . Unlike the position in many other Commonwealth jurisdictions including England, Cayman civil procedure does allow—pursuant to O.24, r.16 of the Grand Court Rules—oral discovery by way of depositions prior to trial. This is, however, as already noted, limited to officers of companies which are parties to the proceedings

before the court. So, while it may not be said that Cayman law is hostile to witnesses being cross-examined prior to trial, such a procedure remains unusual. No case concerning this procedure has been reported since O.24, r.16 of the Grand Court Rules was amended in September 2003 to permit this mechanism.

11 Apart from O.24, r.16 of the Grand Court Rules, there is, generally, no power by which the Cayman courts, on behalf of parties to the actions before it, can compel persons who are not parties to give a full measure of pre-trial discovery, where it includes both the disclosure and production for inspection and copying of documents, as well as the giving of oral or written testimony. In this regard, Cayman law and procedure differs essentially from that of several foreign jurisdictions, including the United States.

12 This court must therefore be alive to the natural concerns of practitioners about the possibility of such pitfalls as duplication of effort and oppression arising from the use of pre-trial depositions. These are considerations which are identified by Lyxor here as militating against the Title 28 proceedings from the perspective of the court in ways which, perhaps, would not trouble the US or other foreign courts where such pre-trial depositions are routine.

13 But the further issue of principle is the other side of the coin: it raises the question to what extent it is desirable or appropriate that a party to litigation before our courts should be prevented from availing itself of a statutory right which it may have under foreign law (here US federal law). The right here is one to apply for an order that persons resident in the foreign jurisdiction, who are themselves not parties to the action before this court and so not amenable to its process, should give pre-trial discovery by way of deposition evidence relevant to the issues in dispute before this court.

14 Framing the competing issues of principle in this way brings into stark relief the competing and equally important concerns which must be considered. It is plain from the outset that where a party has a right to avail itself of a legitimate foreign process, there must be a very compelling reason to prevent it from doing so— something more than just the philosophical differences of approach to litigation existing between jurisdictions."

35 The Chief Justice found assistance in what he described (*2009 CILR 342, at para. 15*) as the "now classical framework" for the consideration of the principles which should guide a court seised of an application for an anti-suit injunction set out by Lord Brandon of Oakbrook in *South Carolina Ins. Co.* v. *Assurantie Maatschappij "De Zeven Provincien" N.V.* (3) ([1987] A.C. at 40). It is, we think, pertinent to have in mind, also, Lord Brandon's observation (*ibid.*) that the power of the court to grant an

anti-suit injunction is "to be exercised with caution because it involves indirect interference with the process of the foreign court concerned."

36. The Chief Justice found further assistance in the judgment of Pumfrey, J. in *Nokia Corp.* v. *Interdigital Technology Corp.* (2), a case (like the present case) in which Lord Brandon's principles fell to be applied in the context of an application to restrain a party from pursuing discovery from non-parties under §1782 of the US Civil Procedure Code. After expressing approval of propositions which counsel derived from Lord Brandon's speech—propositions which are set out in the judgment in *Nokia* ([2004] EWHC 2920 (Pat), at para. 25) and, by the Chief Justice, in his ruling in the present case (*2009 CILR 342, at para. 16*)—Pumfrey, J. went on to say this ([2004] EWHC 2920 (Pat), at para. 26):

"This summary . . . shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision. There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by *Banker's Trust International Plc* v. *PT Dharmala* (unreported, December 1st, 1995, Mance, J., as he then was) and *Omega* v. *Viktor Kozeny* [2002] CLC 132 (Mr. Peter Gross, Q.C., as he then was). In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial. Mance, J. appears to have found little difficulty in concluding that such an application was abusive. In the latter case, Mr. Gross, Q.C. was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings."

37. After observing (*ibid.*, at para. 33) that "experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all," Pumfrey, J. nevertheless refused the injunction sought. He said this (*ibid.*, at paras. 34–36):

"34 On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded. If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely of doubtful utility but an abuse of process. If it were the case that the request would be automatically complied with by the

district court in the United States, then I would be prepared to confer a wide ambit on the term 'abuse of process.' But it is clear from the *Intel* case [*Intel Corp.* v. *Advanced Micro Devices Inc.*, 542 U.S. 241, decided by the US Supreme Court in 2004] that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35 Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings. This I cannot do . . .

36 Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought."

38. The Chief Justice directed himself, in the light of his examination of the English authorities, that the main question which he had to decide was whether to allow the Title 28 deposition to proceed would be "unconscionable." After examining the arguments addressed to him on behalf of the parties, he reached the conclusion that Phoenix had not satisfied that threshold test. Accordingly, he refused the injunction sought. In reaching that conclusion he made the following findings:

(i) It could not be denied that the 11 matters described in the deposition notice were of general relevance to the trial (*2009 CILR 342, at para. 18*).

(ii) The depositions were not to be restrained "simply for being duplicative in and of themselves" (*ibid.*, at *para. 19*).

(iii) The existence of O.24, r.16 in the Grand Court Rules made it impossible to assert that Cayman law regarded "double cross-examination as being, in and of itself, an abuse" (*ibid.*).

(iv) It was not said—and could not credibly be said—that Mr. Rosenberg or Mr. Phlipponneau would be deterred by the deposition process in New York "from coming to testify again at the trial." Nevertheless, the fact that they remained amenable to giving evidence in the Cayman proceedings did not diminish the concerns about unconscionability (*ibid.*, at *para. 20*).

(v) There were proper concerns over the proportionality of proceeding with the deposition process "when compared to the obvious inconvenience, costs and potential oppressiveness of the Title 28 depositions . . ." (*ibid.*, at *para. 21*).

(vi) There was (arguably at least) time enough before a trial at the end

of September 2009 for Phoenix to be able, by administering written interrogatories in the Cayman proceedings, to obtain the information which it sought (*ibid.*).

(vii) It was necessary to consider "whether a comparable forensic objective to that sought by the Title 28 process can be achieved by means of the ordinary process of this court without exposing the witnesses to what is perceived to be the potential inconvenience, costs and oppression of the Title 28 process" (*ibid.*, at *para. 24*).

(viii) The fact that the witnesses had committed their positions to witness statements "is not in and of itself a bar to Title 28 depositions." The question was whether there were "proper concerns about vexatiousness and oppression" (*ibid.*). But the US courts "are shown to be alive to such concerns" (*ibid.*, at *para. 25*). He could not proceed on the basis that those courts might fail to protect the witnesses from oppression: the evidence indicated that very similar objections to those raised before the Cayman court could be raised before the US court (*ibid.*, at *para. 26*).

(ix) This was not a case where Mr. Rosenberg and Mr. Phlipponneau could be treated as fully amenable to the jurisdiction of the Cayman court since they were not officers of Lyxor. They were officers of SG "seeking to advance what is ultimately SG's case" (*ibid.*, at *para. 28*).

(x) Reciprocity could be obtained in the circumstances since Phoenix was content to offer its main witness of fact for deposition under O.24, r.16 (*ibid.*, at *para. 29*).

**The appeal**

39. As we have said, the Chief Justice dismissed the application for an anti-suit injunction by an order made on May 22nd, 2009. He had provided copies of his ruling in draft to parties on May 15th, 2009. Notice of appeal from the order (not then made) was filed by Lyxor on May 21st, 2009. Grounds of appeal were lodged on May 29th, 2009 and a skeleton argument followed on June 23rd, 2009. The appeal was heard on July 6th and 7th, 2009.

40. Lyxor advanced five main grounds of appeal. These were that—

(i) the Chief Justice misdirected himself in law as to the correct test to be applied in considering whether to grant the injunction. It is said that he was obliged to address his mind to the issues of fact in evidence before him and make findings on whether the §1782 proceedings were or were not unconscionable. He erred in directing himself that he could not proceed on the basis that the US District Court might fail to protect the witnesses from oppression. If he had addressed his mind to the issues before him, he would have held that the §1782 proceedings were unconscionable;

(ii) the Chief Justice erred in his approach to the power conferred by O.24, r.16 of the Grand Court Rules. It is said that he was wrong to hold that Cayman law was not hostile to a witness being cross-examined in advance of trial. He ought to have concluded that the exercise of the power under O.24, r.16 depended on the circumstances. If he had done so, he would have concluded that in the circumstances of this case the §1782 proceedings were unconscionable;

(iii) the Chief Justice erred in his characterization of Lyxor's defence. It is said that he was wrong to hold that Lyxor was seeking to advance what was ultimately the case of its parent, SG, and that that approach led him, wrongly, to favour the deposition of SGAS employees in New York. He should have appreciated that Lyxor was "the real party in interest." If he had done so, he would have concluded that the §1782 proceedings were unconscionable;

(iv) although the Chief Justice was correct to hold that he needed to consider whether Phoenix could achieve a comparable forensic objective to that sought in the §1782 proceedings by means of the ordinary process of the Cayman court without exposing Lyxor to the potential inconvenience, cost and oppression of the §1782 proceedings, he failed properly to do so. He ought to have concluded that it was not necessary or desirable to subject the parties to the inconvenience, cost and oppression of the §1782 proceedings because Phoenix's legitimate interests in ensuring full and proper discovery could more efficiently be met through the administration of interrogatories in the Cayman proceedings; and

(v) the Chief Justice erred in holding that the witnesses could not be treated as "participants" in the Cayman proceedings, and in rejecting Lyxor's contention that, because they were properly to be regarded as participants, the need for recourse to discovery in the §1782 proceedings was "less apparent" as based on a false premise.

41. These grounds of appeal can be summarized in that the Chief Justice erred in five principal respects: (i) he left arguments on oppression to the New York court; (ii) he held that Cayman law was not hostile to pre-trial cross examination; (iii) he regarded SG, rather than Lyxor, as the real party in interest; (iv) he should have confined Phoenix to the ordinary processes of the Grand Court; and (v) he should have treated SG as a participant in this action. We will address the five grounds of appeal in turn.

**(1) Was the Chief Justice wrong to proceed on the basis that he could rely upon the New York District Court to protect Mr. Rosenberg and Mr. Phlipponneau from oppression?**

42. It is important to have in mind that the potential for abuse or oppression exists, first, in the course of the §1782 proceedings (that is to

say, in the course of the deposition process itself in New York) and, secondly, in the use to which Phoenix may seek to make in the Cayman proceedings of transcripts of the depositions taken in the §1782 proceedings.

43. It is difficult to see how Lyxor, itself, could be said to be exposed to any potential for oppression in the §1782 proceedings. The deposition notice has been served on SGAS, not on Lyxor, and the individuals to be deposed are employees of SGAS, not employees of Lyxor. It would have been open to SGAS to issue a notice to challenge both the original order made under §1782 and the deposition notice of March 19th, 2009 but SGAS has not chosen to do so. There is nothing in the affidavit of Mr. Driscoll (who does not purport to speak for SGAS) to suggest that SGAS—as distinct from SG or Phoenix—fears abuse or oppression if its employees are required to give deposition testimony in New York.

44. As we have said, the Federal Rules of Civil Procedure provide their own protection against the abuse of the deposition process or the oppression of individual deponents. The deposition can be expected to take place before a court reporter (who is a notary public). That officer will swear the deponent to his oath and record and certify the evidence that he gives. The deponent would be, or could be, accompanied by counsel for SGAS. The deponent, or counsel, could object to questions put on the ground that they were embarrassing or oppressive, and could take that objection to the New York District Court. The court could be expected to protect the witness against the misuse of the deposition process.

45. In those circumstances, we are satisfied that the Chief Justice was entitled to proceed on the basis that he could leave objections as to abuse or oppression arising in the course of the deposition process to be taken on behalf of SGAS (or on behalf of Mr. Rosenberg or Mr. Phlipponneau) before the officer taking the depositions under the Federal Rules of Civil Procedure, and (if and so far as necessary) before the New York District Court.

46. It was suggested, albeit faintly, that the deponents—having experienced cross-examination in the course of the deposition process—might, themselves, feel disinclined to undergo further cross-examination at a trial of the Cayman proceedings. We are not persuaded that senior executives in a major banking group—who, it must be assumed, are doing their best to give a truthful account of facts within their own knowledge—are likely to be intimidated by proper questions designed to probe and test their evidence. The point was not pressed before us.

47. The use to which the transcripts of depositions taken in New York may be put in the Cayman proceedings is, of course, a matter for the Grand Court. In contrast to the position under O.24, r.16 of the Grand Court Rules (to which we shall need to refer), no transcript of depositions

would be admissible as evidence at trial without an order of the Grand Court. In deciding what order to make in this respect, it will be open to the Grand Court to restrict the use which can be made of the deposition transcripts in the course of any cross-examination of Mr. Rosenberg and Mr. Phlipponneau at the trial. In our view, the Grand Court has ample powers to prevent abuse of its own process should the need arise.

**(2) Was the Chief Justice wrong to hold that the law of the Cayman Islands was not hostile to pre-trial cross-examination?**

48. The rules comprised in Part II of O.24 in the Grand Court Rules 1995 make provision for "discovery by oral examination." They were introduced in 2003 and are said to be derived from the rules in force in the Canadian provinces of Ontario and Saskatchewan. We were told that little use has been made of those Rules in the Grand Court but that they are part of Cayman law is not in doubt. They have no counterpart in the Rules of the Supreme Court formerly in force in England or in the current English Civil Procedure Rules.

49. Rule 16(1) provides that "in an action begun by Writ, the Court may make an order for discovery by oral examination of any party or, if the party is a body corporate, any officer thereof." Such an order may be made "if and so far as [the court] is of opinion that discovery by oral examination is necessary either for disposing fairly of the cause or matter or for saving costs": r.16(2). Rule 17 provides for the examination to "be taken down by a court reporter in the form of questions and answers" and the court reporter is "empowered to administer the oath." The examination of a person for discovery is in the "nature of a cross-examination": r.17(4). Objection may be taken to questions and the validity of any objection is determined by the court: r.17(8) and (9). Rule 18 provides for the use at trial of the transcript of an oral examination for discovery. In particular, "a party may put to an adverse party in cross examination any questions and answers contained in the transcript of his examination": r.18(4).

50. It is clear, therefore, that the Rules in Part II of O.24—that is to say, r.16, and its ancillary rules, r.17 and r.18—do make provision for pre-trial cross-examination (by way of oral discovery) in the course of litigation in the Grand Court. It cannot be said that the law of the Cayman Islands is hostile to pre-trial cross-examination. The most that can be said is that (i) it is not available generally in respect of non-parties or their employees and (ii) it is not available generally in circumstances where it might be relevant and useful, but only where "necessary either for disposing fairly of the cause or matter or for saving costs."

51. The interaction between §1782 proceedings in New York and examination for the purpose of discovery under comparable rules in Canada was considered by the Federal Court of Appeal in *Sternson Ltd.* v. *CC*

*Chemicals Ltd.* (4). *Sternson* was a case in which an injunction had been granted by the trial judge restraining the defendant from seeking to depose the assignor of a patent in the United States, under an order made pursuant to §1782. The trial judge had relied on the English authority of *Armstrong* v. *Armstrong* (1), a decision which may no longer be good law in England in the light of Lord Brandon's observations in *South Carolina Ins.* (3) (decided after *Sternson*). In reversing the trial judge—and distinguishing *Armstrong*—the Federal Court of Appeal said this ([1982] 1 F.C. 350, at paras. 17–18):

"17 . . . The most important distinction is that the process of compulsory oral examination for discovery under oath of an adverse party or of a witness was not available under the appropriate rules of the English Court. Under our Rules, such discovery is available in respect of an adverse party and of a party in the position of the party sought to be examined in this case, the assignor of the invention. It is, of course, true that Mr. Rehmar [the assignor] is not subject to such examination under Rule 465(5) [of the Canadian Federal Court Rules] because he is out of the jurisdiction. But he would be if he were in Canada. The procedure obviously is not a procedure we find vexatious or oppressive. It is a procedure which we ourselves apply in respect of assignors of patents who are within our jurisdiction. Mr. Justice Jeune [in *Armstrong*] was concerned that the witnesses in Vienna might be unwilling witnesses and might be subject to cross-examination. He was concerned that the mode of dealing with the testimony of the witnesses in Austria was a mode which would '. . . go far beyond any process of discovery recognised in the procedure of this country.' But that is not so in the present case.

18 It would also appear that the examination of Mr. Rehmar would be useful to the appellant. It may well be that the testimony could not be read in at the trial, but it would be of use in preparing the appellant's case, which is one of the purposes of an examination for discovery."

52. There are, of course, differences between the position in *Sternson* and that in the present case: in that O.24, r.16 of the Grand Court Rules could not be used, in the present case, to obtain discovery by oral examination from SGAS (or from Mr. Rosenberg or Mr. Phlipponneau) even if they were present in the Cayman Islands because SGAS is not itself a party to the Cayman proceedings. Mr. Rosenberg and Mr. Phlipponneau are not officers or employees of Lyxor; they are officers and employees of SGAS. But the underlying premise is the same: the existence of a comparable (although not identical) procedure for oral discovery in the jurisdiction in which the anti-suit injunction is sought is a relevant factor. The court, by allowing the §1782 proceedings to take their course, is not giving effect to procedure which (in its own eyes) is obviously

oppressive or vexatious: it is not going "far beyond any process of discovery" recognized by the law applicable in its own jurisdiction. The Chief Justice cannot be criticized for taking the view which he expressed in the course of his ruling.

### (3) Did the Chief Justice regard SG, rather than Lyxor, as the real party in interest?

53. It is said that the Chief Justice erred in treating SG, rather than Lyxor, as the real party in interest. We find it difficult to understand the basis for this criticism. The issue in the Cayman proceedings—as the Chief Justice appreciated—is the value to be attributed (as between Phoenix and Lyxor) to financial instruments issued by SG to Lyxor as administrator of the Patriot Funds. Both SG and Lyxor (but not Phoenix) have rights and interests under those instruments. It is plainly relevant to ask how, as between Lyxor and SG, those rights and interests should be valued, but the underlying question is whether (knowing that) the bargain made between those parties under those instruments was within the mandate of Lyxor as administrator of the funds. If Lyxor is obliged to pay SG in respect of the early determination of the right to borrow—and if that bargain was within the mandate of Lyxor as administrator of the Patriot Funds—then (*prima facie*, at least) the funds have to bear that liability. If, on the other hand, Lyxor is not obliged to pay SG in respect of the early determination of the right to borrow—or if the bargain made between Lyxor and SG was not within the mandate of Lyxor as administrator of the funds— then it may well be that the liability does not fall upon the funds. SG has an interest in the outcome of the Cayman proceedings, but it is not a party and it cannot be said that SG's interest is identical with, or displaces the interest of, Lyxor.

54. Nor, as it seems to us, can it be said that the Chief Justice thought that it did. Although he referred, in the course of his ruling, to Lyxor's defence to the Cayman proceedings as a claim "on behalf of SG" (see *2009 CILR 342, at para. 2* ("the sum of approximately $100m. which Lyxor claims it is entitled to withhold on behalf of its parent, SG"), at *para. 3* ("Lyxor's claim on behalf of SG"), and at *para. 4* ("Lyxor asserts the claim on behalf of its principal, SG")) he was, as it seems to us, doing no more than recognize the commercial reality which drives Lyxor to defend the Cayman proceedings. It is plain, as a matter of commercial reality, that Lyxor's underlying interest in the proceedings is to ensure that SG, as the counterparty to the derivative, obtains what it (and SG) regards as a proper return for the risk which SG had assumed. That the Chief Justice recognized this appears from his reference (*ibid.*, at *para. 2*) to the charge that Lyxor asserts it must make against the funds on early redemption being the sum "in respect of what SG now claims as an 'undisclosed margin' or profit to which it is entitled for its part as

investment adviser and leveraged financier to the Phoenix funds"; and, (*ibid.*, at *para. 28*) to Mr. Rosenberg and Mr. Phlipponneau as "key witnesses on behalf of Lyxor seeking to advance what is ultimately SG's case . . ."

55. The Chief Justice was entitled to take the view that, although the claim in the proceedings was brought against Lyxor (as it had to be), SG's interest in the outcome (both as Lyxor's parent company and as the counterparty to the derivative) was a factor which pointed to the conclusion that it was not oppressive to allow the §1782 proceedings and the request under the r.30(b)(6) notice to continue against SGAS and its employees, Mr. Rosenberg and Mr. Phlipponneau. There is no substance in the criticism advanced under this ground of appeal.

**(4) Should Phoenix have been confined to the ordinary process of discovery in the Grand Court?**

56. It was submitted on behalf of Lyxor that the Chief Justice should have appreciated that Phoenix could obtain all the information that it needed for the pursuit of its claim by the means provided by the Grand Court Rules: in particular, it could obtain what it needed by making a request for further and better particulars, by administering interrogatories, and by seeking further and specific discovery.

57. That submission may or may not be well-founded but it misses the point. As Lord Brandon explained in *South Carolina Ins.* (3), *prima facie* a party who can invoke the jurisdiction of the US District Court under §1782 may choose to do so. The choice (in the present case) arises from the fact that SGAS is resident in New York. The right to take pre-trial deposition testimony from Mr. Rosenberg and Mr. Phlipponneau is a right conferred by US law—it is not a right conferred by, or to be withheld under, Cayman law. The relevant question is not whether Phoenix could achieve a similar result in the Cayman Islands but whether (if it could) it is acting oppressively or abusively in seeking to rely on the right which it enjoys under US law.

58. In the particular circumstances of this case—having regard to the late amendment of the defence and the very considerable ground which needs to be covered arising out of the late amendment to the defence—Phoenix has taken the view that its interests are best served by seeking to obtain the information which it needs by taking oral depositions in New York—a relatively summary process— rather than by proceeding by way of further and better particulars and interrogatories in the Grand Court—with the potential for procrastination and delay inherent in that process. It cannot be said that, in making that choice, it is acting oppressively or unconscionably or that its choice amounts to an abuse of the process of the Cayman courts.

**(5) Should the Chief Justice have treated SG (or SGAS) as a participant in the Cayman proceedings?**

59. It is said that the judge should have treated SG as a participant in this action. That is a difficult submission to understand. SG is not (so far as we are aware) resident in New York and Mr. Rosenberg and Mr. Phlipponneau are not offered for deposition as employees of SG. It may be that the ground should be read as a criticism that the Chief Justice did not treat SGAS as a participant in the Cayman proceedings. But it is difficult to see any basis upon which it could be so treated.

60. If SGAS were a party to the Cayman proceedings, Mr. Rosenberg and Mr. Phlipponneau could be subject to requests for pre-trial oral examination under O.24, r.16 of the Grand Court Rules. It is because SGAS is not a party to the Cayman proceedings that Phoenix cannot proceed under that rule. Neither SGAS nor Lyxor have suggested that Mr. Rosenberg or Mr. Phlipponneau should be offered for pre-trial oral examination under that rule. There is nothing in this point.

61. We are satisfied that none of the grounds of appeal provide a basis for the appellant's contention that the Chief Justice erred in principle. It is accepted that, absent some error of principle, it is not for an appellate court to consider what order it might have made in the circumstances if it had been exercising its own discretion: it is not for an appellate court to substitute its own view for the view reached by the Chief Justice in the exercise of his discretion. *A fortiori* in the present case, where the Chief Justice has been closely involved in interlocutory matters in the Cayman proceedings since their inception and may be taken to be fully apprised of the detailed issues which arise in these proceedings.

62. Subject to one matter, therefore, we would have dismissed the appeal without further directions. But we were concerned to find in the affidavit of Mr. Kaplan of March 26th, 2009 the assertion that the pre-trial depositions of Mr. Rosenberg and Mr. Phlipponneau would "also be helpful in testing the credibility of key witnesses before trial." We have no doubt that that would not be a proper use of depositions in the context of a trial in the Cayman Islands.

63. The proper purpose of the pre-trial oral examination by way of discovery, in the context of a trial in this jurisdiction, is to ascertain what it is that the witnesses will say but not to seek to establish in the course of the oral examination that what they will say is not to be believed. It is for the trial court in the Cayman Islands to decide whether or not the evidence given at the trial is to be believed or not to be believed.

64. It was for this reason that we added directions in these terms:

"We direct that no use is to be made of the transcripts of the depositions of Samuel Rosenberg or Anthony Phlipponneau taken

pursuant to the deposition notice issued by the plaintiff, Phoenix Meridian Equity Ltd., under r.30(b)(6) of the US Federal Rules of Civil Procedure (whether by way of evidence or in the course of cross-examination) at the trial save as may be permitted by a future order of the Grand Court.

We further direct that the defendant, Lyxor Asset Management S.A., may apply to a judge of the Grand Court, who may be a judge other than the trial judge, for an order that such parts of the transcript of those depositions as may be specified in the application notice be redacted or deleted from the transcripts on the grounds that they constitute cross-examination going to the credit of the deponent."

65. If Phoenix were to trespass, in the course of taking depositions in New York, into cross-examination as to credit—an exercise which is recognized by counsel as inherently unwise (in that it is likely to be counter-productive to spring the cross-examination trap in advance of trial)—then Lyxor should have the opportunity of applying to a judge of the Grand Court, who may be a judge other than the trial judge (so that the trial judge does not have to look at the relevant passages), for an order redacting those parts of the transcripts. That, as it seemed to us, provided an adequate safeguard against the misuse of the depositions in the course of the trial. Further, of course, the trial is subject to the control of the trial judge, and he will allow only such use of the transcripts as seems to him to be useful and sensible in the context of the issues he has to decide.

*Appeal dismissed.*

*Maples & Calder* for the appellant; *Appleby* for the respondent.

[*July 7th, 2009: The Court of Appeal (Chadwick, P., Forte and Mottley, JJ.A.) refused the appellant leave to appeal to the Privy Council.*]